JONES DAY
Corinne Ball
Todd R. Geremia
Benjamin Rosenblum
Andrew M. Butler
250 Vesey Street
New York, New York  10281
Telephone:     (212) 326-3939
Facsimile:      (212) 755-7306

-and-

JONES DAY
Christopher DiPompeo (*pro hac vice* pending)
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone:  (202) 879-7686
Facsimile:  (202) 626-1700

*Proposed Counsel for the Debtor
and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,[1] | Chapter 11 |
| Debtor. | Case No. 20-12345 |

---

[1] The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York, the last four digits of its federal tax identification number are 7437, and its mailing address is 50 North Park Avenue P.O. Box 9023, Rockville Centre, NY 11571-9023.

- 1 -

| | |
|---|---|
| THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,<br><br>Plaintiff,<br><br>v.<br><br>ARK320 DOE, *et al.*,[2]<br><br>Defendants. | Adv. Pro. No. 20-01226 |

**DECLARATION OF KENNETH F. PORTER IN SUPPORT OF
THE DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
UNDER SECTIONS 362 AND 105(a) OF THE BANKRUPTCY CODE**

Kenneth F. Porter, being duly sworn, states the following under penalty of perjury:

1.  I am over twenty-one (21) years of age and I am fully competent to make this Declaration. I am a member and principal of Porter & Curtis, LLC, a professional services firm specialized in risk management and insurance consulting. I hold a Bachelor of Science degree from Dickinson College and a Masters in Business Administration in finance from Temple University. I have over 35 years of experience in the field of risk management and insurance consulting, brokerage, and advisory services, with particular expertise in integrated risk management and self-insurance structures for Roman Catholic Dioceses. I hold the following professional designations from the Insurance Institute of America: Chartered Property Casualty Underwriter, Associate in Risk Management, and Associate in Insurance Accounting and Finance.

2.  Since 2006, I have served as an advisor on risk management and insurance issues to the Diocese of Rockville Centre (the "Debtor" or the "DRVC"), the non-profit corporation

---

[2] A full list of the Defendants in this adversary proceeding is included in Exhibit A to the Complaint [Adv. Pro. ECF No. 1].

that is a debtor and debtor in possession in the above-captioned chapter 11 case.  In that capacity, I have helped the DRVC design its current risk management and insurance programs, place insurance and reinsurance, and write coverage forms.  I and my firm have also been responsible for notifying the DRVC's current and past insurance companies of new claims that could be covered under one or more of the DRVC's insurance programs.  From my work as an advisor to the DRVC, I have developed a personal knowledge of the DRVC's current and historical insurance programs.  This Declaration is based on my personal knowledge of these programs and reflects my best understanding of the DRVC's coverage with the documentation that is currently available.

3. To insure the DRVC's many activities, the DRVC maintains a broad insurance program.  Specifically, the DRVC purchased and continues to purchase commercial general liability ("CGL") primary, umbrella, and excess liability insurance policies to protect itself and various other entities from a myriad of risks.  These CGL policies provided and continue to provide substantial insurance coverage, including under the older policies, for claims arising out of sexual abuse or sexual misconduct.

4. The CGL policies provide coverage to the DRVC and the incorporated parishes, schools, and other Roman Catholic entities within the DRVC's territory (the "DRVC Related Parties").[3]  As "Named Insureds," the DRVC Related Parties have the same rights as the DRVC to the limits of liability under those insurance policies.  Thus, the limits of liability are "shared" between the DRVC and the DRVC Related Parties.  Importantly, these shared insurance policy proceeds are paid on a first-come-first-served basis, meaning that once the insurance company

---

[3] I understand that certain insurance companies have not agreed to defend certain DRVC Related Parties based on missing insurance policy documentation.  The DRVC has reserved all rights with respect to such coverage disputes.

- 3 -

has satisfied its obligation on a per-claim or aggregate basis for one insured, the insurance policy proceeds will not be available to other insureds.

5. From 1957 to the present, the DRVC purchased insurance policies from different insurance companies. These insurance policies can be broken down into three groups: the Royal years (from 1957 to 1976); the London Program years (from 1976 to 1986); and the Ecclesia years (from 1986 to the present).[4] Attached hereto as **Exhibit A** is an illustrative insurance coverage chart that summarizes the DRVC's coverage as written under the Royal and London Program policies.

### A. The Royal Policies (1957 to 1976)

6. From 1957 until 1976, the DRVC purchased both primary and excess or umbrella insurance coverage (as relevant, the "Royal Primary Policies" and the "Royal Umbrella Policies") from Royal Indemnity Insurance and Royal Globe Insurance Company (collectively now known as Arrowood Indemnity Company, "Royal" and its affiliates).[5] Over 100 of the State Court Actions include abuse or misconduct allegations that overlap with Royal's insurance policy periods. The Royal Policies cover both the DRVC and the DRVC Related Parties.

