UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 20-12345 (MG) |
| | ) | |
| THE ROMAN CATHOLIC DIOCESE OF | ) | Chapter 11 |
| ROCKVILLE CENTRE, NEW YORK, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | Adv. No. 20-01226 (MG) |
| THE ROMAN CATHOLIC DIOCESE OF | ) | |
| ROCKVILLE CENTRE, NEW YORK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| ARK320 DOE, *et al*., | ) | **Related Docket Nos. 127-30** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
UNDER SECTIONS 362 AND 105(a) OF THE BANKRUPTCY CODE**

i

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   SUMMARY OF ARGUMENTS ........................................................... 3

III.  FACTUAL BACKGROUND ................................................................ 6

    A.    The Bankruptcy.......................................................................... 6

    B.    The State Court Actions............................................................. 7

    C.    Mediation Has Failed. ............................................................... 8

    D.    The Competing Plans. ............................................................... 8

IV.   THE SHARED INSURANCE .............................................................. 9

    A.    The Royal Policies (1957 to 1976) ......................................... 10

    B.    The London Program Policies (1976 to 1986)....................... 11

    C.    The Ecclesia Policies (1986 to Present)................................. 12

V.    THE UPSTATE DIOCESE CASES (ROCHESTER, BUFFALO, AND SYRACUSE). 13

VI.   LEGAL ARGUMENT .......................................................................... 16

    A.    The Automatic Stay Does Not Apply to All State Court Actions. ....................... 16

        1.    Section 362(a)(1) Is Inapplicable to State Court Actions in Which the Diocese Is Not a Defendant. .............................................................. 16

        2.    Section 362(a)(3) Does Not Stay State Court Actions in Which the Diocese Is Not a Defendant. .................................................................... 18

    B.    An Injunction Under Section 105(a) Is Impermissible Because the Diocese Has Not Established the Court's Subject Matter Jurisdiction to Enjoin Each State Court Action in Which the Diocese Is Not a Defendant............................ 23

        1.    The Diocese Fails to Meet Its Burden to Establish "Related To" Subject Matter Jurisdiction. ............................................................... 26

        2.    The State Court Actions Allege Direct Claims Against the DRVC Related Parties. .................................................................................... 28

        3.    The Diocese Has No Indemnity Obligations to the DRVC Related Parties.................................................................................................. 30

    C.    The Diocese Cannot Meet Its Burden of Proof on Any of the Four Traditional Factors the Court Must Consider to Enjoin the State Court Actions Under Section 105(a) and Rule 7065. ..................................................... 32

        1.    The Diocese Cannot Demonstrate a Likelihood of Success Because Confirmation of the Diocese Plan Is Unlikely.......................................... 33

DOCS_SF:108611.1 18491/002

2.      The Diocese Cannot Meet Its Burden by Proving a Risk of Imminent,
        Irreparable Harm to the Estate. ................................................................... 35

        a.      The Diocese Cannot Prove that Continued Prosecution of
                Each State Court Action Will Dissipate the Proceeds of
                Shared Insurance Policies. ............................................................. 36

        b.      The Diocese Has No Indemnity Obligations to the DRVC
                Related Parties. .............................................................................. 38

        c.      Speculation About Piecemeal Litigation and Inconsistent
                Judgments Does Not Support an Injunction. ................................. 38

        d.      Prosecution of the State Court Actions Will Not Expose the
                Diocese to Risks of Collateral Estoppel and *Res Judicata*. .......... 42

        e.      The Diocese Cannot Show That Prosecution of the State
                Court Actions Will Burden and Distract the Diocese's
                Principals from Reorganization. .................................................... 43

    3.      The Harm to Survivors Outweighs Harm to the Estate. ........................... 45

    4.      The Public Interest Is Not Advanced by an Injunction. ............................. 48

CONCLUSION .................................................................................................................. 49

DOCS_SF:108611.1 18491/002

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*3M Occupational Safety LLC v. Those Parties Listed on Appendix A
(In re Aearo Techs. LLC)*, 642 B.R. 891 (Bankr. S.D. Ind. 2022)............................... 19, 24, 44

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir.1986) ...................................................................... 22, 23, 30

*Abouelmakarem v. Mdnma Inc.*,
2022 U.S. Dist. LEXIS 147579 (S.D.N.Y. Aug. 17, 2022)..................................... 17

*Bayview Loan Serv. LLC v. Fogarty
(In re Fogarty)*, 39 F.4th 62 (2d Cir. 2022) ....................................................... 16, 17

*Calpine Corp. v. Nev. Power Co.
(In re Calpine Corp.)*, 354 B.R. 45 (Bankr. S.D.N.Y. 2006)............................... 33, 43

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006)...................................... 25

*Deutsche Bank AG v. Metromedia Fiber Network, Inc.
(In re Metromedia Fiber Network, Inc.)*, 416 F. 3d 136 (2d Cir. 2005). .................. 41

*Diocese of Rochester v. AB 100 Doe (In re Diocese of Rochester)*,
2022 Bankr. LEXIS 1469 (Bankr. W.D.N.Y. May 23, 2022) .......................... *passim*

*Drennen v. Certain Underwriters at Lloyds of London
(In re Residential Capital, LLC)*, 563 B.R. 756 (Bankr. S.D.N.Y. 2016) ............... 39

*Dunaway v. Purdue Pharm L.P.
(In re Purdue Pharm. L.P.)*, 619 B.R. 38 (S.D.N.Y. 2020).............................. *passim*

*Elscint, Inc. v. First Wis. Fin. Corp.
(In re Xonics)*, 813 F.2d 127 (7th Cir. 1987) ....................................................... 24

*Feld v. Zale Corp.
(In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995),.............................................. 24, 25

*Fengler v. Numismatic Americana, Inc.*,
832 F. 2d 745 (2d Cir. 1987) ............................................................................. 32

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*,
25 F.3d 119 (2d Cir. 1994) .............................................................................. 33

*GAF Corp. v. Johns-Manville Corp.
(In re Johns-Manville Corp.)*, 26 B.R. 405 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219
(S.D.N.Y 1984)................................................................................................ 35

*Gold v. Johns-Manville Sales Corp.*,
723 F.2d 1068 (3d Cir. 1983) ........................................................................... 46

*Goldin v. Primavera Familienstiftung Tag Assocs.*
   *(In re Granite Partners, L.P.)*, 194 B.R. 318 (Bankr. S.D.N.Y. 1996) ............................ *passim*

*Gramatan Home Investors Corp. v. Lopez*,
   414 N.Y.S. 2d 308 (1979) ........................................................................................... 42

*Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*,
   2006 U.S. Dist. LEXIS 42499 (S.D.N.Y. Dec. 20, 2006) ................................. 33, 44

*Holman v. Johnson & Johnson*,
   600 B.R. 6 (Bankr. N.D. Ill. 2019) ........................................................................... 26

*In re Anje Jewelry Co., Inc.*,
   47 B.R. 485 (Bankr. E.D.N.Y. 1983) .................................................................. 32, 33

*In re Circle K Corp.*,
   121 B.R. 257 (Bankr. D. Ariz. 1990) ........................................................................ 22

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004) .............................................................................. 24, 26

*In re Diocese of Buffalo, NY*,
   618 B.R. 400 (Bankr. W.D.N.Y. 2020) ................................................................ *passim*

*In re Diocese of Buffalo, NY*,
   626 B.R. 866 (Bankr. W.D.N.Y. 2021) ....................................................... 13, 15, 16

*In re Imerys Talc Am., Inc.*,
   2019 U.S. Dist. LEXIS 120572 (D. Del. July 19, 2019) .......................................... 26

*In re Johns-Manville Corp.*,
   517 F. 3d 52 (2d Cir. 2008) ............................................................................... 22, 29

*In re Mariner Health Cent., Inc.*,
   2023 Bankr. LEXIS 95 (Bankr. N.D. Cal. Jan. 12, 2023) ................................... *passim*

*In re Metal Center, Inc.*,
   31 B.R. 458 (Bankr. D. Conn. 1983) ........................................................................ 18

*In re Roman Catholic Bishop of Great Falls*,
   584 B.R. 335 (Bankr. D. Mont. 2018) ...................................................................... 48

*Johns-Manville Corp. v. Asbestos Litigation Group*
   *(In re Johns-Manville Corp.)*, 40 B.R. 219 (Bankr. S.D.N.Y. 1983) ................................ 23, 29

*Konsky v. Escada Hair Salon*,
   113 A.D.3d 656 (2d Dep't 2014) .............................................................................. 31

*Law v. Siegel*,
   134 S. Ct. 1188 (2014) .............................................................................................. 24

*Littanzi v. State*,
   388 N.Y.S.2d 686 (3d Dep't 1976) ............................................................................ 17

*Lomas Fin. Corp. v. Northern Trust Co.*
   *(In re Lomas Fin. Corp.)*, 117 B.R. 64 (S.D.N.Y. 1990) ............................................. 43

iv

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*
(*In re LTL Mgmt., LLC*)*, 638 B.R. 291 (Bankr. D.N.J. 2022) .................................. 43

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc.*
(*In re Lyondell Chem. Co*), 402 B.R. 571 (Bankr. S.D.N.Y. 2009) .................................. 25, 33

*MacArthur Co. v. Johns-Manville Corp.*
(*In re Johns-Manville Corp.*), 837 F.2d 89 (2d Cir. 1998) .................................. 22, 29

*Manville Corp. v. Equity Sec. Holders Comm.*
(*In re Johns-Manville Corp.*), 801 F.2d 60 (2d Cir. 1986) .................................. 24

*Mardice v. Ebony Media Operations,*
2021 U.S. Dist. LEXIS 8520 (S.D.N.Y. Jan. 15, 2021) .......................................... 18

*McCartney v. Integra National Bank North,*
106 F.3d 506 (3d Cir.1997) .................................................................. 18, 23

*McHale v. Alvarez*
(*In re The 1031 Tax Grp., LLC*)*, 397 B.R. 670 (Bankr. S.D.N.Y. 2008)......................... passim

*McNutt v. GMAC*,
298 U.S. 178 (1936)............................................................................ 25

*Minoco Grp. of Cos., Ltd. v. First State Underwriters Agency of New Eng. Reins. Corp.*
(*In re Minoco Grp. of Cos., Ltd.*), 799 F. 2d 517 (9th Cir. 1986)............................. 22

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. The Roman Catholic Diocese of Brooklyn,*
2017 WL 748834 (N.Y. Sup. Ct. Feb. 27, 2017)..................................................... 11

*Nev. Power Co. v. Calpine Corp.*
(*In re Calpine Corp.*), 365 B.R. 401 (S.D.N.Y. 2007) .................................. 33, 35, 43

*Nuveen Mun. Tr. v. Withumsmith Brown, P.C.,*
692 F.3d 283 (3d Cir. 2012) .................................................................. 25

*Pacor, Inc. v. Higgins,*
743 F.2d 984 (3d Cir. 1984) .................................................................. 42

*Parmalat Capital Finance, Ltd. v. Bank of America Corp.*,
639 F. 3d 572 (2d Cir. 2011) .................................................................. 24

*Peak v. Bartlett, Pontiff, Stewart & Rhodes, P.C.,*
814 N.Y.S.2d 763 (3d Dep't 2006)............................................................... 17

*Publicker Indus., Inc. v. United States*
(*In re Cuyahoga Equip. Corp.*), 980 F.2d 110 (2d Cir. 1992)................................... 25

*Queenie, Ltd. v. Nygard Int'l,*
321 F.3d 282 (2d Cir. 2003) .................................................................. 23, 42

*Quigley Co., Inc. v. Law Offices of Peter G. Angelos*
(*In re Quigley Co., Inc.*), 676 F.3d 45 (2d Cir. 2012)......................................... 26

*Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
21 N.Y.3d 139, 991 N.E.2d 666 (2013).......................................................... 11

v

*Safeguard Ins. Co. v. Angel Guardian Home*,
    946 F. Supp. 221 (E.D.N.Y. 1996) ........................................................ 11

*Shapiro v. Cadman Towers, Inc.*,
    51 F. 3d 328 (2d Cir. 1995) ................................................................. 35

*Singleton Mgmt. v. Compere*,
    673 N.Y.S. 2d 381 (App. Div. 1st Dept. 1998) .................................... 42

*Sobchack v. Am Nat'l Bank & Trust Co. of Chicago*
    *(In re Ionosphere Clubs, Inc.)*, 17 F. 3d 600 (2d Cir. 1994)................. 22

*Solidus Networks, Inc. v. Excel Innovations, Inc.*
    *(In re Excel Innovations, Inc.)*, 502 F.3d 1086 (9th Cir. 2007) ............. 34

*SPV OSUS, Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018) ................................................................. 24

*Stanford v. Foamex L.P.*,
    2009 U.S. Dist. LEXIS 32405 (E.D. Pa. April 15, 2009)...................... 18

*Teachers Ins. & Annuity Assn v. Butler*,
    803 F. 2d 61 (2d Cir. 1986) ................................................................. 16

*The Roman Catholic Diocese of Syracuse, New York*,
    628 B.R. 571 (Bankr. N.D.N.Y. 2021) ............................................ 13, 33

*Travelers Casualty & Surety Co. v. Chubb Indemnity Ins. Co.*
    *(In re Johns-Manville Corp).*, 600 F.3d 135 (2d Cir. 2010)................... 29

*Travelers Casualty & Surety Co. v. Chubb Indemnity Ins. Co.*
    *(In re Johns-Manville Corp.)*, 517 F.3d 52 (2d Cir. 2008) ................... 25

*Travelers Indem. Co. v. Bailey*,
    557 U.S. 137 (2009).............................................................................. 25

*Trustee of Columbia Univ. v Mitchell/Giurgolas Assoc*,
    109 A.D.2d 449, 492 N.Y.S.2d 371 (1st Dep't 1985) .......................... 31

*W.R. Grace & Co. v. Chakarian*
    *(In re W.R. Grace & Co.)*, 591 F.3d 164 (3d Cir. 2009)........................ 42

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008).............................................................................. 32, 33

*XPO Logistics, Inc. v Malcomb*,
    2021 N.Y. Misc. LEXIS 479 (N.Y. Co. Feb. 5, 2021) .......................... 31

**Statutes**

NY CLS CPLR § 1001 ................................................................................ 17

**Other Authorities**

2 COLLIER ON BANKRUPTCY ¶105.03 (16th ed. 2022) ................................ 32

DOCS_SF:108611.1 18491/002

The Official Committee of Unsecured Creditors (the "**Committee**") of The Roman
Catholic Diocese of Rockville Centre, New York, the above-captioned debtor and debtor in
possession (the "**Diocese**"), opposes (the "**Opposition**") to the Diocese's *Motion for a
Preliminary Injunction Under Sections 362 and 105(a) of the Bankruptcy Code* [Docket Nos.
126-127] (the "**Motion**").[1]  In support of its Opposition, the Committee respectfully states:

## I.  <u>INTRODUCTION</u>

1.        For over two and a half years, the victims of child sexual abuse (the "**Survivors**")
agreed not to pursue their civil lawsuits against Parishes, schools, and other Catholic entities
(collectively, "**DRVC Related Parties**")[2] in the unfulfilled hope of achieving a consensual plan
that would enable Survivors to obtain closure and fair compensation for their suffering and
exploitation.  The Survivors repeatedly agreed to forbear from telling their tragic stories of abuse
to state court juries.  The Committee has participated in almost a year of mediation, including at
least eleven sessions with a combination of the Diocese, the Parishes, and the Diocese's insurers,
only to reach an impasse.  Unless litigation is allowed to move forward against the DRVC
Related Parties, neither the DRVC Related Parties, nor their insurers, will be motivated to
contribute to a global settlement that reflects their exposure for the harm caused to Survivors.