7. *Royal Primary Policies*: The Royal Primary Policies provide the first layer of insurance coverage for the DRVC and the DRVC Related Parties. These insurance policies do not have aggregate limits of liability, but they do have per-occurrence limits of liability. These per occurrence policy limits range from $150,000 to $300,000, depending on the policy period.

---

[4] The descriptions provided herein are intended to provide an overview of the DRVC's insurance programs. To the extent that the statements made herein in any way conflict with or are expanded upon by the insurance policies, the language in the insurance policies control. The DRVC reserves any and all rights with respect to its insurance policies. Furthermore, the DRVC and its advisors have not yet been able to locate copies of all relevant insurance policies and thus the descriptions provided herein may need to be amended to incorporate any newly-discovered evidence.

[5] From the founding of the DRVC in 1957 until 1960, the DRVC and the DRVC Related Parties were covered by Royal under policies purchased by the Diocese of Brooklyn.

- 4 -

This means that the Royal Primary Policies cover the first $150,000 to $300,000 of liability, for as many claims as may be asserted for any injury occurring during the policy period. The Royal Primary Policies also provide for an unlimited payment of defense costs for each claim, as long as the Royal Primary Policies' limits of liability have not been exhausted for any particular claim.

8. Until 1964, the Royal Primary Policies were the DRVC's only insurance coverage—there are no Royal Umbrella Policies before that date. Thus, for example, if a parish or another insured settles a claim for the policy limit, the DRVC would be left with no insurance coverage remaining for that particular claim, either for the ongoing defense or for any settlement or judgment against the DRVC.

9. *Royal Umbrella Policies*: From 1964 to 1976, Royal also provided the DRVC with excess or umbrella insurance coverage. The Royal Umbrella Policies cover liability that exceeds the limits of liability for the Royal Primary Policies.

10. From June 4, 1964 to June 4, 1966, the Royal Umbrella Policies had a $2 million per-occurrence limit of liability with no aggregate limit of liability per policy period. From June 4, 1966 to June 4, 1970, the per-occurrence limits were $4 million, apparently with no aggregate limit of liability per policy period. From June 4, 1970 to October 1, 1973, the Royal Umbrella Policies had per-occurrence and likely aggregate limits of liability of $4 million per policy period. And from October 1, 1973 through March 1, 1975, the Royal Umbrella Policies had per-occurrence and likely aggregate limits of $7 million per policy period. Finally, from March 1, 1975 through October 1, 1976, the Royal Umbrella Policies had per-occurrence and likely aggregate limits of $12 million per policy period. For each of those Royal Umbrella Policies with an aggregate limit of liability, once certain amounts equal to the aggregate limit of liability are

paid pursuant to the terms of that Royal Umbrella Policy, that particular insurance policy is exhausted and no new claims will be covered by that insurance policy.

### B. The London Program Policies (1976 to 1986)

11. From 1976 until 1986, the DRVC purchased insurance coverage (the "London Policies") from a syndicate of insurance companies known as the London Market Insurers (the "London Insurers"), with additional excess insurance coverage provided by various other insurers, including Interstate Fire & Casualty Company (collectively with the London Insurers, the "London Program"). Approximately 70 of the State Court Actions include allegations of abuse or misconduct during the London Policies' policy periods. Like the Royal Policies, all of the London Policies also cover both the DRVC and the DRVC Related Parties, and the insurance policy proceeds are shared between all co-insureds.

12. Under the London Policies, the insureds are required to cover the first $100,000 of liability per occurrence, an amount referred to as the "Self-Insured Retention" ("SIR").[6] From there, the London Policies provide an initial layer of insurance coverage containing two insuring agreements—an "Aggregate Agreement" and a "Specific Excess Agreement." The London Policies also provide a layer of umbrella insurance policies—the "Interstate Policies"—and upper layer excess insurance policies—the "London Excess Policies."[7]

13. *Aggregate Agreement*: The Aggregate Agreement is designed to reimburse the insureds for SIR payments above a prescribed SIR aggregate amount. This SIR aggregate amount was $1.2 million beginning with the first London Program insurance policy in 1976, and

---

[6] Generally, a "self-insured retention," or SIR, is a dollar amount specified in a liability insurance policy that must be paid by the insured before the insurer will respond to a loss. Insurance policies include "self-insured retentions" when the insured decides to retain some risk. Insurance policies that contain SIRs often have reduced premium costs and place the responsibility for handling the claim with the insured until the SIR is exhausted.

[7] Some of the London Market Insurers may currently be insolvent and unable to fulfill their obligations under the London Policies.

- 6 -

was incrementally increased to $4.5 million with the last policy ending in 1986. Once the insureds have made the applicable aggregate amount of SIR payments, the London Insurers are responsible for any additional SIR payments during that policy year up to a stated aggregate limit (ranging between approximately $500,000 and $1 million in later years). Any SIR payments above these limits would again be the responsibility of the insureds.