2.        At the outset of this adversary proceeding, in October 2020, the Survivors agreed
to a standstill of State Court Actions pending against the DRVC Related Parties to facilitate a

---

[1] Capitalized terms not otherwise defined have the meanings given to them in the Motion. All statutory references
are to the Bankruptcy Code unless otherwise noted.

[2] DRVC Related Parties includes the Parishes and certain affiliates of the Diocese. The Diocese maintains that
DRVC Related Parties are all separate entities from the Diocese whose assets are not being administered in this
chapter 11 case and, none of them is in bankruptcy proceedings.  Motion at 5.

1

global resolution of this case and a consensual plan of reorganization.  Docket No. 36 (the

"**Standstill Order**").  The Standstill Order has been extended nine times.  There are now 490

non-duplicative State Court Actions pending against the DRVC Related Parties, including 228

State Court Actions (the "**228 State Court Actions**") identified on Exhibit A to the Appendix of

Evidence filed herewith, that do not name the Diocese as a defendant and have no foreseeable

effect on the bankruptcy estate.[3]

3.      At present, the Committee is not opposing the Motion with respect to enjoining to

the 230 State Court Actions that name the Diocese as a defendant or the 32 that potentially

impact insurance proceeds under the Ecclesia program, as discussed below.  The remaining 228

State Court Actions, which are against non-debtors only, should proceed on the condition that a

Survivor may not enforce a judgment against, or receive a settlement payment from, insurance

policies that provides coverage to the Diocese as a named insured, absent further order of this

Court.

4.      The Diocese seeks to enjoin all of the State Court Actions without regard to

whether it can meet its burden to prove that the litigation will diminish shared insurance or

otherwise cause immediate and irreparable harm to the estate.  The Diocese's effort to shift the

leverage in this case by prohibiting Survivors from prosecuting their claims against non-debtors

---

[3] The Motion states "the Diocese is a defendant in 234 of the 503 cases subject to the current preliminary
injunction."  Motion at 15.  The Agreed Coverage Summary [Docket 169] and Related Insurance Schedules (defined
below, each derived from the Agreed Coverage Summary), subsequently stipulated to by the parties, identify 490
non-duplicative State Court Actions.

The Committee opposes an injunction of 228 State Court Actions that **do not** name the Diocese as a defendant or
implicate Ecclesia insurance coverage, set forth on Exhibit A to the Appendix of Evidence. Exhibits A1 through A6
("**Related Insurance Schedules**") break down the insurance coverage of the 228 State Court Actions as follows: (i)
108 Royal only, (ii) 70 London only, (iii) 29 Royal/London overlapping coverage, (iv) 17 no insured defendant, (v)
2 no coverage, and (vi) 2 no information pertaining to coverage.

2

while it engages in the futile and value-destructive pursuit of an unconfirmable plan with

coercive releases in favor of the same non-debtors must be rejected by this Court.

## II.  <u>SUMMARY OF ARGUMENTS</u>

5.      The Motion must be denied because (1) the automatic stay does not apply to the

228 State Court Actions in which the Diocese is not a defendant and there is no material impact

on shared insurance; (2) the Court lacks subject matter jurisdiction to enjoin all State Court

Actions in which the Diocese is not a defendant, and (3) the Diocese cannot meet its burden of

proof regarding each of the State Court Actions that it seeks to enjoin under the applicable four-

factor test.

6.      The Diocese cannot carry its burden to show that Bankruptcy Code section 362

automatically stays the State Court Actions against the DRVC Related Parties.  The Diocese

cannot prove that prosecution of each of the 228 State Court Actions in which the Diocese is not

a party will have a material adverse impact on the per-occurrence or aggregate limits of a

specific insurance policy that is property of the estate.

7.      None of the shared policies will have their available limits materially reduced by

prosecution of the 228 State Court Actions against the DRVC Related Parties.  First, the Royal

Primary Policies issued by Royal from 1957-1976, which do not have aggregate limits, are also

"non-wasting" policies, meaning that defense costs do not erode the Royal Primary Policies' per-

occurrence limits.  Porter Dec., ¶7.[4]  Second, while defense costs may reduce per-occurrence

limits under policies issued by the London Program between 1976 and 1986, the London

---

[4] Kenneth Porter is the insurance broker and advisor for the Diocese. *See also* Appendix of Evidence, Exhibit B
(Porter Tr. 48:2-10).

Program Policies with eroding coverage have sufficiently high per-occurrence limits (up to $100 million per-occurrence in some years)—and no applicable aggregate limits— that defense costs will not materially deplete coverage.  Porter Dec. ¶¶ 15-17 and Agreed Coverage Summary.  For example, if a State Court Action alleges one instance of abuse in January 1983, there would be $99,900,000 of insurance coverage under the London Program Policies available exclusively to defend against or resolve that single State Court Action.[5]  Thus, even if the DRVC Related Parties spent $10 million to defend that State Court Action, it would only result in a 10 percent reduction of the available per-occurrence limits for that single claim, meaning that the Diocese would still have $89,900,000 of insurance remaining under the London Program Policies to defend that State Court Action.[6]

8.     Moreover, because the Royal Primary Policies are "non-wasting," there can be no impact on those policies whatsoever prior to judgment or settlement.[7]  As a result, any immediate impact on the estate can be eliminated by an order that no judgment can be enforced against, nor any settlement paid from, insurance policies that name the Diocese as an insured without a further order of this Court.[8]  The Committee supports the entry of such an order.

9.     The Diocese has failed to carry its burden to show its entitlement to a preliminary injunction of the State Court Actions under section 105(a).  Recent decisions have held that a

---

[5] *See* Agreed Coverage Summary at 47, and Appendix of Evidence, Exhibit B (Porter Tr. 75:8- 76:10).

[6] *Id.,* Exhibit B (Porter Tr. 91:22- 92:9).

[7] *Id.,* Exhibit B (Porter Tr. 51: 3-9).

[8] *See Diocese of Rochester v. AB 100 Doe (In re Diocese of Rochester),* 2022 Bankr. LEXIS 1469, *19 (Bankr. W.D.N.Y. May 23, 2022) ("***Rochester***") (denying preliminary injunction of state court litigation while prohibiting plaintiffs "from attempting to enforce a CVA judgment granted by any court from executing against the proceeds of any insurance policy that names the Diocese as a co-insured, absent a further order of this Court.").

DOCS_SF:108611.1 18491/002

debtor's attempt to confirm a non-consensual plan over the objections of tort victims precludes a determination that a successful reorganization is likely.[9]  Accordingly, the Diocese cannot satisfy the first prong of the four-factor test.

10.    In addition, the Diocese cannot demonstrate a risk of imminent, irreparable harm to the estate if the State Court Actions proceed.  First, the Diocese acknowledges that none of the State Court Actions is close to trial.  Motion at 9.  Second, the Diocese admits it has no contractual indemnity obligations to the DRVC Related Parties.  Third, the Diocese has no risk of collateral estoppel or *res judicata* from the prosecution of State Court Actions to which it is not a party.  That the Diocese "historically" directed and administered litigation in which it was named as a defendant with DRVC Related Parties does not require it to do so today, especially as to State Court Actions in which it is not a party.  Fourth, the Diocese's argument that an injunction must issue because its General Counsel, Chief Operating Officer, and other unidentified key personnel will be distracted from the reorganization because they must review and approve settlements,  strategies, and expenses in the State Court Actions (Moore Declaration, ¶¶ 5-6) is not credible for actions to which it is not a party, its insurance is not diminished by prosecution of the actions, and after two and a half years, most of the reorganization work is handled by counsel and financial personnel.  The Diocese has retained an army of highly specialized professionals to assist with its reorganization efforts and cannot offer particularized evidence that prosecution of the State Court Actions will have an immediate and material impact on its reorganization efforts.

---

[9] *Rochester,* 2022 Bankr. LEXIS 1469, *18); *In re Mariner Health Cent., Inc.,* 2023 Bankr. LEXIS 95, *35 (Bankr. N.D. Cal. Jan. 12, 2023).

11.     Pending litigation, discovery deadlines, and trial dates motivate parties and their

insurers to realistically evaluate their litigation costs and risks, and ultimately to compromise.  If

all of the State Court Actions are stayed, settlement discussions will remain at a standstill.  If the

Diocese believes that a mediated resolution is still feasible, the prosecution of the 228 State

Court Actions will not foreclose settlement discussions.  Rather, allowing these State Court

Actions to proceed may break the impasse and foster progress toward a consensual plan.

### III.  <u>FACTUAL BACKGROUND</u>

### A.     The Bankruptcy

12.     On September 30, 2020 (the "**Petition Date**"), the Diocese filed a voluntary

petition for relief under chapter 11 in the wake of hundreds of lawsuits filed by Survivors of

sexual abuse under the New York Child Victims Act ("**CVA**") and in anticipation of the

assertion of more sexual abuse claims.  The CVA changed the statute of limitations and created a

"window" beginning August 14, 2019, during which victims of child sexual abuse whose claims

may have been time-barred could bring a timely civil action.

13.     The bar date for filing of sexual abuse claims against the Diocese expired on

August 14, 2021.  Six hundred fifty-three (653) unique, non-duplicative proofs of claim for

sexual abuse were filed prior to the expiration of the bar date.

14.     The Committee is comprised of seven men and two women.  Eight of the

Committee members are Survivors of child sexual abuse ranging from under-the-clothes groping

to repeated incidents of anal penetration.  For at least one of the Committee members, the abuse

began at age six.  Others ranged in age from eight to fifteen when their abuse began.  For some

DOCS_SF:108611.1 18491/002

Committee members, the sexual abuse was perpetrated over two to three years.  The ninth

Committee member is a guardian for a child who was subjected to serious racially-based

bullying at a diocesan school.  The perpetrators (and primary tortfeasors) were priests, teachers,

youth leaders and others *employed by various Parishes, schools, and other non-debtor entities*

affiliated with the Diocese.

### B.    The State Court Actions

15.    The Diocese seeks a stay of 490 State Court Actions, including the 228 State

Court Actions in which the Diocese is not a defendant and there is no foreseeable impact on

shared insurance.

16.    In the vast majority of the State Court Actions, the Survivors assert direct claims

(in contrast to derivative claims) against the DRVC Related Parties and other non-debtors,

including, without limitation, claims for: negligence; gross negligence; negligent hiring,

retention, supervision, and failure to warn; breach of duty; and premises liability.[10]  In many of

the State Court Actions, the Survivors also assert claims against non-debtors that are not DRVC

Related Parties, including another diocese, an unaffiliated religious order, or the New York

Bureau of Child Welfare.

17.    On October 29, 2020, the Diocese stipulated to Committee intervention in this

adversary proceeding.  [Docket No. 33].  On November 4, 2020, the Court entered the Standstill

Order.  The Committee has consented to the extension of the Standstill Order nine times and a

---

[10] Appendix of Evidence, Exhibit C (sample complaints filed in the 228 State Court Actions). The Survivors assert claims against the DRVC Related Parties in their capacities as parishes, schools, and administrators, independent of any alleged liability of the Diocese.

7

stay remains in place until the Court rules on the Motion.  *See* Docket Nos. 59, 69, 88, 98, 105, 112, 120, 137 and 157.

### C.    Mediation Has Failed.

18.    On October 20, 2021, the Court entered an order appointing Paul J. Van Osselaer as mediator and ordering the Committee, the Diocese, and the Diocese's insurers to mediate.  The first mediation session did not occur until April 2022.  Four months passed before the next mediation session was scheduled for August 2022.  The Parishes, for whom the Bishop and the Vicar General are the board chairs and vice chairs respectively, became mediation parties upon the Committee's insistence in June 2022 and the Committee received the Parishes' basic financial information in September 2022.[11]

19.    Since the Committee received the Parish financial information, the Committee has participated in multiple Zoom and in-person mediation sessions with a combination of the Diocese, the Parishes, and the Diocese's insurers, and understands the mediator has held multiple additional sessions focused only on other parties.  Mediation has not achieved a global settlement or likelihood of one.  The parties' negotiations are at a complete standstill notwithstanding discussions to engage a new mediator and a recent meeting among counsel to the Diocese, Parishes, and the Committee.