14. *Specific Excess Agreement*: The Specific Excess Agreement provides coverage for losses that exceed the SIR of $100,000, up to a specified per-occurrence limit. The Specific Excess Agreement contained per-occurrence limits of mostly $200,000, meaning that after the SIR was satisfied for a claim (either by the insureds or under the Aggregate Agreement), the Specific Excess Agreement required the London Insurers to cover the next $100,000 of liability for that occurrence.

15. Significantly, there is no aggregate limit of liability under the Specific Excess Agreement. As a result, the London Insurers continue to be liable for their share of all covered losses over $100,000, including for claims alleging injuries during a London Market policy period that have been recently asserted under the New York Child Victims Act (the "CVA").

16. Under the London Policies, defense costs are generally considered part of the ultimate net loss.[8] This means that incurring reimbursable defense costs depletes the available policy proceeds.

17. *Interstate Policies and London Excess Policies*: To cover losses beyond the amounts covered by the Specific Excess Agreement, the DRVC also purchased umbrella insurance policies as part of the London Program. The umbrella layer of coverage generally covered the difference between $200,000 and $5 million for each occurrence, with no aggregate

---

[8] The Debtor reserves the right to argue that the London Insurers have a duty to defend under the London Policies. To the extent that the statements made herein in any way conflict with or are expanded upon in the insurance policies, the language in the insurance policies controls, and the Debtor reserves any and all rights in that regard.

- 7 -

limit of liability, and was provided by Interstate and other insurance companies. The excess insurance policies covered per-occurrence liability above $5 million, up to a per-occurrence limit of liability of $5 million to $45 million, depending on the policy period. Typically, neither layer of insurance coverage included an aggregate limit of liability, meaning that those insurance companies still retain liability for new claims alleging injury during a London Program policy period, up to their share of the per-occurrence limits of liability.

18.     Thus, even while the automatic stay bars litigation against the DRVC, if a CVA plaintiff succeeded in establishing liability against a parish for sexual abuse occurring during the London Program policy periods, the parish would be able to draw insurance policy proceeds to cover the loss. For example, if the parish's liability for the claim was $200,000, the parish would be responsible for a $100,000 SIR, but may be entitled to have some or all of the SIR reimbursed from the insurance proceeds of that year's Aggregate Agreement. The parish would also be entitled to indemnification of $100,000 under the Specific Excess Agreement for the amount of the loss exceeding the SIR. Importantly, once the insurance company has paid its share of the covered loss to the parish, it will have no further obligation regarding that occurrence. As a result, if the DRVC later attempted to settle with that CVA plaintiff in its chapter 11 case, no insurance policy proceeds would be available under the Aggregate Agreement, and the proceeds paid to the parish under the Specific Excess Agreement would also not be available to the DRVC.

    **C. The Ecclesia Policies**

19.     Ecclesia Assurance Company ("Ecclesia") is the sole provider of insurance for the DRVC and the DRVC Related Parties for alleged sexual abuse that occurred after August 31,

1986.[9] Approximately 30 of the State Court Actions include allegations of abuse or misconduct triggering the Ecclesia insurance policies. Ecclesia is a captive property and casualty insurance company that provides insurance to the DRVC. It is a separate corporation that is wholly owned by the DRVC. Ecclesia was incorporated in New York in December 2003. The company is a licensed insurer and reinsurer. It is also subject to the supervision of the New York State Department of Financial Services.

20. The sexual abuse liability insurance coverage provided by Ecclesia is subject to per claim limits of $750,000 in excess of self-insured retentions (or deductibles) of $250,000 per claim and an aggregate limit of liability for sexual abuse claims of (i) $15 million for claims made before October 31, 2020 based on alleged incidents that occurred on or after September 1, 1986 and prior to October 31, 2019 and (ii) $7.5 million for claims made, and for claims based on alleged incidents that occurred, on or after October 31, 2019.

21. As with the Royal Policies and the London Program Policies, the DRVC Related Parties are co-insureds with the DRVC and the insurance policy proceeds are shared among all the insureds. Thus, if litigation were allowed to continue to judgment against a Parish, notwithstanding that the litigation has been automatically stayed against the DRVC, the Parish would be able to recover proceeds from the Ecclesia insurance policies, and those insurance proceeds would not be available to the DRVC to fund a judgment or settlement of claims. Indeed, because the Ecclesia insurance policies include aggregate limits of liability, a dollar of insurance recovery paid to a Parish is a dollar less insurance recovery available to the DRVC for *any* covered claims during that policy period, not simply for the particular claim.

---

[9] Ecclesia began providing insurance coverage in 2003 for sexual abuse claims made during the Ecclesia policy periods that allege wrongful acts after August 31, 1986.

22. Attached hereto as **Exhibit B** is a true and correct copy of currently available Royal Policies and related documents.

23. Attached hereto as **Exhibit C** is a true and correct copy of currently available London Polices and related documents.

24. Attached hereto as **Exhibit D** is a true and correct copy of currently available Ecclesia Policies and related documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 30th day of September, 2020, in Delaware County, Pennsylvania.

                                                           */s/ Kenneth F. Porter*
                                                           Kenneth F. Porter