### D.    The Competing Plans.

---

[11] *See Notice of Additional Mediation Parties (Certain Parishes)* [Bankr. Docket No. 1170]; *Stipulation and Agreed Order Extending the Termination Date of the Preliminary Injunction Staying Continued Prosecution of Certain Lawsuits* [Docket No. 141].

The Diocese takes the position that the Committee has always had the "power" to join the Parishes as mediation parties.  Motion at 12 (citing Stephens Dec., Exh. B).  However, it is the Diocese that chairs each Parish board and the Diocese that seeks expansive third-party releases in favor of the Parishes in a reorganization plan.

8

20.     On January 19, 2023, the Committee filed a *Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors* [Docket No. 1574] ("the "**Committee Plan**").  The Committee Plan proposes the creation of a trust funded with $41 million from the Diocese, as well as transfer of ownership or proceeds from the sale of the Diocese's telecommunication assets, real estate, and captive insurance company.  The Committee Plan transfers avoidance actions, the Diocese's insurance claims, and causes of action related to insurance recovery to the trust as well.  Absent an acceptable, meaningful contribution to the trust based on settlement offers described in the Committee Plan, the Committee Plan does not release non-debtors and, if confirmed, Survivors will be able to pursue their claims against non-debtors.

21.     On January 27, 2023, the Diocese filed a *Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Rockville Centre, New York* [Docket No. 1614] (the "**Diocese Plan**") and related *Disclosure Statement* [Docket No. 1615] ("**Diocese Disclosure Statement**").  Under the Diocese Plan, a channeling injunction and non-consensual third-party releases would permanently protect the DRVC Related Parties (i.e., all Parishes and any other co-insureds under policies applicable to the Diocese) from past, present, and future claims by Survivors and such claims would be asserted exclusively against the trust.  The Diocese Plan imposes coercive releases upon the Survivors of all their direct claims against the DRVC Related Parties in exchange for payment of only $11.1 million, exclusive of insurance rights.

## IV.  THE SHARED INSURANCE

22.     The DRVC insurance policies fall into three primary buckets: the Royal years

(from 1957 to 1976); the London Program years (from 1976 to 1986); and the Ecclesia years

(from 1986 to the present).  Motion at 6-9. Contrary to the Diocese's representations, defense

costs or damages incurred by the DRVC Related Parties in the State Court Actions will not

deplete estate resources in all of the cases.  Motion at 1.  Rather, each insurance program

provides distinct policy terms and conditions, which create significant variations on the

conceivable impact of a particular State Court Action on the shared insurance.

### A.     The Royal Policies (1957 to 1976)[12]

23.     The Royal Policies consist of primary and umbrella insurance policies with policy

periods running from 1957 to 1976.  Porter Dec. ¶ 6.  There are 108 State Court Actions that do

not name the Diocese as a defendant and fall only within the Royal Policies period.[13]

24.     The Royal Policies provide for "an unlimited payment of defense costs for each

claim," (Porter Dec. ¶ 7) as long as the Royal Primary Policies' per-occurrence limits of liability

have not been exhausted for that claim through indemnity payments.  The Royal Policies are

"non-wasting" policies, meaning that defense costs do not erode the policy limits. Thus, before

judgment or settlement, there is **no impact** on the shared Royal Policies from the 108 State Court

Actions falling only within the Royal period.

25.     The Royal Primary Policies have no aggregate limits.  Porter Dec. ¶ 7.  The

payment of any one claim under the Royal Primary Policies would not impact the availability of

---

[12] The DRVC insurance program is described in the Motion and the Agreed Coverage Summary.

[13] Appendix of Evidence, Exhibit A1.

insurance under those policies for the payment of any other claims.[14]

26.        An order prohibiting enforcement of any judgment against, or payment of any

settlement from, shared insurance, absent further order of this Court, eliminates the risk of any

immediate impact on the Royal Policies from any future settlement or judgment.

### B.        The London Program Policies (1976 to 1986)

27.        The "London Program Policies" consist of primary and excess insurance policies

with policy periods running from 1976 to 1986.  Porter Dec. ¶ 11.  The London Program Policies

include primary coverage purchased by the Diocese from a syndicate of "London Market

Insurers," with additional excess insurance coverage provided by various other insurers,

including Interstate Fire & Casualty Company.  There are a 99 State Court Actions that do not

name the Diocese as a defendant that fall in the London Program period.[15]

28.        Unlike the Royal Policies, defense costs do erode the per-occurrence limits of the

---

[14] Even if there were aggregate limits under the Royal Primary Policies (there are not), Royal's exposure in each policy year for claims spanning multiple policy periods is even greater.  The Diocese's broker agrees that insurance available for any one claim of repeated abuse would likely be **many multiples** of the per-occurrence limit—not a single per occurrence limit.  Appendix of Evidence, Exhibit B (Porter Tr. 49:25- 50:8).

*See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. The Roman Catholic Diocese of Brooklyn*, 2017 WL 748834, at *7 (N.Y. Sup. Ct. Feb. 27, 2017) ("[T]he incidents of abuse suffered by each of the claimants constituted multiple occurrences and there was at least one 'occurrence' per claimant per policy period because the injuries suffered by each claimant were unique to that claimant in a given policy year and caused by separate incidents."); *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 21 N.Y.3d 139, 149, 991 N.E.2d 666, 672 (2013) (concluding that a priest's alleged sexual abuse of the same child taking place over a six-year period constituted multiple occurrences); *Safeguard Ins. Co. v. Angel Guardian Home*, 946 F. Supp. 221, 231 (E.D.N.Y. 1996) (determining that number of occurrences under liability insurance policies was equivalent to number of policy periods during which insured's actions led to exposure of the foster children to the sexually abusive conditions). Beginning in 1964, the Diocese also purchased umbrella insurance from Royal, again with no aggregate limits for many years, with $2 million per-occurrence limits from 1964-66 and $4 million per-occurrence limits from 1966-70. (Porter Dec. ¶ 10). Aggregate limits only began to apply on the Royal Umbrella Policies (but not the Royal Primary Policies) beginning on June 4, 1970. *Id.*

[15] 70 State Court Actions that do not name the Diocese as a defendant fall entirely within the London Program period and 29 State Court Actions that do not name the Diocese as a defendant overlap between the Royal and London Program Periods.  *See* Appendix of Evidence, Exhibits A2-A3.

11

London Program Policies.  Porter Dec. ¶ 16.  Still, the London Program period has

extraordinarily high per-occurrence limits for defense costs and indemnity payments.  *See*

Agreed Coverage Summary (reflecting per-occurrence limits of $100 million for certain years in

the 1980s).  An order prohibiting enforcement of judgments against shared insurance mitigates

any potential risk of material erosion.

29.       In addition, there are no applicable aggregate limits of liability for the London

Program Policies, meaning that the payment of per-occurrence limits on behalf of any one claim

does not impact the availability of per-occurrence limits for any other claim.  *See* Agreed

Coverage Summary at fn. 4-5 and Porter Dec. ¶¶ 15, 17.

30.       The massive per-occurrence limits available during this period—and the lack of

any applicable aggregate limits—precludes a finding that defense costs incurred for the State

Court Actions falling within the London Program period have any meaningful impact on the per-

occurrence limits available under the London Program Policies.

## C.      The Ecclesia Policies (1986 to Present)

31.       Ecclesia Assurance Company ("**Ecclesia**"), the Diocese's captive insurance

company, is the sole provider of insurance for sexual abuse claims occurring after August 31,

1986.  Porter Dec. ¶ 19.  The Committee recognizes that prosecution of certain claims that fall

within the Ecclesia period could materially affect limits available to the Diocese at some point

based on eroding limits of liability and available aggregate limits, and therefore does not oppose

an injunction of such State Court Actions at the present time.

32.       The differences between the insurance programs show that the Diocese cannot

establish its entitlement to an injunction of **all** State Court Actions and the Committee is not

opposing the injunction for those actions in which defense costs may erode policy limits in a

meaningful way.

## V.   THE UPSTATE DIOCESE CASES (ROCHESTER, BUFFALO, AND SYRACUSE)

33.    Recent decisions in the other New York diocese cases explain why (i) the

automatic stay is inapplicable to the 228 State Court Actions and (ii) a section 105 injunction is

improper.  *Rochester,* 2022 Bankr. LEXIS 1469 (denying extension of standstill agreement after

two years of unsuccessful negotiations to achieve a consensual plan); *The Roman Catholic*

*Diocese of Syracuse, New York,* 628 B.R. 571 (Bankr. N.D.N.Y. 2021) ("***Syracuse***") (granting

preliminary injunction applicable to six CVA actions when the committee unanimously

stipulated to stay litigation in exchange for discovery and "rogue" defendants objected through

their counsel); *In re Diocese of Buffalo, NY,* 618 B.R. 400, 405 (Bankr. W.D.N.Y. 2020)

("***Buffalo I***") (granting two-month stay at the outset of the case to allow the diocese to gather

evidence regarding shared insurance); *In re Diocese of Buffalo, NY,* 626 B.R. 866 (Bankr.

W.D.N.Y. 2021) ("***Buffalo II")*** (granting preliminary injunction extension for 36 CVA actions

by non-consenting litigants when the committee stipulated to stay litigation in exchange for

discovery, the debtor was making progress gathering insurance information, and the debtor was

expected to report back on filed claims and the status of a reorganization plan).[16]  Each case is

discussed in more detail below based on its facts and the relevant considerations that supported

---

[16] *See also In re Diocese of Buffalo,* Bankr. W.D.N.Y. Adv. No. 20-1016, Docket No. 261, *Decision and Order* entered Aug. 11, 2022 ("***Buffalo III***") (preliminary injunction extended to 49 actions by non-consenting claimants where committee stipulated to extension on behalf of other survivors and parties were scheduled to resume mediation).

DOCS_SF:108611.1 18491/002

the decisions.

34.     The facts here mirror those in *Rochester*.  The Diocese's argument in its Motion that *Rochester* is "nothing like" the present case because "mediation is just beginning" (Motion at 24 n.15) is incorrect.  In both cases: (i) the Survivors extended the standstill agreement multiple times hoping to facilitate a global settlement through mediation; (ii) the parties reached an impasse in the mediation two and a half years after the case was filed and the Survivors refused to consent to further extensions of the standstill agreement; and (iii) the entire Survivor class opposed the continuation of the stay.

35.     After concluding the automatic stay does not apply to parishes and other non-debtor affiliates, Judge Warren held that the debtor did not satisfy its burden under the four-factor test for a preliminary injunction under section 105.  His reasons included: (i) the diocese's suggestion it might pursue a non-consensual plan precluded the court from finding a likelihood of successful reorganization; (ii) the diocese's arguments that absent an injunction, litigation against the non-debtor affiliates would deplete insurance proceeds, create risks of collateral estoppel, evidentiary prejudice, and divert its key personnel from the reorganization, were not supported by evidence and insufficient to show immediate and irreparable harm to the estate (as here, the CVA cases were in the early stages); (iii) the balance of harms tipped in favor of the abuse survivors as the "sands of time are working against them;"[17] and (iv) the public interest is advanced by allowing the abuse survivors to seek justice from a jury of their peers.  The court noted that if non-debtor affiliates need to stay litigation without the survivors' consent, the

---

[17] *Rochester,* 2022 Bankr. LEXIS 1469 at *21.

proper remedy is for them to seek bankruptcy protection, not for the court to issue a sweeping injunction.[18]

36.    In *Rochester,* after two and a half years in fruitless mediation and just five months after Judge Warren permitted litigation against the parishes to proceed, the diocese and the committee entered into a restructuring agreement.[19]  The Diocese acknowledged this point by citing to *Rochester* when arguing in favor of claim objection procedures to "help catalyze settlement" and because "proper compensation to claimants in this case will be substantially impacted by" resolution of proposed claim objections.[20]  The Diocese cannot have it both ways. Prosecution of the State Court Actions against the DRVC Related Parties will establish claim values and mobilize the defendants to assess their exposure and the risks of litigation separate from claims against the Diocese.  The Diocese admits that "there is no realistic prospect that any cases will proceed to judgment for years"[21] and none of the State Court Actions is presently scheduled for trial.[22]  Absent any judgments against defendants with shared insurance, there is no threat of immediate harm to the estate.

37.    The facts here are distinguishable from *Buffalo I, II, and III,* and *Syracuse.*  In those cases the requests for injunctive relief were made early in the cases and directed at a small

---

[18] *Id.* at *18-23.

[19] *Motion for Entry of an Order (I) Approving the RSA, (II) Authorizing the Diocese to Enter into and Perform Under the RSA; (III) Approving the Committee Settlement, and (IV) Granting Related Relief.  Rochester,* Bankr. W.D.N.Y. 19-20905, Docket No. 1790 (Nov. 3, 2022).

[20] *Reply in Support of the Debtor's Motion for an Order Approving Claim Objection Procedures, Etc.* [Bankr. Docket No. 1524] at 5, ¶11 and fn. 3.

[21] *Id.* at 6, ¶12.

[22] Appendix of Evidence, Exhibit D (Debtor's Responses to Requests for Admission, No. 1).

15

subset of survivors who refused to consent to a stay *even though the committee and the majority of survivors consented*.  Here, the Diocese seeks to enjoin 490 State Court Actions rather than the 6, 36, or 49 lawsuits by rogue plaintiffs at issue in the *Syracuse* and *Buffalo* decisions.  In those cases, mediation was ongoing, or had not yet begun, and the committee and the majority of survivors were still hopeful that mediation would prove fruitful.  Here, the Committee and the entire Survivor constituency (essentially the Diocese's entire creditor constituency) have determined that a stay of all of the State Court Actions is no longer conducive to mediation efforts or settlement.

## VI.  <u>LEGAL ARGUMENT</u>

### A.    **The Automatic Stay Does Not Apply to All State Court Actions.**

### 1.    **Section 362(a)(1) Is Inapplicable to State Court Actions in Which the Diocese Is Not a Defendant.**

38.    Section 362(a)(1) automatically stays the commencement or continuation only of a proceeding "**against the debtor***" that arose before the commencement of the case.  Section 362(a)(1) does not apply to non-debtor defendants.[23]

39.    The Diocese contends that *Bayview Loan Serv. LLC v. Fogarty (In re Fogarty)*, 39 F.4th 62, 76 (2d Cir. 2022), sets forth a bright-line rule that all State Court Actions that name the Diocese are automatically stayed against the non-debtor co-defendants.  Motion at

---

[23] *Teachers Ins. & Annuity Assn v. Butler,* 803 F. 2d 61, 65 (2d Cir. 1986) ("It is well-established that stays pursuant to 362(a) are limited to debtors and do not encompass non-bankruptcy co-defendants"); *Buffalo I,* 618 B.R. at 405 (same); *Rochester,* 2022 Bankr. LEXIS 1469 at *13-14 (same).

15.[24]  While the Committee disagrees and *Fogarty* is distinguishable on its facts, at present, the

Committee does not oppose the Motion with respect to State Court Actions in which the Diocese

is a defendant.  The Diocese is not a defendant in 260 State Court Actions, including the 228

State Court Actions identified in Exhibit A to the Appendix of Evidence, and these actions are

not subject to the automatic stay.

40.      As to these cases, the Diocese argues that the Diocese is "likely… a necessary

party in the vast majority" and these State Court Actions "would become automatically stayed"

by section 362(a)(1) upon adding the Diocese as a necessary party.  Motion at 15.  This is

specious.[25]

41.      The Motion fails to explain why the Diocese is a necessary party to any State

Court Action, nor is there evidence that any court has determined it is a necessary party to any

State Court Action.  The Survivors assert claims against the DRVC Related Parties based on

their own negligence and breaches of fiduciary and statutory duties.  Under New York law, joint

tortfeasors are not necessary parties because their liability is several and joint.[26]  This principle is

not unique to New York law, and bankruptcy and district courts have determined in bankruptcy

---

[24] *But see Abouelmakarem v. Mdnma Inc.,* 2022 U.S. Dist. LEXIS 147579 at *3 (S.D.N.Y. Aug. 17, 2022) ("The application of the stay to actions against non-debtors is limited… to actions with an 'adverse impact on a debtor that occurs by operation of law;'" quoting *In re Fogarty* and compelling discovery from non-debtor co-defendants).

[25] NY CLS CPLR § 1001, entitled "Necessary joinder of parties," provides:

> (a) Parties who should be joined. Persons who ought to be parties if complete relief is to be accorded between the persons who are parties to the action or who might be inequitably affected by a judgment in the action shall be made plaintiffs or defendants. When a person who should join as a plaintiff refuses to do so he may be made a defendant.

[26] *See, e.g., Littanzi v. State*, 388 N.Y.S.2d 686, 688 (3d Dep't 1976); *Siskind v. Levy*, 213 N.Y.S.2d 379, 380-381 (N.Y. App. Div. 2d Dep't 1961); *see also Peak v. Bartlett, Pontiff, Stewart & Rhodes, P.C.*, 814 N.Y.S.2d 763, 765 (3d Dep't 2006) (joint tortfeasors are not necessary parties and need not be sued together in the same action).

stay proceedings that joint tortfeasor debtors are not necessary parties.[27]  Therefore, the fact that

the Diocese may be liable to Survivors as a joint tortfeasor, whether or not it is named as a co-

defendant, should not impede the Survivors' claims against the non-debtor DRVC Related

Parties.  The Diocese's argument that section 362(a)(1) automatically stays the State Court

Actions in which the Diocese is not a defendant is both legally and factually baseless.[28]

> **2.      Section 362(a)(3) Does Not Stay State Court Actions in Which the Diocese Is Not a Defendant.**

42.      The Diocese incorrectly argues that section 362(a)(3) (staying acts to obtain

property of the estate or to exercise control over property of the estate) applies because the

DRVC Related Parties are co-insureds under the Diocese's insurance policies.  Motion at 16.

43.      In *Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners,*

*L.P.*), 194 B.R. 318, 337-38 (Bankr. S.D.N.Y. 1996), cited by the Diocese, the court rejected the

trustee's request to apply the automatic stay to suits by third parties against non-debtors based on

shared insurance.  Two policies were at issue and the facts were not in dispute. Both policies

shared an aggregate $5 million cap.  The debtor's indemnification coverage was diminished by

defense costs and payment of any liability on behalf of the defendants.  The court concluded that

---

[27] *See, e.g., Mardice v. Ebony Media Operations,* 2021 U.S. Dist. LEXIS 8520, at *8 (S.D.N.Y. Jan. 15, 2021) (automatic stay not applicable to non-debtor defendants who could be held independently liable as joint tortfeasors); *In re Metal Center, Inc.,* 31 B.R. 458, 462 (Bankr. D. Conn. 1983) (automatic stay does not apply where non-debtor defendant is "independently liable as, for example, where the debtor and another are joint tortfeasors or where the non-debtor's liability rests upon his own breach of a duty"); *Stanford v. Foamex L.P.,* 2009 U.S. Dist. LEXIS 32405 at *10-17 (E.D. Pa. April 15, 2009) (same; denying extension of automatic stay to non-debtor defendants based on direct claims against them).

[28] *McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 511 (3d Cir. 1997) is the sole case cited by the Diocese in support of its argument and is inapposite.  *McCartney* dealt with a Pennsylvania law requiring a creditor who purchases its collateral at a foreclosure sale to file a valuation action against both the borrower and the guarantor to collect any deficiency claim.  The case does not address either the situation presented by the State Court Actions where the co-defendants face independent liability as joint tortfeasors, or New York law that expressly states joint tortfeasors are not necessary parties.

18

the automatic stay was inapplicable to the third party litigation, stating:

> We are not convinced that an action by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights, implicates the automatic stay.

> We conclude, therefore, that the automatic stay does not bar these lawsuits on this separate ground involving the debtor's insurance coverage.

*Id.* at 337-338.

44.        In both *Rochester* and *Buffalo I,* the court held section 362(a)(3) inapplicable to CVA litigation against non-debtor affiliates because movants had not shown the impact of any particular CVA action on insurance policies that were property of the estate.  In *Rochester*, the court declined to apply the automatic stay because the diocese did not satisfy its burden of proof.[29]  In *Buffalo I*, the diocese's proffer of "only an outline" of insurance coverage was insufficient to establish application of section 362(a)(3).[30]

---

[29] Unpersuaded by conclusory allegations that litigation against non-debtors would impose defense costs on the diocese and erode insurance coverage shared by the diocese and the non-debtors, the *Rochester* court stated:

> But, it is one thing to make that sweeping statement. It is another thing to prove it. Here, the Diocese made no effort to provide evidence showing that a specific CVA case would have a materially adverse impact on the per-occurrence limits of a specific policy of insurance. Instead, the Diocese invites the court to make a leap of faith and find that any state court litigation by any Abuse Survivor against any Catholic Corporation will necessarily adversely affect property of the Diocese's Estate. The Court declines that invitation.

> The Court holds that **the Diocese has failed to carry its burden of proving that a specific CVA case would materially erode coverage under a specific policy of insurance. As a consequence, the Court is not convinced that section 362(a)(3) stays litigation by Abuse Survivors against non-debtor Catholic Corporations.**

2022 Bankr. LEXIS 1469 at *15-16 (emphasis added).  *See also 3M Occupational Safety LLC v. Those Parties Listed on Appendix A (In re Aearo Techs. LLC)*, 642 B.R. 891, 906 (Bankr. S.D. Ind. 2022) (beyond notification of insurers, moving parties presented no evidence that state court plaintiffs were proceeding against shared insurance or that there was a threat of inequitable distribution of insurance proceeds requiring automatic stay under 362(a)(3)).

[30] *Buffalo I,* 618 B.R. at 406-07.  The *Buffalo I* court granted a two month preliminary injunction to allow the diocese to gather evidence of its shared insurance. The narrow preliminary injunction, issued within the first five months of the case, was an accommodation to allow the debtor to marshal insurance evidence to show whether litigation against non-debtors would have a material adverse impact on insurance policies that were property of the estate.  *Id.* at 407.

19

45.      Here, too, the Diocese cannot meet its burden. The Diocese must prove that the prosecution of *each* State Court Action that it seeks to enjoin will have a material adverse impact on the per-occurrence or aggregate limits, if any, of a specific insurance policy.  The differing periods of abuse alleged in the State Court Actions, and the materially different terms of the insurance policies implicated by those actions, make it impossible to accept the Diocese's argument that defense costs and/or damages incurred by the DRVC Related Parties will necessarily erode all shared insurance policies.

46.      At least 17 State Court Actions that do not name the Diocese as a defendant **also** do not name any other co-insured defendant.[31]  Because no insured is named as a defendant, those 17 State Court Actions can have no impact on the shared insurance under any scenario.

47.      Similarly, another 2 State Court Actions allege abuse occurring solely before the inception of any of the Diocese's insurance policies.[32]  Those 2 State Court Actions, likewise, can have no impact on the shared insurance under any scenario.

48.      The Diocese also cannot meet its burden regarding the 108 State Court Actions that do not name the Diocese as a defendant and fall only within the Royal Policies period. Those policies provide for unlimited payment of defense costs, as long as the policies' per-occurrence limits have not been exhausted through indemnity payments. Porter Dec. ¶ 7. Furthermore, the entry of an order prohibiting enforcement of any judgment against, or payment of a settlement from, shared insurance, absent further order of this Court, eliminates the risk of any immediate

---

[31] Appendix of Evidence, Exhibit A4.

[32] Appendix of Evidence, Exhibit A5

impact on the Royal Policies from any future judgment.

49.     Nor can the Diocese meet its burden regarding the 99 State Court Actions that do not name the Diocese as a defendant and fall (exclusively or partially) within the London Program period.[33]  The massive per-occurrence limits available during that period (in some years reaching $100 million per-occurrence), and the lack of any applicable aggregate limits, precludes finding that defense costs that may be incurred in connection with the relevant State Court Actions would have any meaningful impact on the per-occurrence limits available under the London Program Policies.

50.     The authorities relied upon by the Diocese are inapposite.  In *McHale v. Alvarez (In re The 1031 Tax Grp., LLC),* 397 B.R. 670, 683 (Bankr. S.D.N.Y. 2008), the court held that section 362(a)(3) applied to parts of three lawsuits brought by plaintiffs against former employees of the debtor because some causes of action were derivative claims that belonged to the estate.  The court specifically reviewed the legal allegations brought against the former employees and determined that charges of conspiracy and aiding and abetting the principal's conversion of assets were derivative, as were generalized breach of fiduciary duty claims that arose from the defendants' employment by the debtor.  *Id.* at 681-83.  In contrast, claims against the former employees for fraudulent and negligent misrepresentation and violation of consumer statutes were direct claims that "allege[d] injuries particularized to the Plaintiffs" and, therefore, were not subject to the automatic stay.  *Id.* at 682.  Here, the Diocese admits that the State Court

_____

[33] Appendix of Evidence, Exhibit A2-A3.

Actions assert direct claims against DRVC Related Parties.[34]  The 228 State Court Actions

against the DRVC Related Parties do not seek recovery based exclusively on the Diocese's

conduct or from the Diocese's assets, and the Diocese could not conceivably assert such personal

injury claims derivatively against the DRVC Related Parties on behalf of the estate and the

general creditor body.[35]

51.     As for the plaintiffs' direct claims identified in *The 1031 Tax Grp., LLC*, the court

enjoined their prosecution under section 105 only after finding the lawsuits threatened the

debtor's reorganization efforts based on proof that (a) the proceeds of "wasting insurance

policies" shared by the debtor and the defendants would be diminished by the lawsuits, (b) the

trustee's motion to approve the estate's settlement with the defendants was pending and the

settlement would be threatened, and (c) the trustee was on the verge of proposing a plan.  *Id.* at

687.  Other cases cited by the Diocese affirm the uncontroversial principle that a debtor's

insurance policies are property of the estate and proceedings against an insurer or an officer or

employee who may receive indemnification under the policy may be subject to the automatic

stay under 362(a)(3).[36]

52.     The Diocese's reliance on *Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 287 (2d

---

[34] Appendix of Evidence, Exhibit D (Debtor's Responses to Requests for Admissions, Nos. 2-3).

[35] *See In re Johns-Manville Corp.,* 517 F. 3d 52, 63 (2d Cir. 2008) (vacating injunction of lawsuit against insurer alleging independent misconduct by insurer unrelated to misconduct of debtor); *Sobchack v. Am Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.),* 17 F. 3d 600, 605 (2d Cir. 1994) (distinction between derivative and direct claims turns on whether breach of duty is to the debtor or the individual claimant, and whether the debtor or claimant should receive the relief).

[36] Motion at 16, citing *Manville I,* 837 F. 2d at 92; *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1001 (4th Cir. 1986); *In re Circle K Corp.,* 121 B.R. 257, 261 (Bankr. D. Ariz. 1990); *Minoco Grp. of Cos., Ltd. v. First State Underwriters Agency of New Eng. Reins. Corp. (In re Minoco Grp. of Cos., Ltd.),* 799 F. 2d 517, 519 (9th Cir. 1986).

22

Cir. 2003), for application of section 362(a)(3) is equally misplaced. Motion at 16. The mere

fact that the DRVC Related Parties are co-insureds with the Diocese does not establish that

prosecution of the State Court Actions will have an immediate adverse economic consequence

on the Debtor's estate. In *Queenie*, the Second Circuit did not apply section 362(a)(3) and the

case does not involve or discuss shared insurance. *Id.* at 288. Rather, the Second Circuit

articulated a narrow exception to the general rule that the automatic stay is limited to debtors and

does not shield non-debtor co-defendants:

> The automatic stay can apply to non-debtors, but normally does so only
> when a claim against the non-debtor will have an **immediate adverse
> economic consequence** for the debtor's estate. Examples are a claim to
> establish an obligation of which the debtor is a guarantor, *McCartney v.
> Integra National Bank North,* 106 F.3d 506, 510-11 (3d Cir.1997), a claim
> against the debtor's insurer, *Johns-Manville Corp. v. Asbestos Litigation
> Group (In re Johns-Manville Corp.),* 40 B.R. 219 (Bankr. S.D.N.Y. 1983)
> (on rehearing), and actions where "there is such identity between the
> debtor and the third-party defendant that **the debtor may be said to be
> the real party defendant** ...," *A.H. Robins Co. v. Piccinin,* 788 F.2d 994,
> 999 (4th Cir.1986).

*Id.* at 288 (emphasis added).

53.     Here, separate from any shared insurance argument, the automatic stay under

section 362(a)(1) and (a)(3) cannot apply to the 228 State Court Actions in which the Diocese is

not named as a defendant because the causes of action asserted in the complaints are direct, non-

derivative claims against the DRVC Related Parties based on their own acts or omissions—not

those of the Diocese. Therefore, the Diocese cannot show it is the "real party defendant."

**B.     An Injunction Under Section 105(a) Is Impermissible Because the Diocese Has
Not Established the Court's Subject Matter Jurisdiction to Enjoin Each State
Court Action in Which the Diocese Is Not a Defendant.**

54.     This Court must have subject-matter jurisdiction over each State Court Action the

Court intends to enjoin.  Section 105 does not provide an independent source of federal subject matter jurisdiction.[37]

55.        The Court can only enjoin the clearly non-core State Court Actions if it has "related to" jurisdiction over those claims.[38]  A civil proceeding is related to a bankruptcy case if the action's outcome has a conceivable effect on the bankruptcy estate.[39]  Further, courts must analyze the causes of action asserted in the lawsuit the debtor is seeking to enjoin.[40]  "[I]t is the relation of dispute to estate, and not of party to estate, that establishes jurisdiction."[41]  This case-by-case analysis is essential for purposes of determining the jurisdiction of this Court to enjoin a proceeding between two non-debtors.

56.        When a bankruptcy court lacks subject matter jurisdiction over claims it is asked to enjoin, the existence of "unusual circumstances" supporting the court's discretion to enjoin the prosecution of those claims is irrelevant.[42]  A bankruptcy court's authority "to provide finality to

---

[37] *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 63 (2d Cir. 1986).  *Law v. Siegel*, 571 U.S. 415, 421 (2014), cautions that "Section 105(a) confers authority to 'carry out' the provisions of the Code, but it is impossible to do that by taking action that the Code prohibits."  The Court may not exercise authority to enjoin claims under section 105 if it lacks subject matter jurisdiction over those claims.

[38] *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 225 (3d Cir. 2004).

[39] *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 339-340 (2d Cir. 2018); *Parmalat Capital Finance, Ltd. v. Bank of America Corp.*, 639 F. 3d 572, 579 (2d Cir. 2011).

[40] *See Dunaway v. Purdue Pharm L.P. (In re Purdue Pharm. L.P.),* 619 B.R. 38, 54 (S.D.N.Y. 2020) (related to jurisdiction does not exist where prosecution of litigation against no-debtors "does not entail proving facts that would also prove [the debtor's] own liability" and the debtor has "no legal or contractual duty to indemnify" the non-debtor third party defendants).

[41] *Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746, 755 (5th Cir. 1995), *citing Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics),* 813 F.2d 127, 131 (7th Cir. 1987).

[42] U.S. Bankruptcy Judge Graham recently concluded that he lacked jurisdiction to issue an injunction in favor of non-debtors notwithstanding debtor's indemnity obligations because financial arrangements between the debtors and the affected non-debtor rendered the debtors economically indifferent to the outcome of litigation sought to be enjoined, including any indemnity obligations.  *In re Aearo Techs. LLC*, 642 B.R. at 909-912.  The court acknowledged that an injunction could help facilitate a successful and consensual resolution.  *Id*. at 912.  Notwithstanding, the court concluded that such considerations could not influence the outcome of its subject matter jurisdiction inquiry and the fact that it lacked subject matter jurisdiction to issue a section 105 injunction.  *Id.*

a third-party is defined by its jurisdiction, not its good intentions."[43]  Federal courts are presumed

not to have jurisdiction without affirmative evidence of this fact.[44]  The burden to establish

federal jurisdiction rests on the party invoking it.[45]

57.    The Diocese treats the threshold issue of bankruptcy subject matter jurisdiction

over the direct claims of Survivors against non-debtor third parties as an afterthought and

concludes, without analysis, that this Court has "related to" subject matter jurisdiction over the

State Court Actions. Motion at 14, n.11.  The extent to which any one State Court Action may

affect the estate cannot be determined *en masse.*  Here, each DRVC Related Party, as a separate

legal entity, has its own liability to Survivors under New York law based on its own acts and

omissions and the factual underpinnings that are unique to each Survivor and each perpetrator

employed and controlled by the DRVC Related Party.

58.    The evidence will not permit the Court to make necessary findings that

prosecution of each State Court Action against DRVC Related Parties and other non-debtors will

impact the estate.  The Diocese relies on general statements of law in cases without

acknowledging their significant factual distinctions from this case.[46]

---

[43] *Manville II,* 517 F.3d at 66 (2d Cir. 2008), *rev'd and remanded on other grounds*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *see also In re Zale Corp.*, 62 F.3d at 753-54 (desire to foster, encourage and preserve settlement does not confer jurisdiction).

[44] *Nuveen Mun. Tr. v. Withumsmith Brown, P.C.*, 692 F.3d 283, 293 (3d Cir. 2012), citing *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 342 n.3, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006).  *McNutt v. GMAC*, 298 U.S. 178, 189 (1936).

[45] *McNutt v. GMAC*, 298 U.S. 178, 189 (1936).

[46] The cases cited by the Diocese in support of jurisdiction are inapposite.  *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co)*, 402 B.R. 571, 586 (Bankr. S.D.N.Y. 2009) dealt with a request by the debtor to enjoin creditors of its non-debtor foreign parent, who had guaranteed certain of the debtor's debt, from putting the parent/guarantor into bankruptcy because it would impact the debtor's ability to get financial assistance from the parent to propose a plan which would deal with the guaranteed debt.  Nor is *Publicker Indus., Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir. 1992) relevant.  *Cuyahoga* dealt

1.      **The Diocese Fails to Meet Its Burden to Establish "Related To" Subject Matter Jurisdiction.**

59.      The Diocese fails to establish that prosecution of each of the 228 State Court

Actions to which the Diocese is not a party will have the requisite impact on the estate to

establish "related to" subject matter jurisdiction.  General allegations of shared insurance do not

provide a basis for "related to" subject matter jurisdiction absent particularized evidence of how

each insurance policy is implicated by each State Court Action.  Evidence of shared insurance

sufficient to confer related-to jurisdiction must be specific to the claims and policies.[47]  As

described above, the Diocese fails to tie the prosecution of each State Court Action to an actual

---

with the jurisdiction of the bankruptcy court to approve a settlement of CERCLA litigation between the
debtor/property owner and the U.S.  The CERCLA litigation had been pending in a different federal district court
than the district in which the bankruptcy was pending.  A co-defendant in the CERCLA litigation (the former
property owner) had challenged the jurisdiction of the bankruptcy court to approve the settlement and attempted to
have the motion transferred to the district court presiding over the CERCLA litigation.  The Second Circuit
determined because the lawsuit effected the estate and resolved a claim against the estate, the bankruptcy court had
jurisdiction to approve the settlement.  While both these cases contain general discussions of when a lawsuit may
have an effect on a debtor's estate, neither case dealt with the jurisdiction of the bankruptcy court to enjoin direct
claims of tort victims against non-debtor tortfeasors based on the tortfeasor's own acts and omissions.

[47] *Compare Quigley Co., Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.),* 676 F.3d 45, 53-54 (2d
Cir. 2012) (shared insurance was a basis for related-to jurisdiction where court had issued several rulings detailing
how the policies worked and the limits and caps on each policy, clearly showing the impact on the estate).

In *Combustion Engineering*, 391 F.3d at 232-33, the Third Circuit considered "related-to" jurisdiction premised
upon shared insurance. The Court found that there was insufficient evidence in the record to resolve the issue of
shared insurance and declined to exercise jurisdiction based on an assumption that independent claims against
certain non-debtors would reduce the insurance proceeds available to the estate.  391 F.3d 232.  In its ruling, the
Court noted that "[c]ourts finding 'related to' jurisdiction over claims against non-debtors based in part on shared
insurance policies have relied not only on extensive record findings regarding the terms and operation of the subject
policies, but also on additional evidence of automatic liability against the debtor." *Id.* at 232-33 (citing to *A.H.
Robins* as an example where the court made express findings as to the status of the D&O co-insureds, their
automatic entitlement to indemnification and the thousands of Dalkon Shield claims that would drain the limited
fund available under the insurance policy).

*See also In re Imerys Talc Am., Inc.*, 2019 U.S. Dist. LEXIS 120572 at *19-21 (D. Del. July 19, 2019) (finding
shared insurance insufficient to support related-to jurisdiction where the court was provided with "scant detail
specifying how the policies might apply to claims by each of the many Plaintiffs, whether the policies have been
exhausted, or whether Debtors are actually entitled to them"); *Holman v. Johnson & Johnson*, 600 B.R. 6, 14
(Bankr. N.D. Ill. 2019) ("[w]ithout more precise evidence, such as direct references to the relevant parts of the
insurance contracts themselves and/or some concrete indication from the insurer (or a ruling from a court) to the
effect that the policies do indeed cover J&J and Imerys both, 'related to' jurisdiction cannot exist over the
[plaintiff's] lawsuit claims based on the alleged shared insurance policies.").

DOCS_SF:108611.1 18491/002

reduction of insurance proceeds available to the estate.

60.    The only purported evidence to support jurisdiction (and the alleged need for an all-encompassing injunction) is conclusory statements in the Declarations of Charles Moore and Kenneth Porter.  Mr. Moore, a managing director of the Diocese's restructuring advisor, speculates that all State Court Actions against the DRVC Related Parties – even those in which the Diocese is not a party—will have a conceivable effect on the Debtor's estate by creating a risk of *res judicata* for the Debtor, creating potential indemnification claims for the DRVC Related Parties, and distracting individuals at the Diocese from developing a plan of reorganization, to the detriment of "other creditors."  Moore Dec. ¶¶ 4-11.  Mr. Porter, the Diocese's insurance broker, states that for policies where defense costs reduce limits—which are only a limited subset—any payment might erode proceeds available to the estate.  Porter Dec. ¶¶ 7-21.  Mr. Porter also speculates  about hypothetical scenarios where—even though no State Court Action is scheduled for trial and the insurers are actively disputing their coverage obligations in four separate district court proceedings—an insurer willingly pays the full per-occurrence limits to settle a claim against a DRVC Related Party (but does not also obtain a release for the Diocese), thus leaving no remaining coverage for that claim as to the Diocese, (Porter Dec. ¶ 8), and expresses concerns about the potential impacts of settlements or judgments on the limited sub-set of policies with aggregate limits (*id.* ¶¶ 10-21).  This is speculation, not evidence, by individuals who have not read any of the complaints, and cannot be applied across the board to almost 500 lawsuits.  No other evidence of "related to" jurisdiction is presented to establish the requisite subject matter jurisdiction.

2. **The State Court Actions Allege Direct Claims Against the DRVC Related Parties.**

61.     The failure of the Diocese to link the Court's jurisdiction to grant the requested injunction to the actual causes of action pled in the State Court Actions is fatal.  *In re Granite Partners, L.P.*, 194 B.R. at 325 ("[I]n deciding whether to issue an injunction, we look solely to the allegations in the complaint.").  This Court lacks related-to jurisdiction because the State Court Actions assert direct, non-derivative claims against the DRVC Related Parties.[48]  The facts required to establish the liability of the non-debtors based on their own negligence and breaches of duty would not establish DRVC's liability.[49]

62.     The Diocese admits that the State Court Actions against DRVC Related Parties assert one or more direct, non-derivative claims against such parties.[50]  The complaints in the State Court Actions against only the DRVC Related Parties reveal direct claims against each non-debtor defendant for its own negligence, breach of fiduciary duty, and other torts.  Such claims do not belong to the estate, unlike a breach of duty claim against former directors of a debtor or fraudulent transfer claims against a debtor's affiliate.[51]  And proof of facts establishing the direct liability of non-debtors named in the 228 State Court Actions will not result in liability for the Diocese.

63.     The Second Circuit delineated the outer reaches of a bankruptcy court's subject-

---

[48] *See Purdue Pharm. L.P.,* 619 B.R. at 54 ("the jurisdiction of the bankruptcy court remains 'limited to actions that create contingent obligations against the estate;'" citation omitted).

[49] *Id.*  (related to jurisdiction does not exist where prosecution of litigation against non-debtors "does not entail proving facts that would also prove [the debtor's] own liability" and the debtor has "no legal or contractual duty to indemnify" the non-debtor third party defendants.

[50] Appendix of Evidence, Exhibit D (Debtor's Responses to Requests for Admissions, No. 2).

[51] *See, e.g., In re Granite Partners, L.P.,* 194 B.R. at 325-26; *Keene Corp. v. Coleman (In re Keene Corp.),* 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994).

DOCS_SF:108611.1 18491/002

matter jurisdiction to enjoin claims against non-debtors in a series of decisions in the *Johns-Manville* bankruptcy.[52]  In *Manville I*, the court enjoined a party's claim against an insurer because the claim was based on Manville's conduct and was inseparable from Manville's insurance policy.[53]  However, in *Manville II*, the Second Circuit distinguished its prior ruling because the plaintiff's claims were direct claims against the insurer based on the insurer's own independent wrongdoing.  *Manville II,* 517 F.3d at 65.  Therefore, "the district court did not have jurisdiction to enjoin claims against Travelers that were predicated, as a matter of state law, on Travelers' own alleged misconduct and were unrelated to Manville's insurance policy proceeds and the *res* of the Manville estate."  *Id.* at 68. The Second Circuit reconfirmed this distinction in *Manville III*.  600 F.3d at 151-52.

64.     In both *Manville I* and *Manville II*, the court focused on the claims asserted against the non-debtor in the underlying lawsuit to determine if those claims were effectively claims against the debtor or direct claims against the non-debtors.  *Manville II*, 517 F.3d at 63. The subject matter jurisdiction analysis mandated by the *Manville* decisions, distinguishing between claims against a non-debtor based on actions of the debtor and claims against a non-debtor for that non-debtor's own conduct, is still the law in this Circuit.

65.     As in *Manville II*, the Survivors' claims in the State Court Actions against the DRVC Related Parties and other unrelated non-debtors are direct claims against those entities

---

[52] *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 837 F.2d 89 (2d Cir. 1998) ("***Manville I***"); *(ii) Johns-Manville Corp.,* 517 F.3d 52 ("***Manville II***"); and *Travelers Casualty & Surety Co. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp).,* 600 F.3d 135 (2d Cir. 2010) ("***Manville III***").

[53] *Manville I, 837* F.2d at 92-93; *accord, Manville II,* 517 F.3d at 62.

based on the actions or inactions of those entities. The Diocese cannot have it both ways. The Diocese and the DRVC Related Parties either are separate entities with their own independent operations, assets, and management, or they share an identity of interest.[54] The Diocese and DRVC Related Parties cannot cherry pick the benefits of corporate separateness and evade the burdens when it becomes convenient. *Rochester,* 2022 Bankr. LEXIS 1469 at \*14. The DRVC Related Parties and other non-debtors each bear responsibility and liability for their own torts relating to their own actions or inactions in connection with their duty to each Survivor and their relationship with the primary tortfeasor/abuser. In accord with the *Manville* decisions, this Court lacks subject matter jurisdiction to enjoin direct, non-derivative claims by non-debtors against other non-debtors.

### 3.   The Diocese Has No Indemnity Obligations to the DRVC Related Parties.

66.   The Diocese admits that it is not contractually obligated to indemnify any DRVC Related Party for liability arising from any State Court Action, or for liability arising from child sexual abuse.[55] Any alleged contractual or common law indemnity claims of the Parishes or other DRVC Related Parties must fail as a matter of law on multiple grounds.[56]

---

[54] Identity of interest may be a basis for related-to jurisdiction in product liability cases where the debtor is the sole source of the defective product that caused the injury and the other defendants are involved in the litigation because they are selling the debtor's defective or dangerous product. Thus, in *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002), the personal injury liability of both the debtor and non-debtors was based on a single product, silicone breast implants, of which Dow Corning was either the main manufacturer or supplier to every other defendant. *See also A.H. Robins*, 788 F.2d at 999 (Dalkon Shields); *In re Purdue Pharma L.P.,* 619 B.R. at 49 (opioid drugs). The analysis in inapposite here where each tortfeasor's liability is independent from the liability of any other tortfeasor.

[55] Appendix of Evidence, Exhibit D (Debtor's Responses to Requests for Admission, Nos. 5-6).

[56] *See* Committee's First Omnibus Objection to Proofs of Claim [Bankr. Docket No. 1718] (addressing Parish claims for "indemnification, reimbursement and contribution …for known or unknown claims that have been or will in the future be asserted against the Claimant").

67.    In New York, common law indemnification enables an **innocent** person held liable to shift that liability to another person because of the relationship between the parties.[57] To establish  common law indemnification claims against the Diocese, the DRVC Related Parties must establish: (i) the Diocese had **exclusive responsibility** for the acts or omissions that resulted in the Survivor's damages, and (ii) the **DRVC Related Parties committed no wrongdoing themselves** that contributed to the Survivors' losses.  A DRVC Related Party may not be indemnified if it was a wrongdoer in its individual capacity as an employer, administrator, or supervisor of the sexual abuser.  The Diocese cannot demonstrate a risk of indemnification liability because the DRVC Related Parties cannot establish both of the foregoing requirements. Here, the Diocese acknowledges that it is not exclusively liable for the damages to the Survivors, and there has been no adjudication of any DRVC Related Party wrongdoing.[58]

68.    Absent evidence of indemnity obligations or diminution of insurance proceeds available to the estate, the Diocese fails to meet its burden to show related to jurisdiction to enjoin each of the 228 State Court Actions.  The Court has no basis to make the specific and detailed findings necessary to support its subject matter jurisdiction to enjoin the lawsuits naming only non-debtors.

---

[57] *See Konsky v. Escada Hair Salon*, 113 A.D.3d 656, 658 (2d Dep't 2014) ("the predicate of common-law indemnity is vicarious liability **without actual fault** on the part of the proposed indemnitee.) (emphasis added); *XPO Logistics, Inc. v Malcomb*, 2021 N.Y. Misc. LEXIS 479, *13 (N.Y. Co. Feb. 5, 2021) ("With respect to the proposed common law indemnity claims, it is well established that 'since the predicate of [such claims] is vicarious liability without actual fault on the part of the proposed indemnitee, **it follows that the party who has itself participated to some degree in the wrongdoing cannot receive the benefit of the doctrine**'") (citing *Trustee of Columbia Univ. v Mitchell/Giurgolas Assoc*, 109 A.D.2d 449, 453, 492 N.Y.S.2d 371 (1st Dep't 1985) (emphasis added).

[58] Appendix of Evidence, Exhibit D (Debtor's Responses to Requests for Admission, Nos. 3-4).

C.     **The Diocese Cannot Meet Its Burden of Proof on Any of the Four Traditional Factors the Court Must Consider to Enjoin the State Court Actions Under Section 105(a) and Rule 7065.**

69.      Injunctive relief is an extraordinary remedy.[59]  The Diocese bears the burden of proof.[60]  Explicit findings of fact and conclusions of law by this Court are required and failure to make them is reversible error.[61]

70.      To obtain a stay of litigation against non-debtors under section 105(a), the Diocese must satisfy all the prerequisites for an injunction in the Second Circuit.[62]  When, as here, the injunction is sought over two and a half years after the Petition Date, settlement discussions have failed, the Diocese has proposed a plan with coercive third party releases that will not receive Survivor or Committee support, and the Committee Plan proposes to allow litigation to continue against the DRVC Related Parties, this Court must examine the record before it without giving the Diocese the benefit of the doubt as it may have done in the immediate months after the case was filed.[63]

71.      A preliminary injunction requires consideration of four factors: (1) likelihood of success on the merits, (2) imminent, irreparable harm to the estate absent an injunction, (3) the balance of harms tips in favor of the moving party, and (4) the public interest weighs in favor of

---

[59] *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24 (2008).

[60] *Id.* at 22*; see, e.g., In re Anje Jewelry Co., Inc.,* 47 B.R. 485, 487 (Bankr. E.D.N.Y. 1983).

[61] *Fengler v. Numismatic Americana, Inc.,* 832 F. 2d 745, 748 (2d Cir. 1987) (preliminary injunction vacated based on absence of factual findings to support relief).

[62] 2 COLLIER ON BANKRUPTCY ¶105.03 (16th ed. 2022) ("Unlike the automatic stay, a request for relief under section 105 must meet traditional requirements for an injunction, and must be presented and prosecuted in traditional formats.").  *In re Anje Jewelry Co., Inc.,* 47 B.R. at 487 ("The court may issue a stay under section 105(a) only if the moving party satisfies the [] test established by the Second Circuit for the issuance of a preliminary injunction.").

[63] *See In re Mariner Health Cent., Inc.,* 2023 Bankr. LEXIS 95 at *29.

an injunction.[64]  The recent diocesan cases in upstate New York confirm the four "traditional"

factors must be applied.[65]  The Diocese cannot satisfy the requisite elements for a preliminary

injunction.

72.     The Diocese fails to even address the traditional injunction factors, presumably

because it cannot satisfy the first and most essential element of showing a likelihood of

confirming its plan.

**1.    The Diocese Cannot Demonstrate a Likelihood of Success Because Confirmation of the Diocese Plan Is Unlikely.**

73.     In the bankruptcy context, "likelihood of success" means likelihood of a

successful reorganization.  *In re Calpine Corp.,* 354 B.R. at 50; *In re Lyondell Chemical Co.,*

402 B.R. at 590 (successful reorganization is unknowable in the early days and may be a matter

of whether the debtor is "on track," but any reasons to conclude that the debtor cannot reorganize

weigh against this factor).

74.     Bankruptcy courts are required to find particularized evidence of the likelihood of

plan confirmation or successful reorganization (and irreparable harm) before ordering injunctive

relief.  *Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.),* 502 F.3d

---

[64] *Winter,* 555 U.S. at 20.  *See also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.,* 25 F.3d 119, 122 (2d Cir. 1994); *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.),* 365 B.R. 401, 409 (S.D.N.Y. 2007); *In re Anje Jewelry Co., Inc.,* 47 B.R. at 487.

[65] *Rochester,* 2022 Bankr. LEXIS 1469 at *17; *Buffalo I,* 618 B.R. at 404-05; *Syracuse,* 628 B.R. at 580.  The Diocese argues that it is entitled to an injunction based on five considerations described in *The 1031 Tax Grp., LLC* and *Granite Partners* (Motion at 17).  While these considerations are relevant to whether the State Court Actions will cause immediate and irreparable harm to the Diocese, they are not a substitute for the traditional four elements required by the Second Circuit.  The Diocese's own citations are in accord.  *See, e.g., In re Purdue Pharma L.P.,* 619 B.R. at 45-46 and 58-62 (applying traditional injunction criteria); *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.,* 2006 U.S. Dist. LEXIS 42499 at *13-18 (S.D.N.Y. Dec. 20, 2006) (same); *Calpine Corp. v. Nev. Power Co. (In re Calpine Corp.),* 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006) (same); *In re TK Holdings Inc.,* Bankr. D. Del. Adv. No. 17-50880, Docket No. 64-3, Transcript at 21:18-22:2 and 25:19-29:18 (same).  The Diocese cannot meet its burden under either set of factors.

1086, 1097 (9th Cir. 2007) (injunction vacated).  *Excel* teaches that a bankruptcy court must

examine the record before granting an injunction and cannot rely on generalities alleged by the

debtor, especially when an injunction is sought years after the case was filed rather than in the

early days of the case.  *Accord, In re Mariner Health Cent., Inc.*, 2023 Bankr. LEXIS 95, at *29

(Bankr. N.D. Cal. Jan. 12, 2023).

75.    There is no evidence that the Diocese plan will likely be confirmed.  Indeed, the

Diocese Plan cannot be confirmed because it includes coercive non-debtor releases of the DRVC

Related Parties without fair compensation to the Survivors.  Neither the Committee nor the

Survivor constituency will support the Diocese Plan because, among other things, it releases the

DRVC Related Parties without requiring them to make a substantial contribution.

76.    A plan containing third-party releases that is contested by the Survivors is

unlikely to be confirmed and, therefore, a successful reorganization is unlikely and an injunction

of the State Court Actions must be denied on this basis alone.[66]  In particular, Survivors

steadfastly object to a proposed plan that broadly releases non-debtors, including the DRVC

Related Parties that are the subject of pending State Court Actions, without fair compensation.

By contrast, Survivors will support the Committee Plan, which will compensate them from assets

of the Diocese while preserving other avenues of recovery, including claims against the DRVC

---

[66] *Rochester,* 2022 Bankr. LEXIS 1469 at *18 ("[T]he Diocese also points to the serious possibility that it may seek
to confirm a nonconsensual Chapter 11 plan—a plan that does not have the consent of the Abuse Survivors.  While
obtaining confirmation of a non-consensual plan is not impossible, it makes the likelihood of a successful
reorganization much more difficult.  Given the Diocese's suggestion that it may seek to confirm a Chapter 11 plan
without the consent of the Abuse Survivors, ***the Court cannot conclude that a successful reorganization is likely***.")
(Emphasis added).  *See also In re Mariner Health Cent., Inc.,* Bankr. LEXIS 95 at *32 (debtor's likelihood of
confirming a plan was "highly uncertain" and debtor failed to meet its burden on this prong where tort claimants
could block confirmation of any plan that does not pay them in full in while retaining ownership of assets).

Related Parties, if those parties are not willing to provide fair compensation for their liability and releases thereof.  A stay of State Court Actions against the DRVC Related Parties is not necessary to facilitate the Committee Plan because they will not be released unless they make contributions acceptable to the Survivors.

> **2.    The Diocese Cannot Meet Its Burden by Proving a Risk of Imminent, Irreparable Harm to the Estate.**

77.    In the bankruptcy context, risk of "imminent, irreparable harm" means there must be an imminent and substantial threat to the reorganization process posed by each action sought to be enjoined.  *Shapiro v. Cadman Towers, Inc.,* 51 F. 3d 328, 332 (2d Cir. 1995) (injury must be neither remote nor speculative, and actual and imminent).[67]

78.    Enjoining litigation against non-debtors is only appropriate if the Diocese proves the litigation threatens its reorganization.  *In re Granite Partners, L.P.,* 194 B.R. at 38.  ("The trustee's proof falls well short of what he must show; he has not shown that the continuation of these lawsuits will frustrate or thwart the reorganization because of their effect on [debtor's] insurance coverage, or for any other reason.").  The fact that the *Granite Partners* bankruptcy case had been filed two years before the decision and no plan had been filed weighed against an injunction.[68]

79.    Relying on *The 1031 Tax Grp., LLC,* the Diocese argues that it satisfies five

---

[67] *In re Calpine Corp.,* 365 B.R. at 410("[T]he threat to the reorganization process must be imminent, substantial and irreparable.") (citing *Haw. Structural*); *GAF Corp. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 26 B.R. 405, 416-18 (Bankr. S.D.N.Y. 1983) (finding no showing of irreparable harm to the bankruptcy estate or that the balance of hardships favored an injunction notwithstanding movants' argument that there were unities of interest, they needed to jointly coordinate defenses, and there were pending disputes regarding insurance coverage).

[68] *In re Granite Partners, L.P.,* 194 B.R. at 338.

35

factors relevant to whether non-bankruptcy claims threaten to thwart the debtor's reorganization efforts.[69]  The Diocese relies on conclusory and speculative statements of Messrs. Moore and Porter that (a) there will be dissipation of shared insurance, (b) the DRVC Related Parties could be entitled to indemnification, (c) the Diocese could be subject to piecemeal litigation and inconsistent judgments, (d) the Diocese risks liability from *res judicata* and collateral estoppel, and (e) administration of the estate will be disrupted.  Moore Dec. ¶¶ 5-10; Porter Dec. ¶¶ 7-21. None of these are true as explained below.

> **a.  The Diocese Cannot Prove that Continued Prosecution of Each State Court Action Will Dissipate the Proceeds of Shared Insurance Policies.**

80.      The Diocese cannot prove that the prosecution of each State Court Action creates an imminent threat to its reorganization based on the purported dissipation of shared insurance. As discussed above at IV, the Diocese cannot prove that each of the insurance policies it shares with the DRVC Related Parties will be diminished by the State Court Actions.

81.      The Diocese's reliance on *1031 Tax Grp.,* 397 B.R. 670, is misplaced.  The court was presented with evidence of immediate harm to the reorganization effort and made specific findings regarding the litigation and five policies at issue.  *Id.* at 685 (non-debtor defendants had made claims against E&O policies and aggregate policy limits of $5.5 million were diminished by defense costs).

82.      Here, there is no evidence to support similar findings regarding each of the State

---

[69] The considerations are: "whether the suits would (i) threaten the debtor's insurance coverage, (ii) increase the debtor's indemnification liability, (iii) result in inconsistent judgments, (iv) expose the debtor to risks of collateral estoppel or res judicata, and (v) burden and distract the debtor's management by diverting its manpower from reorganization to defending litigation."  *In re The 1031 Tax Grp., LLC,* 397 B.R. at 684.

Court Actions it seeks to enjoin. The Royal Primary Policies are **not** "wasting policies" and, for many years, none of the Royal Policies have aggregate limits of liability. *See* Agreed Coverage Summary at fn. 2-3, Porter Dec. ¶¶ 7, 10. To the extent that certain years have likely aggregate limits under the Royal Umbrella Policies (but not the Royal Primary Policies), those limits are not impacted here because defense costs remain payable under the Royal Primary Policies until the insurer has paid the full per-occurrence limits available for that claim based on a settlement or judgment, which will not happen if an order precludes judgment or settlement collection from shared insurance without Court permission. The London Program Policies also have no applicable aggregate limits and, while defense costs do erode the per-occurrence limits, the per-occurrence limits are exceptionally high during this period—in some years reaching $100 million per-occurrence—and thus a material reduction in those substantial limits from defense costs on a per claim basis is unlikely and not imminent. *See* Agreed Coverage Summary at fn. 4-5, Porter Dec. ¶¶ 15, 17. In addition, the Diocese has not addressed the fact that certain insurance carriers have declined coverage for certain DRVC Related Parties based on missing policy documentation. Porter Dec. ¶ 4 n.3.

83.     The Diocese admits that 17 State Court Actions only plead claims against non-debtors who are **not co-insureds under the DRVC Policies**. Likewise, the Diocese admits that 2 State Court Actions plead claims for which there is **no available coverage**; and 2 more State Court Actions plead claims for which there is **insufficient information** to determine coverage.[70] The prosecution of these State Court Actions will have no impact on the shared insurance under

---

[70] Appendix of Evidence, Exhibit A4-A6.

DOCS_SF:108611.1 18491/002

any scenario.

84.      As to the remaining State Court Actions for which there is co-insurance, the

Motion conflates the various insurance policies—and the materially different terms they

contain—and asks this Court to draw general conclusions regarding policies that do not

uniformly apply to all claims.  For the reasons discussed above, there is no evidence to enable

the Court to make the requisite finding that prosecution of each State Court Action would cause

immediate irreparable harm based on diminishment of insurance proceeds.

85.      Finally, the Diocese acknowledges that the State Court Actions are at early stages.

None is presently scheduled for trial, much less trial-ready, so judgments are not an imminent

threat.  An order prohibiting enforcement of a judgment against, or payment of a settlement

from, insurance policies that name the Diocese as an insured, without a further order by this

Court (*Rochester,* 2022 Bankr. LEXIS 1469 at *4) would protect the estate and is a far less

drastic remedy than a sweeping injunction of all State Court Actions.

**b.  The Diocese Has No Indemnity Obligations to the DRVC Related Parties.**

86.      The Diocese's argument that it has a substantial risk of indemnification liability if

the State Court Actions are allowed to proceed is specious.  Motion at 19.  The Diocese cannot

establish either contractual or common law indemnity obligations arising from the State Court

Actions for reasons set forth above at ¶¶ 66-67 and in the Committee's omnibus objection to

proofs of claim asserted by the Parishes.

**c.  Speculation About Piecemeal Litigation and Inconsistent Judgments Does
Not Support an Injunction.**

87.      The Diocese argues that courts have stayed non-debtor third party litigation under

section 105(a) where the litigation involved common questions of fact and law and was more

effectively resolved in one bankruptcy proceeding.  Motion at 19-20.  The cases relied upon are

inapposite.  In *Drennen v. Certain Underwriters at Lloyds of London (In re Residential Capital,*

*LLC),* 563 B.R. 756 (Bankr. S.D.N.Y. 2016), the bankruptcy court addressed a post-confirmation

insurance dispute over the extent of coverage under primary and excess policies brought by the

post-confirmation assignees of those policies.  The policies required arbitration in different

foreign jurisdictions, and the insurers argued that they would be prejudiced by disparate

arbitration rulings on coverage between the excess and the primary carriers and a ruling by the

bankruptcy court on the same issue.  *Id.* at 761-66.  The court granted the insurers' arbitration

motions but stayed the arbitration proceedings "until issues as to coverage under the primary,

excess, and second excess layers of [insurance] coverage are decided."  *Id.* at 775-77.  Because

the issue in *Residential Capital* was the same in all the proceedings—the extent of coverage

under certain policies—it made sense to have one court proceeding go forward instead of

different arbitration proceedings.

88.      Here, the claims of each Survivor in the 228 State Court Actions—in which the

Diocese is not a defendant and shared insurance is not at risk—are based on facts and damages

unique to each action, and the liability of each DRVC Related Party is based on its own acts or

omissions and not those of the Diocese.[71]

89.      Relying on the Moore Declaration (¶¶ 6, 9), the Diocese contends that common

questions of law and fact predominate in the State Court Actions because the alleged "unlawful

---

[71] Appendix of Evidence, Exhibit C (sample complaints in the 228 State Court Actions).

policies and practices giving rise to claims" against the DRVC Related Parties and the Diocese

are the same. Motion at 20. Mr. Moore has not reviewed any complaints or pleadings in the

State Court Actions that do not name the Diocese as a defendant, and has no personal knowledge

of the facts or law that predominate.[72] The causes of action pled against the DRVC Related

Parties are based on those parties' own acts or omissions in failing to protect children in their

care. Determinations of fact made in the 228 State Court Actions would not bind the Diocese

since it is not a party.

90.     The Diocese argues that prosecution of the State Court Actions against the DRVC

Related Parties "would be likely to 'have cascading effects' on the larger reorganization."

Motion at 20 (citing *In re Purdue Pharma L.P.,* 619 B.R. at 60). The Diocese cannot prove this

and its authorities are inapposite. In *Purdue,* the district court affirmed the bankruptcy court's

injunction of litigation against non-debtors (including Dr. Sackler, the former president and

chairman, and the controlling shareholders) where the debtor submitted a proposed term sheet to

the court for a global settlement of multi-district litigation that placed the debtor's assets in trust

for the benefit of claimants and provided the trust with $3 billion from the sale of overseas

affiliates owned directly or indirectly by the Sackler family. *Id.* at 43-46. The bankruptcy court

held that an injunction protecting the non-debtors was necessary because the proposed settlement

depended on the non-debtors' contribution from the sale of the overseas affiliates and because

continued litigation would threaten those assets and the settlement funding. *Id.* at 46. The

objecting appellants were rogue plaintiffs in a single lawsuit. *Id.* at 42.

---

[72] Appendix of Evidence, Exhibit E (Moore Depo Tr. 37:4-9 and 59:14-60:6).

91.    The facts in *Purdue* are vastly different than those before this Court.  In *Purdue*:
(i) the litigation against non-debtors threatened to disrupt a global settlement that was supported
by a multidistrict litigation committee <u>and</u> the unsecured creditors' committee; (ii) the debtor
was contractually obligated to indemnify Dr. Sackler; (iii) allowing the litigation to proceed
would have added to the priority claims and prejudice general unsecured creditors; (iv) a finding
of liability against Dr. Sackler, who controlled the debtor, was "equivalent to finding that Purdue
itself is liable;" (v) the same facts relied upon to prove the liability of Dr. Sackler would be used
to prove statutory liability of the debtor for drug dealing; and (vi) lifting the injunction as to the
plaintiff's lawsuit would cause other claimants to challenge the injunction and ultimately
threaten the proposed settlement funding.  *Id.* at 44-48, 57, 60.

92.    The DRVC Related Parties have not reached a global settlement nor have they
proposed a contribution that is supported by the Committee or the Survivors.  Under the Diocese
Plan, the Parishes will provide only $11.1 million to fund a plan, exclusive of insurance—i.e.,
approximately $23,000 per state court lawsuit—in exchange for a release of liability for decades
of sexual abuse.  The Committee estimates that the Parishes hold aggregate assets in excess of
$200 million.  The proposed contribution is not "substantial,"[73] but creditors do not know, and
will not know, the precise value of Parish assets because transparency is not a component of the
Diocese Plan.[74]  Even if the Diocese proposed a larger contribution by the Parishes to fund their

---

[73] *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F. 3d 136, 142 (2d Cir. 2005).

[74] *Compare In re Purdue Pharma L.P.,* 619 B.R. at 47 (public interest in transparency served by disclosures under Settlement Structure) and 49 (non-debtors "will have to make financial disclosures in order to obtain releases from individual liability").

contested plan, the Diocese does not offer evidence that any State Court Action threatens the

ability of the Diocese or a Parish to fund such plan.

> **d. Prosecution of the State Court Actions Will Not Expose the Diocese to Risks of Collateral Estoppel and *Res Judicata*.**

93.     Relying on the Moore Declaration, the Diocese speculates that if the State Court

Actions proceed without the Diocese, it will face "substantial risks of collateral estoppel, record

taint, and evidentiary prejudice." Motion at 20.  Mr. Moore is not competent to make such legal

conclusions, and his alleged understanding is derived from privileged communications with

counsel.[75]  There is no actual risk of either collateral estoppel or *res judicata* because the Diocese

is not a party to over half of the State Court Actions, including the 228 State Court Actions it

seeks to stay.[76]

94.     In *Queenie,* 321 F. 3d 282, the Second Circuit rejected "apprehension" of

collateral estoppel as a basis for enjoining litigation against non-debtors:

> We have not located any decision applying the stay to a non-debtor solely because of an apprehended later use against the debtor of offensive collateral estoppel or the precedential effect of an adverse decision.  **If such apprehension could support application of the stay, there would be a vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants.**

*Id.* at 288 (emphasis added).

---

[75] Appendix of Evidence, Exhibit E (Moore Depo Tr. 67:21-70:5).

[76] Collateral estoppel only applies to matters "actually litigated and determined" against the party to be precluded. *Singleton Mgmt. v. Compere,* 673 N.Y.S. 2d 381, 383 (App. Div. 1st Dept. 1998).  Likewise, *res judicata* or claim preclusion requires an identity of claims between a prior and current action and privity of parties.  *Id.; Gramatan Home Investors Corp. v. Lopez,* 414 N.Y.S. 2d 308, 311 (1979) ("[A] person may not be precluded from litigating issues resolved in an action in which that person was not a party."); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),* 591 F.3d 164, 172 (3d Cir. 2009) (debtor "will not be bound by any judgment against the third party in question"); *Pacor, Inc. v. Higgins,* 743 F.2d 984, 995 (3d Cir. 1984) ("Since Manville is not a party . . ., it could not be bound by res judicata or collateral estoppel.").  This Court has previously recognized that neither *res judicata* nor collateral estoppel apply to a non-party.  *The 1031 Tax Grp.,* LLC, 397 B.R. at 685.

95.     The cases in which issue preclusion has been viewed as a risk to the debtor

sufficient to justify an injunction are distinguishable because they typically involve actions

against the debtor's principals, or directors and officers, sued in their capacity as agents of the

debtor.[77]  The Diocese offers speculation and incompetent testimony, but cannot establish an

actual risk of collateral estoppel and *res judicata* if the State Court Actions to which it is not a

party proceed.  Moreover, even if preclusion were a risk (it is not), it is not immediate given the

early stage of the State Court Actions.[78]

      **e.   The Diocese Cannot Show That Prosecution of the State Court Actions Will
         Burden and Distract the Diocese's Principals from Reorganization.**

96.     The Diocese cannot prove that continued prosecution of the State Court Actions,

to which it is not a party, will divert critical resources and distract key personnel from the

Diocese's critical operations or its reorganization and mediation efforts.

97.     Courts require detailed evidence of the alleged burden on reorganization for this

factor to be considered in granting injunctive relief.[79]

---

[77] *See, e.g., Lomas Fin. Corp. v. Northern Trust Co. (In re Lomas Fin. Corp.)*, 117 B.R. 64, 66-67 (S.D.N.Y. 1990)
(action for fraud against principals of debtor by debtor's lender).  *Compare In re Calpine Corp.*, 354 B.R. 45, 47
(cited by Diocese; enjoining litigation against surety where adverse judgment would collaterally estop the debtor in
subsequent litigation and traditional factors supported preliminary injunction); *LTL Mgmt., LLC v. Those Parties
Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*,
638 B.R. 291 (Bankr. D.N.J. 2022) (cited by Diocese; extensive analysis of preliminary injunction factors
demonstrated balance of harms in favor of stay of talc claim litigation where the debtor's "indemnification
obligations [were] clearly established"), *rev'd,* 2023 U.S. App. LEXIS 2323 (3d Cir. Jan. 30, 2023) (petition
dismissed and injunction rendered moot).

[78] *In re Mariner Health Cent., Inc.*, 2023 Bankr. LEXIS 95 at *45 (declining to enjoin litigation against non-debtors
even where preclusion was a risk because litigation was in early stages; "there appears to be little if any imminent
peril with respect to the Covered Actions").  The court also observed, "[I]t should be obvious that litigation proceeds
frequently slowly, and certainly incrementally, to its final outcome, and that **at this early stage there is simply no
identifiable likelihood of irreparable harm**."). *Id.* at *48  (emphasis added).

[79] *In re Calpine Corp.*, 365 B.R. 401, 411-12 (cited by the Diocese; irreparable harm finding based on evidence that
a single individual was responsible for the work of 5 individuals that comprised his group before bankruptcy, that
this individual was "integral and indispensable member of the restructuring team at [debtor] and devoted "30 to forty
percent of his twelve hour work day directly to restructuring issues," and same individual was critical to the

98.     The Diocese again relies on the testimony of Mr. Moore, who describes actions

taken by the Diocese before the bankruptcy filing and draws an unsupported conclusion that

resumption of litigation will be "extremely burdensome."  Moore Dec., ¶5.  Mr. Moore does not

explain why, if the Debtor is not a party and has the benefit of the automatic stay, it would

continue its ***pre-petition practices*** regarding litigation oversight by so-called key DRVC staff,

with respect to State Court Actions to which it is not a party.  Mr. Moore has no current

involvement in State Court Actions, particularly those that do not name the Diocese, and no State

Court Actions have scheduled depositions or trials.[80]

99.     Further, the Diocese does not explain how the mostly unidentified alleged "key

personnel" are critical to the Diocese's reorganization efforts two and a half years into the case

or why they would be involved in State Court Actions (mostly filed post-petition) in which the

Diocese is not a party.  The Motion offers <u>no evidence</u> of: (i) which alleged key personnel may

have to participate in State Court Actions and their role in the State Court Actions in which the

Diocese is not a party; (ii) why these purported key personnel have to participate and testify in

actions in which the Diocese is not a party; (iii) how the purported key personnel are necessary to

---

litigation against the debtor's guarantor that the debtor was seeking to stay); *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.,* 2006 U.S. Dist. LEXIS 92499 at *5-7 (cited by the Diocese; irreparable harm finding based on testimony of Chief Accounting Officer regarding time and attention he and his staff spent on reorganization, their involvement in responding to discovery requests, their availability to respond to lawyer inquiries, and that two executives handling contract review relating to assumption and rejection of leases would be needed in connection with the state court litigation).

*Compare In re Mariner Health Cent., Inc.,* 2023 Bankr. LEXIS 95 at *38-39 (Court finds debtors' claim of distraction from reorganization efforts unconvincing where there was no precise evidence of senior management distraction due to pending litigation against non-debtors or of particularized harm from such distraction);  *In re Aearo Techs. LLC,* 642 B.R. at 911 (same; "Undoubtedly those 3M employees tasked with providing services [] are busy and likely taxed on a regular basis… But the Court has otherwise heard no evidence to conclude that Aearo's operations or its administration of these bankruptcy cases will be impacted in the manner that Aearo argues.").

[80] Appendix of Evidence, Exhibit E (Moore Depo Tr. 86:10-87:2, 89:19-22, and 90:11-91:25).

the Diocese's reorganization and confirmation of a plan; (iv) how much of their time will be spent on reorganization issues, plan confirmation issues, and matters related to the State Court Actions; or (v) what other personnel are available to assist.

100.    In sum, there is no non-hearsay evidence that allowing the State Court Actions in which the Diocese is not a party to proceed will disable the Diocese's reorganization efforts. Nor can the Diocese explain why personnel key to its reorganization efforts would be required to spend significant amounts of their time on litigation to which the Diocese is not a party.

101.    The Diocese does not allege outstanding discovery demands,[81] pending trial dates, or factors that would disable its General Counsel, Chief Operating Officer, and others from fulfilling their unexplained roles in the Diocese's reorganization efforts.  To the extent the Diocese is required to participate in the State Court Actions against the DVRC Related Parties, which the Committee disputes, the Diocese has vast professional resources available, which mitigate, if not entirely eliminate, any immediate harm to its reorganization effort.  The Diocese has an extraordinary number of specialized and highly paid professionals to assist its reorganization efforts, including four advisory firms focused on restructuring, communications consulting, real estate valuation, and investment banking, and four capable law firms well-versed in complex bankruptcy and insurance issues.[82]

### 3.    The Harm to Survivors Outweighs Harm to the Estate.

102.    The harm to the Survivors from an injunction of the State Court Actions is plain.

---

[81] The Diocese maintains that it has collected all conceivably relevant documents regarding the State Court Actions, including by production to the Committee of "all documents that would otherwise be produced to plaintiffs in the underlying CVA Actions."  Appendix of Evidence, Exhibit F (Stephens Tr. 26:15-27:6, 29:24-32:11).

[82] Diocese Disclosure Statement at 26.

"[T]he clear damage to the plaintiffs is the hardship of being forced to wait for an indefinite and, if recent experience is any guide, a lengthy time before their causes are heard . . . . [P]laintiffs and crucial witnesses are dying…" *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983).

103.     The Diocese ignores the egregious nature of the sexual abuse suffered by the Survivors, their advancing age and deteriorating health, and the fact that some Survivors have already died and more will pass during the pendency of an injunction.

104.     First, the Survivors' right to have their cases heard by a jury has been significantly delayed by a stay that has been in place for two and a half years; the injunction will impose further delay.  Second, many of the Survivors experienced sexual abuse decades ago and are elderly or ill, or both.  An injunction means some Survivors will never receive compensation or see the perpetrators of their sexual abuse held accountable.  At least six Survivors have passed since the statutory window was expanded[83] and others will pass before their case is heard. Third, litigation delays create a risk of further memory loss and lack of witnesses, which increases the burden on Survivors to prove their claims and diminishes the value of their claims.  The Survivors and their counsel have invested time and money in the State Court Actions, much of which is lost when a case is substantially delayed.  Fourth, the Survivors have asserted direct claims against non-debtors, and a broad injunction will prejudice the Survivors by precluding critical discovery from solvent non-debtors.[84]

---

[83] Appendix of Evidence, Exhibit G (Death Certificates of Survivors).

[84] *See Rochester*, 2022 Bankr. LEXIS 1469 at *20-21 (finding that the balance of speculative harms to the Diocese weighed against the harms to survivor-plaintiffs in connection with a proposed injunction favored survivor-plaintiffs).  In *Rochester*, Judge Warren forcefully explained:

105.     Prosecution of the 228 State Court Actions will advance, rather than impede, the

goals of a global settlement by incentivizing the DRVC Related Parties and insurers to make

payments commensurate with the risk they seek releases for.  Discovery in, and trials of, the

State Court Actions will establish the strength and value of the Survivors' claims.  This will

advance the settlement process and enable the parties to price plan releases the DRVC Related

Parties seek.  Absent valuation of these claims at trial, this Court, or the district court, could be

tasked with a massive estimation proceeding in connection with a contested plan.  In addition,

discovery will aid settlement negotiations by providing the facts and transparency necessary if

mediation is ever to resume.

106.     By contrast, while the State Court Actions are stayed, the DRVC Related Parties

and their insurers have no incentive to settle in an amount that reflects their litigation risk and

costs, and mediation negotiations will remain at a standstill.  The Diocese, the DRVC Related

Parties, and the insurers can afford to do nothing while litigation is at standstill and justice

continues to be denied to the Survivors.  At the risk of stating the obvious, the insurers and the

DRVC Related Parties benefit from delay beyond diminishing the value of the Survivors' claims

because the insurers continue to earn returns on their invested reserves and the DRVC Related

Parties do not have to pay their self-insured retentions and continue to earn investment returns on

---

[W]hat is not academic is the fact that those Abuse Survivors lost the chance to seek justice in a court of law. Given the age of many of the Abuse Survivors, if enjoined from going forward with actions against the independent Catholic Corporations, it is likely that more will be denied the chance to seek justice because the sands of time are working against them. Additionally, given the Diocese's unequivocal threat to pursue a non-consensual Chapter 11 plan, the valuation of CVA claims becomes vitally important to the confirmation process. The state courts are far better equipped to handle the trial of CVA cases (and provide the valuation of CVA claims) than is the bankruptcy court or the district court. And, the Abuse Survivors are entitled to have juries hear their cases—an option rarely available in bankruptcy courts.

*Id.* at *19-20.

those funds.

107.     At this late stage of the case, the Motion is a bald attempt by the Diocese to tilt

the leverage in this case in favor of itself and the DRVC Related Parties, rather than a legitimate

effort to facilitate a reorganization.  *In re Mariner Health Cent., Inc.,* 2023 Bankr. LEXIS 95 at

*58 (characterizing debtor's motion to enjoin litigation against non-debtor affiliates as "leverage

shifting," and noting that "certainly does not support a request for injunctive relief").

**4.     The Public Interest Is Not Advanced by an Injunction.**

108.     The Diocese has failed to address whether the public interest would be advanced

by an injunction.  To the extent this element means promoting the likelihood of a successful

reorganization or allowing settlement discussions to proceed without the distraction and expense

of litigation, no public interest will be served by an injunction.  As discussed above, the Diocese

Plan cannot be confirmed without Survivor support.  The public interest is advanced by

motivating the DRVC Related Parties and their insurers to realistically evaluate their litigation

expense and risk.  *See Rochester,* 2022 Bankr. LEXIS at *22 ("[W]hat good are future charitable

works if the people (children at the time) who suffered horrific acts of sexual abuse in the past

(allegedly at the hands of clergy) are silenced?").

109.     In the bankruptcy of the *Roman Catholic Bishop of Great Falls*, the court

recognized the "therapeutic" value of letting litigation proceed against parishes when settlement

discussions had stalled.[85]  The two and a half year stay of litigation against the DRVC Related

---

[85] In *In re Roman Catholic Bishop of Great Falls*, 584 B.R. 335, 340 n.7 (Bankr. D. Mont. 2018), the court stated:

> The Court also believes that **prosecution of the Avoiding Actions may have a therapeutic effect on the parties' attitudes about the desirability of a negotiated resolution to the issues raised in this case, and perhaps motivate them to consider a consensual plan**.  Thus far, the parties have been unsuccessful in achieving any consensus on the appropriate outcome in this case.  In the absence of a

Parties has led to an impasse in global settlement discussions rather than creating a path to a

consensual plan.  Allowing the litigation to proceed is the only way to incentivize the insurers

and the Parishes to meaningfully assess their litigation risk for purposes of any future

negotiations.

110.    The public's interest in accountability and a meaningful resolution weighs

strongly in favor of allowing the Survivors to pursue the 228 State Court Actions pending against

the DRVC Related Parties in which the Diocese is not a party and there is no immediate impact

on shared insurance.

## <u>CONCLUSION</u>

For the reasons set forth above, the automatic stay of section 362(a) is inapplicable and a

preliminary injunction under section 105(a) is not available because the Court lacks subject

matter jurisdiction to enjoin each State Court Action, and the Diocese cannot meet its burden of

proof on the four factors necessary to obtain an injunction.  The Committee respectfully requests

that the Court enter an order denying the Motion.

---

settlement, the Court believes litigation is the only means to clarify the parties' respective interests in the
case, albeit an expensive, less desirable approach when compared to a compromise.  (Emphasis added).

49

Dated:    March 17, 2023          **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Kenneth H. Brown*
James I. Stang (*pro hac vice*)
Kenneth H. Brown (*pro hac vice*)
Iain A.W. Nasatir (NY Bar No. 036027)
Gail S. Greenwood (*pro hac vice*)
Brittany M. Michael (*pro hac vice*)
780 Third Avenue, 34th Floor
New York, NY  10017
Telephone: 212/561-7700
Facsimile:  212/561-7777
Email: jstang@pszjlaw.com
        kbrown@pszjlaw.com
        inasatir@pszjlaw.com
        ggreenwood@pszjlaw.com
        bmichael@pszjlaw.com

Counsel for the Official Committee of Unsecured Creditors

**BURNS BAIR LLP**

Timothy W. Burns (*pro hac vice*)
Jesse J. Bair (*pro hac vice*)
10 E. Doty St., Suite 600
Madison, Wisconsin 53703
Telephone: 608-286-2808
Email: tburns@burnsbair.com
        jbair@burnsbair.com

Special Insurance Counsel for the Official Committee of
Unsecured Creditors

DOCS_SF:108611.1 18491/002