**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br><br>       Debtor. | <u>**FOR PUBLICATION**</u><br><br>Chapter 11<br><br>Case No. 20-12345 (MG) |
| THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br><br>       Plaintiff,<br><br>v.<br><br>Ark320 Doe, *et al.,*<br><br>       Defendants. | Adv. Pro. No. 20-01226 (MG) |

<u>**MEMORANDUM OPINION AND ORDER DENYING THE DEBTOR'S MOTION FOR**</u>
<u>**A PRELIMINARY INJUNCTION**</u>

*A P P E A R A N C E S:*

JONES DAY
*Counsel for the Debtor*
250 Vesey Street, 32nd Floor
New York, NY 10281
By: Corrinne Ball, Esq.
   Todd Geremia, Esq.
   Andrew Butler, Esq.
   Benjamin Rosenblum, Esq.

51 Louisiana Avenue N.W.
Washington, D.C. 20001
By: Christopher DiPompeo, Esq.

PACHULSKI STANG ZIEHL & JONES LLP
*Counsel for the Official Committee of Unsecured Creditors*
780 Third Avenue, 34th Floor
New York, NY 10017
By:    James I. Stang, Esq.
       Kenneth H. Brown, Esq.
       Iain A.W. Nasatir, Esq.
       Gail S. Greenwood, Esq.
       Brittany M. Michael, Esq.

BURNS BAIR LLP
*Special Insurance Counsel for the Official*
*Committee of Unsecured Creditors*
10 E. Doty Street, Suite 600
Madison, WI 53703
By:    Timothy W. Burns, Esq.
       Jesse J. Bair, Esq.

CULLEN AND DYKMAN LLP
*Counsel for Certain Parishes*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
By:    Matthew G. Roseman, Esq.
       Thomas R. Slome, Esq.
       Michelle McMahon, Esq.

MARSH LAW FIRM PLLC
*Counsel for Certain Claimants*
31 Hudson Yards, 11th Floor
New York, NY 10001
By:    James R. Marsh, Esq.

JEFF ANDERSON & ASSOCIATES, PA
*Counsel for Certain Claimants*
363 7th Avenue, 12th Floor
New York, NY 10001
By:    Patrick Stoneking, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the Motion for a Preliminary Injunction ("PI Motion," ECF

Doc. # 127) filed by The Roman Catholic Diocese of Rockville Centre, New York (the "Debtor"

or "Diocese") that is the debtor in possession of this chapter 11 case. The Debtor submitted three

declarations in support of its PI Motion: (1) the Declaration of Eric P. Stephens ("Stephens

Decl.," ECF Doc. # 128); (2) the Declaration of Kenneth F. Porter ("Porter Decl.," ECF Doc. #

129); (3) the Declaration of Charles Moore ("Moore Decl.," ECF Doc. # 130). The PI Motion

seeks to enjoin hundreds of state court actions against the Debtor and/or DRVC Related Parties[1]

by plaintiffs with claims based on sexual abuse ("Survivors").

The Official Committee of Unsecured Creditors ("Committee") filed an Opposition to the

PI Motion. ("Opposition," ECF Doc. # 172.) The Committee submitted an Appendix of

Evidence with its Opposition. ("Committee Appx.," ECF Doc. # 173, with Exs. A through G at

ECF Doc. ## 173-1 through 173-8.) The Debtor filed a Reply Brief in Support of the PI Motion.

("Reply," ECF Doc. # 184.)

The Court entered a joint pretrial order on April 13, 2023. ("Pretrial Order," ECF Doc. #

192.) An evidentiary hearing ("PI Hearing") was held on April 19 and April 20, 2023.

This chapter 11 case was filed more than two-and-a-half years ago. In that time, there

has been little discernible progress in reaching a consensual plan of reorganization. More than

500 sexual abuse claims have been asserted against the Debtor or DRVC Related Parties in state

---

[1]     The Debtor defines DRVC Related Parties as including: (1) parishes within the DRVC (the "Parishes");
and/or (2) affiliates of the DRVC. (PI Motion at 1.) "Affiliates" of the DRVC is not further defined.

3

court,[2] many of which arise from alleged sex abuse that occurred decades ago.  These sex abuse survivors have essentially been stymied in their efforts to obtain compensation since this chapter 11 case was filed.  The issue facing the Court is whether, given all this, the Debtor has established cause for granting the preliminary injunction.

For the reasons set forth below, the relief requested in the PI Motion is **DENIED**. However, pursuant to the most recent Stipulation and Order governing the terms of the stay, the stay "will continue through the Hearing or as the Court may order." (*See* "September 2022 Order," ECF Doc. # 157 ¶ 12.)  The Court hereby **ORDERS** that the stay shall remain in place until noon on the fourteenth day after issuance of this Opinion and Order.  The Court directs counsel for the Debtor and the Committee to submit a proposed Order implementing the terms of this Opinion that shall be applicable following that fourteen-day period.  To the extent the Debtor and Committee wish to mutually extend the duration of the stay, they should include such provisions in the proposed Order while the mediation continues.

## I.    BACKGROUND

### A.  Overview and Procedural History

As already stated, the PI Motion seeks to enjoin hundreds of state court actions by Survivors against the Debtor and/or DRVC Related Parties by plaintiffs with claims based on sexual abuse.  In the Debtor's PI Motion, the Debtor originally identified that this included over 500 such actions.  (*See* Moore Decl. ¶ 4).  The parties have narrowed the scope of actions at issue

---

[2]      Even more sexual abuse claims have been asserted against the Debtor in the bankruptcy case.  As of January 27, 2023, the Debtor reported in its draft disclosure statement for its proposed plan of reorganization that 747 sexual abuse claims had been filed in the bankruptcy case.  *See* Disclosure Statement, *In re Roman Cath. Diocese of Rockville Ctr., New York ("Diocese of Rockville")*, No. 20-12345-MG, ECF Doc. # 1615 at 28.  The overlap between the sexual abuse claims asserted in state court and in the bankruptcy case is discussed in detail *infra*.

here since the Debtor filed its PI Motion in July 2022 to certain actions that do not name the

Debtor or implicate certain shared insurance policies.  At a high level, the Debtor seeks to stay

actions against the DRVC Related Parties because, it argues, allowing such actions to proceed

will drain estate resources—namely, shared insurance proceeds and the time of key personnel—

and otherwise adversely affect the Debtor's ability to reach a consensual resolution of the case

through mediation.

### 1. Bankruptcy Case Commences and Committee Agrees to Limited Stay

The PI Motion does not seek any new type of relief—it effectively seeks to preserve the

stay of state court actions that has been in place since the beginning of this case.  On October 1,

2020, the same day the Debtor commenced the main bankruptcy case, it filed the complaint in

this adversary proceeding seeking a preliminary injunction to stay the state court actions against

the Debtor and DRVC Related Parties.  (*See* Compl., ECF Doc. # 1.)  On October 28, 2020, the

Debtor and Committee entered into a Consent Order granting the Debtor's first Motion for

Preliminary Injunction Under Sections 362 and 105(a) of the Bankruptcy Code.  ("Consent

Order," ECF Doc. # 36.)  As part of that Consent Order, the parties agreed to "an initial

preliminary injunction of the further prosecution" of state court actions brought pursuant to the

Child Victims Act ("CVA") against the Debtor and its co-insureds, including parishes, up to and

including December 10, 2020.  The parties also agreed to use that time to "negotiate in good

faith . . . over the terms of . . . a longer-term consensual stay."  (*Id.*)

### 2. Initial Discovery and Extensions

As a condition for any longer-term consensual stay, the Committee demanded the Debtor

provide discovery on the underlying CVA claims as well as financial information concerning the

Debtor and certain of its affiliates.  (Stephens Decl. ¶ 6.)  Consistent with the Committee's

request, the Debtor began fielding informal discovery document requests and making rolling

productions in late 2020 and early 2021.  The Committee agreed to extend the effective date of

the Consent Order multiple times during the same period.  (*Id.*)

### 3. May 2021: Court Extends Stay Over Committee Objection & Discovery Resumes

On May 20, 2021, the Committee informed the Court that the Debtor would not agree to

produce requested financial information related to the Parishes, which the Committee considered

vital to any future mediation.  (Committee Letter dated 5/20/2021, ECF Doc. # 73.)  The

Committee would not agree to any further extensions of the Consent Order absent such financial

information and requested a status conference regarding a motion to obtain the information

through formal discovery under Bankruptcy Rule 2004.  (*Id.*)  In response, the Debtor stated that

it could not produce the requested discovery considering unresolved objections by the Parishes.

(Debtor Letter dated May 24, 2021, ECF Doc. # 76.)  The Debtor argued that opposition to an

extension of the Consent Order was not a proper method for obtaining discovery and agreed that

the discovery in question should be sought through Rule 2004, and independent of any

extensions to the Consent Order.  (*Id.*)

The Court held a status conference to resolve these issues on May 21, 2021.  Judge

Chapman expressly rejected the Committee's effort to link disclosure of Parish financial

information to extending the stay:

> I don't think that the connection of these two issues is appropriate. I mean,
> I understand the Committee is free to take whatever position that it wants
> with respect to discovery and with respect to the continuation of the
> injunction. But somehow, consent to one is now conditioned on the other,
> and there seems to be a sense from the Committee that I ought to follow that
> lead and somehow link those two. I don't think that that's correct. To state
> the obvious, I would like to avoid a contested hearing on the extension of
> the stay. I think it's an enormous use and waste of resources, and that it is

6

> something that is in everyone's interest to continue for short periods of time
> on a go-forward basis.
>
> \*        \*        \*
>
> It just seems to me that it is unfair, frankly, to shoehorn the discovery
> dispute into the preliminary injunction process. And you know, kind of
> holding it over frankly my head as well as a threat, that unless they, you
> know, turn over these documents, or by implication I force them to turn over
> the documents, you know, you're going to oppose the stay.

(May 21, 2021 Hr'g Tr. at 6:20–7:8; 12:18–24.)

Following the May 26, 2021 status conference, the parties agreed to another consensual

extension of the stay. The Debtor continued producing documents and information to the

Committee on a rolling basis and the parties continued to extend the preliminary injunction every

two to three months. (Stephens Decl. ¶ 17.) On April 11, 2022, the Court so-ordered a

stipulation between the Debtor and the Committee setting a deadline of May 31, 2022 for

completion of final information requests and responses. *See Diocese of Rockville*, No. 20-12345-

MG, ECF Doc. # 1067. On May 31, 2022, the Debtor sent the Committee a letter explaining that

it had substantially completed its production. (PI Motion at 16). The deadline for the stay in

place at that time was August 10, 2022. (ECF Doc. # 120.)

### 4.  Debtor Files PI Motion

Just over two weeks after the Debtor completed its production, the Committee stated that

it would not extend the stay unless the Parishes disclosed their financial information. (*See*

Stephens Decl. Ex. A.) The Debtor responded, as it had to the demand approximately one year

earlier, stating that it had no objection to Parish discovery and offering to facilitate a meeting on

this topic with the Parishes. The Debtor also questioned why the Committee had not yet made

the Parishes mediation parties. (*See id.*, Ex. B.) At that time, three days of mediation had taken

place on April 26, 27 and 28, 2022 between principals and counsel for the Debtor, its insurers,

the Committee, and the future claims representative.  (Stephens Decl. ¶ 33.)

The Debtor proposed a brief 30-day bridge extension of the stay to allow the Parishes and

the Committee to discuss the Committee's demands.  (PI Motion at 17.)  The Committee rejected

that proposal.  On June 28, 2022, the case was reassigned from Judge Chapman to me.  (ECF

Doc. # 124.)  The Debtor filed the PI Motion on July 21, 2022, seeking to extend the stay on a

contested basis.  The PI Motion specifically requested a preliminary injunction enjoining further

prosecution of the State Court Actions until December 8, 2022, subject to renewal as

circumstances warranted.  (PI Motion at 30.)

5.  Procedural History Post-PI Motion

This Court held a status conference regarding the PI Motion on July 26, 2022.  (*See* July

26, 2022 Hr'g Tr., ECF Doc. # 136.)  On August 8, 2022, the Court entered a stipulation and

order extending the stay of the state court actions through October 28, 2022, and setting a

hearing on the PI Motion for October 24, 2022.  (ECF Doc. # 138.)

In September 2022, however, the Debtor and Committee entered into another stipulation

that was approved by the Court further extending the stay.  ("September 2022 Order," ECF Doc.

# 157.)  The September 2022 Order did not set an exact date for expiration of the stay; it

contemplated that the Debtor and Committee, among others, would participate in mediation and

that the PI Motion would only proceed if mediation was unsuccessful.  The September 2022

Order stated that the Committee would continue to support the stay until a consensual resolution

for a plan was reached, or the Committee determined that mediation was at a standstill and filed

a Consent Withdrawal Notice.  The Order stated that the Committee could not file a Consent

Withdrawal Notice before January 13, 2023.  (*See id.* ¶ 11.)  If a Consent Withdrawal Notice was

8

filed, the Court agreed to set a hearing date for the PI Motion, and that the stay would continue through the hearing or as the Court may order.  (*Id.* ¶ 12.)

On January 14, 2023, the Committee filed a Consent Withdrawal Notice.  (ECF Doc. # 166.)  On January 25, 2023, the Court entered an Amended Stipulated Scheduling Order setting a hearing for the PI Motion for April 19, 2023.  ("Scheduling Order," ECF Doc. # 168 at 1.)  This Opinion sets forth the Court's findings of fact and conclusions of law denying the PI Motion.

### B.  Debtor's Relation to Parishes and DRVC Related Parties

The Debtor, as a Diocese, is the seat of the Catholic Church on Long Island.  The Diocese was established by the Vatican in 1957 from territory that was formerly part of the Diocese of Brooklyn; it was established by the State of New York as a religious corporation in 1958.  (PI Motion at 9.)  There are 135 Parishes within the Diocese's geographic boundary.  (*Id.* at 10.)  Each Parish is a separate religious corporation, formed under Article 5 of New York's Religious Corporations Law.  (*Id.* (citing N.Y. RELIG. CORP. L. § 90).)  Parishes are the epicenter of the Catholic Church's mission, and they play a central role in the lives of Catholics.  (*Id.*)  Many of the Parishes are named in the underlying state court actions at issue here.  Some but not all of those state court actions also name the Debtor as a defendant.

In addition, certain other Debtor affiliates are also defendants in the state court actions, such as Catholic Charities of the Diocese of Rockville Centre and the Department of Education, Diocese of Rockville Centre.  Generally, these affiliates are separate, not-for-profit charitable member corporations, each with their own boards and governance.  (*Id.*)  Each is separately represented by restructuring counsel, and none have sought relief under chapter 11.  (*Id.*)

The pending state court actions allege that the Debtor and DRVC Related Parties are liable for certain personal injury tort claims or, in some instances, statutory claims stemming

9

from sexual abuse or misconduct arising out of the victim's involvement with the Debtor.  (*See* Moore Decl. ¶ 4.)  There are approximately 500 state court actions pending against the Debtor and/or the DRVC Related Parties.  (*Id.*)  Although the actions vary in their procedural posture, none are close to trial; they are in either the motion practice or early discovery phase.  (*Id.*)

The Debtor states that, historically, claims against the Debtor and the DRVC Related Parties have, with very limited exceptions, been litigated and administered by the Debtor in close coordination with the DRVC Related Parties.  (*Id.* at ¶ 3.)  The Diocese asserts that this approach is due to the relationship between the Debtor and the DRVC Related Parties; many of the plaintiffs' key allegations are substantially directed at the Debtor.  (*Id.*)  Consistent with past practice, the Debtor states it must coordinate many aspects of the litigation with the DRVC Related Parties, including responses to discovery requests.  (*Id.*)  The Debtor contends that the majority of discovery requests are ultimately directed at the Debtor because the Debtor maintains most of the responsive documents.  (*Id.*)

As explained in the Moore Declaration, before the chapter 11 case, key Debtor personnel, including those from the legal, financial, and risk management departments, devoted substantial time to matters related to the state court actions.  (*Id.* ¶ 6.)  The Debtor contends that the Debtor's General Counsel and Chief Operating Officer were required to analyze potential settlements, strategies, and expenses with respect to the state court actions, and key Debtor personnel had to monitor the status of the state court actions and coordinate with the DRVC Related Parties.  (*Id.*)  Debtor contends these same key personnel are responsible for overseeing and managing the Debtor's chapter 11 case and participating in the ongoing mediation.  (*Id.* ¶ 7.)

10

### C. The Insurance Programs

One of the Debtor's primary reasons for seeking the preliminary injunction is the existence of insurance policies that are shared between the Debtor and other DRVC Related Parties. The Debtor and Committee appear to agree that there are three relevant sources of insurance that are applicable to mutually exclusive time periods: (1) the Royal insurance (from 1957 to 1976); (2) the London insurance (from 1976 to 1986); and (3) the Ecclesia insurance (from 1986 to the present). (PI Motion at 6–9; Opposition ¶ 22.)

The Debtor and Committee appear to largely agree on the terms and conditions for coverage under each of the policies. The parties filed a Notice of Agreed Coverage Summary ("Coverage Summary," ECF Doc. 169, 169-1), laying out the coverage periods and claim limits. (*Id.* at 45.) Further, all the Committee's observations regarding the insurance plan appear to be from citations to the Debtor's Porter Declaration. The facts regarding the policies recited below appear to be undisputed unless otherwise noted.

#### 1. Royal Insurance

From 1957 until 1976, the Debtor purchased both primary and excess or umbrella insurance coverage (the "Royal Primary Policies" and the "Royal Umbrella Policies") from Royal Indemnity Insurance and Royal Globe Insurance Company (collectively now known as Arrowood Indemnity Company). (Porter Decl. ¶ 6.) The Debtor claims that the Royal Policies cover both the Debtor and the DRVC Related Parties. (*Id.*)

The Royal Primary Policies provide the first layer of insurance coverage for the Debtor and the DRVC Related Parties. (*Id.* ¶ 7.) These insurance policies do not have aggregate limits of liability, but they do have per-occurrence limits ranging from $150,000 to $300,000,

depending on the policy period.  (*Id.*)  Until 1964, the Royal Primary Policies were the Debtor's only insurance coverage.  (*Id.* ¶ 8.)

From 1964 to 1976, Royal also provided the Debtor with excess or umbrella insurance coverage.  (*Id.* ¶ 9.)  The Royal Umbrella Policies provide coverage for liability that exceeds the limits of liability for the Royal Primary Policies.  (*Id.*)  The Royal Umbrella Policies contained per-occurrence limits that ranged from $2 million to $12 million.  (*Id.* ¶ 10.)  While the Royal Umbrella Policies apparently did not contain any aggregate limits during the first several years of the program, aggregate limits began being imposed in 1970.  The Debtor reports these aggregate limits ranged from $4 million to $12 million in the policies covering 1970 to 1976.  (*Id.*)

The Committee notes that the Royal Policies provide for "an unlimited payment of defense costs for each claim" (Porter Dec. ¶ 7), if the Royal Primary Policies' per-occurrence limits of liability have not been exhausted for that claim through indemnity payments. (Opposition ¶ 24.)  The Debtor does not contest this aspect of the policy, but contends that because Arrowood is in financial distress, there may be a practical limitation on Arrowood's ability to pay in any event.  (*See* April 20, 2023 Hr'g Tr. at 27:12–24.)

2. London Insurance

From 1976 until 1986, the Debtor purchased insurance coverage (the "London Policies") from a syndicate of insurance companies known as the London Market Insurers (the "London Insurers"), with additional excess insurance coverage provided by various other insurers, including Interstate Fire & Casualty Company (collectively with the London Insurers, the "London Program").  (Porter Decl. ¶ 11.)  Like the Royal Policies, Debtor states that the London Policies also cover both the Debtor and the DRVC Related Parties, and the insurance proceeds are shared between all co-insureds.  (*Id.*)

12

Under the London Policies, the "Self-Insured Retention" ("SIR") requires insureds to cover the first $100,000 of liability per occurrence. (*Id.* ¶ 12.) The London Policies then provide an initial layer of coverage through two insuring agreements—an "Aggregate Agreement" and a "Specific Excess Agreement." (*Id.*) As detailed in the Porter Declaration, these agreements provide some coverage for the first $200,000 of liability on a claim.

The London Policies also provide a layer of umbrella insurance policies—the "Interstate Policies"—and upper layer excess insurance policies—the "London Excess Policies." (*Id.* at 17.) The umbrella layer of coverage generally covered the difference between $200,000 and $5 million for each occurrence, with no aggregate limit of liability, and was provided by Interstate and other insurance companies. (*Id.*) The Debtor states that the excess insurance policies covered per-occurrence liability above $5 million, up to a per-occurrence limit of liability of $5 million to $45 million, depending on the policy period. (*Id.*) The Committee contends that such policies have per-occurrence limits up to $100 million in some years, citing both the Porter Declaration and the Coverage Summary.[3]

Neither layer of insurance coverage included an aggregate limit, meaning that those insurance companies retain liability for new claims alleging injury during a London Program policy period, up to their share of the per-occurrence limits of liability. (*See* Porter Dec. ¶¶ 15, 17; Coverage Summary at n.4–5.) Unlike the Royal Policies, defense costs do reduce the per-occurrence limits of the London Program Policies. (Porter Dec. ¶ 16.) Still, the Committee

---

[3]     The Committee appears to be including an approximate additional $50 million in excess coverage by the "Fireman's Fund High Level Excess Program," shown in exhibits to the Porter Declaration and in the Coverage Summary, but that was not considered in the Porter Declaration's discussion of the London Policies, specifically. (*See* Ex. A to Porter Decl., ECF Doc. # 129-1.)

observes that the London Program period has extraordinarily high per-occurrence limits making

it unlikely that defense costs would ever dissipate a substantial amount of these proceeds.

       3.  <u>Ecclesia Insurance</u>

Ecclesia Assurance Company ("Ecclesia"), the Debtor's captive insurance company, is

the sole provider of insurance for sexual abuse claims occurring after August 31, 1986.  (Porter

Dec. ¶ 19.)   The policy terms are irrelevant here, as the Committee recognizes that prosecution

of certain claims that fall within the Ecclesia period could materially affect limits available to the

Debtor at some point based on eroding limits of liability and available aggregate limits, and

therefore does not oppose an injunction of state court actions implicating the Ecclesia insurance

at the present time.  (Opposition ¶ 31.)

### D.  Scope of the Dispute Regarding the State Court Actions

Two of the Debtor's main reasons for seeking a stay of the 490 non-duplicative state

court actions[4] pending against the Debtor and/or DRVC Related Parties are to avoid: (1)

expending estate resources to focus on parallel litigation, both as a practical necessity and to

avoid adverse legal consequences from the suits; and (2) dissipation of shared, finite, insurance

proceeds.  The Committee has narrowed the scope of the dispute by stating that it does not

oppose the stay with respect to state court actions that: (1) name the Debtor as a defendant (230

cases); or (2) do not name the Debtor, but implicate the Ecclesia policies (32 cases).  Put

differently, the Committee only opposes the stay with respect to the actions ("228 State Court

---

[4]      In the PI Motion, the Debtor originally sought relief with respect to more than 500 state court actions.  (*See* Moore Decl. ¶ 4.)  By the time the Opposition was filed, it appears that the parties had stipulated that the scope of relief sought by the Debtor was only directed at 490 non-duplicative state court actions.  (Opposition ¶ 2 (citing Coverage Summary).)  As explained above, the Committee's Opposition further narrowed the group of cases in dispute from 490 to 228.

Actions" or "State Court Actions") that do not name the Debtor, and only implicate the Royal or London insurance policies, or no policies at all. The Committee provides a breakdown of these 228 State Court Actions for which it opposes the stay, categorized by the applicable insurance: (1) 108 State Court Actions that fall exclusively within the Royal Period; (2) 29 State Court Actions that overlap the Royal and London periods; (3) 70 State Court Actions that fall exclusively within the London Period; (4) 17 State Court Actions that involve no insured defendant, (5) 2 State Court Actions that involve no insurance coverage, and (6) 2 State Court Actions that have no information pertaining to coverage.[5]

The Debtor observes that nearly all—224 of the 228 State Court Actions—involve related proofs of claim filed against the Debtor. (*See* Committee Appx., Ex. A.)

The Committee contends that allowing only these State Court Actions to proceed will obviate the Debtor's need for a stay. Specifically, the Committee argues that litigation against non-debtors alone will not distract the Debtor to the point of affecting the reorganization, and that the terms of the Royal and London policies are such that litigating against Debtor's co-insured under those policies will not meaningfully affect the coverage available to the Debtor. The Committee further offers that the Court could allow the State Court Actions to proceed on the condition that a Survivor may not enforce a judgment against, or receive a settlement payment from, insurance policies that provide coverage to the Debtor as a named insured, absent further order of this Court. (Opposition ¶ 3.)

---

[5] The Committee assembled these figures from the stipulated Coverage Summary, which it presented as Exhibits A1-A6 to the Committee Appendix ("Related Insurance Schedules").

### E. Bankruptcy Case Progress Since the PI Motion was Filed

Both parties characterize the progress in the bankruptcy case differently to support their

arguments on the merits for and against a stay.  When it filed the PI Motion, the Debtor

contended that "the current posture of the case weighs strongly in favor of preserving the status

quo so the parties can pursue mediation without the distraction that will result from an explosion

of hundreds of cases in state court."  (PI Motion at 9.)  The Debtor also highlighted that

mediation was in its early phases; it argued that the Committee should not be permitted to "short-

circuit" that process before determining if a consensual plan was possible.  The PI Motion,

however, was filed more than ten months ago, and thus the facts relevant to mediation and plan

confirmation have been evolving in the interim.

1. Committee's Characterization

The Committee's Opposition adds the following background regarding mediation and

plan confirmation.

*a. Mediation*

When the PI Motion was filed, only one mediation session had occurred, in April 2022.[6]

Four months passed before the next mediation session was scheduled for August 2022.

(Opposition ¶ 18.)  The Parishes became mediation parties upon the Committee's insistence in

June 2022.  The Committee received the Parishes' basic financial information in September

2022.  (*Id.*)

Since the Committee received the Parish financial information, the Committee reports

that it has participated in multiple Zoom and in-person mediation sessions with a combination of

---

[6]     That mediation was conducted pursuant to an October 20, 2021 order appointing Paul J. Van Osselaer as
mediator and ordering the Committee, the Diocese, and the Diocese's insurers to mediate.  *Diocese of Rockville*, No.
20-12345-MG, ECF Doc. # 794.

16

the Debtor, the Parishes, and the Debtor's insurers, and understands the mediator has held

multiple additional sessions focused only on other parties.  (*Id.* ¶ 19.)  Mediation has not

achieved a global settlement or demonstrated that such a settlement is likely, according to the

Committee.  The Committee further contends that the parties' negotiations are at a complete

standstill notwithstanding discussions to engage a new co-mediator and a recent meeting among

counsel to the Debtor, Parishes, and the Committee, as further explained below in the context of

the Debtor's Reply.

### b.  *Proposed Plans*

Exclusivity has expired in the Debtor's chapter 11 case.  Both the Committee and the

Debtor have proposed plans, but neither the Committee nor the Debtor have pushed their plans

and disclosure statements for consideration by the Court.

On January 19, 2023, the Committee filed the Chapter 11 Plan of Reorganization

Proposed by the Official Committee of Unsecured Creditors.  *See* Committee Plan, *Diocese of

Rockville*, No. 20-12345-MG, ECF Doc. # 1574.   The Committee Plan proposes creating a trust

funded with $41 million from the Debtor, as well as transfer of ownership or proceeds from the

sale of the Debtor's telecommunication assets, real estate, and captive insurance company to the

trust.  (*Id.* ¶ 19.)  The Committee Plan would transfer avoidance actions, the Debtor's insurance

claims, and causes of action related to insurance recovery to the trust as well.  Absent an

acceptable, meaningful contribution to the trust based on settlement offers described in the plan,

the Committee Plan would not release non-debtor affiliates and would enable Survivors to

pursue their claims against non-settling non-debtors, including DRVC Related Parties.  (*Id.*)

On January 27, 2023, the Debtor filed the Chapter 11 Plan of Reorganization for The

Roman Catholic Diocese of Rockville Centre, New York.  *See* Diocese Plan, *Diocese of

*Rockville*, No. 20-12345-MG, ECF Doc. # 1614.  Under the Diocese Plan, a channeling

injunction and non-consensual third-party releases would permanently protect the DRVC Related

Parties (i.e., all Parishes and any other co-insureds under policies applicable to the Diocese) from

past, present, and future claims by Survivors and such claims would be asserted exclusively

against the trust.  (*Id.* ¶ 21.)  The Diocese Plan would impose releases upon the Survivors of all

their direct claims against the DRVC Related Parties in exchange for payment of $11.1 million,

exclusive of insurance rights, an amount the Committee considers grossly inadequate.  (*Id.*)

### 2.    Debtor's Characterizations of the Case

In its Reply, the Debtor argues that the existence of competing plans does not suggest that

reorganization is unlikely.  (Reply at 22.)  The Debtor states that it is not attempting to confirm

its plan non-consensually, and highlights the possibility that a consensual resolution could result

in the filing of an amended plan.  (*Id.*)  The Debtor argues that the parties are not at an impasse

in mediation as the Committee suggests.  (*Id.*)  The Debtor noted that the week before filing the

Reply, the parties requested appointment of a judicial co-mediator, and that the Committee

remained open to a resolution.  (*Id.*)

### 3.    Additional Mediation

As the Debtor noted, between the filing of the Committee's Opposition and the Debtor's

Reply, the parties requested appointment of a judicial co-mediator in an attempt to reach a

consensual resolution for the entire bankruptcy case.  On April 17, 2023, the Court entered an

order taking judicial notice of the appointment of United States Magistrate Judge Sarah L. Cave

as the mediator in the four declaratory judgment actions pending in the Southern District of New

York related to the insurance coverage that is at issue in this case.  *See* Order, *Diocese of*

*Rockville*, No. 20-12345-MG, ECF Doc. # 2018.  The Court understands that the mediation with

18

Judge Cave was scheduled to last at least through May 31, 2023, subject to Judge Cave

extending the mediation period, if progress warrants it.  (*See* April 19, 2023 Hr'g Tr. 39:17–21.)[7]

### 4.  Other Party Briefing and Joinders

On March 31, the Parishes (constituting all 136 parishes within the Debtor Diocese's

territory, as defined in their brief) submitted a response to the Committee's Opposition.  ("Parish

Response," ECF Doc. # 179.)  Two motions to join the Committee's Opposition were filed on

behalf of certain Survivors and claimants in the bankruptcy case.  (*See* ECF Doc. ## 176, 177.)

### F.  The PI Hearing and Witnesses

On January 25, 2023, the Court entered the operative Scheduling Order, setting a hearing

for the PI Motion for April 19, 2023, and continuing on April 20-21, 2023 as necessary.

(Scheduling Order at 1.)  On April 13, the Court entered the Joint Pretrial Order.  (*See generally*

Pretrial Order.)  The PI Hearing was held on April 19 and 20, 2023.

The Debtor submitted the direct testimony of three witnesses: (1) Kenneth F. Porter

("Porter Direct," ECF Doc. # 181); (2) Eric P. Stephens ("Stephens Direct," ECF Doc. # 180);

and (3) Charles Moore ("Moore Direct," ECF Doc. # 182), the same three individuals that

originally submitted declarations in support of the PI Motion.  Their respective direct testimony

addressed the same subject matter as their original declarations.

Mr. Porter is an insurance broker and advisor on risk management and insurance issues to

the Debtor.  He testified about the operation of the insurance policies.  Mr. Stephens is a partner

at Jones Day, the Debtor's counsel in this case; he testified about the nature of the state court

actions against the Debtor and DRVC Related Parties, and the burdens associated with that

---

[7]     On May 26, 2023, one of the co-mediators, Paul J. Van Osselaer, filed a status report indicating that no
resolution had been reached in the mediation, but that the parties "expressed their desire and willingness to continue
a dialogue toward a settlement."  *See* Status Report, *Diocese of Rockville*, No. 20-12345-MG, ECF Doc. # 2113 ¶ 3.

litigation.  Mr. Moore is a Managing Director with the North American restructuring division of

Alvarez & Marsal, the Debtor's restructuring advisor.  Mr. Moore testified about the burdens

associated with the state court actions against the Debtor and DRVC Related Parties, as well as

the involvement of key personnel in the reorganization efforts.

Each witness appeared in person at the hearing, and each witness was cross-examined by

the Committee's counsel.  The Committee did not call any of its own witnesses.

## II.    <u>LEGAL STANDARD</u>

### A.  Automatic Stay Under Section 362

Section 362(a) of the Bankruptcy Code automatically stays virtually all litigation against

a debtor and efforts by creditors to obtain the debtor's property.  *See* 11 U.S.C. § 362(a). The

automatic stay is one of the fundamental protections for a debtor and permits the debtor to focus

on its reorganization.  *See E. Refractories Co. Inc. v. Forty Eight Insulations Inc.*, 157 F.3d 169,

172 (2d Cir. 1998).  The automatic stay prohibits (i) the continuation of any judicial,

administrative, or other action or proceeding against the debtor, 11 U.S.C. § 362(a)(1); and (ii)

any act, whether against the debtor or third parties, to obtain possession of, or exercise control

over, property of the estate, 11 U.S.C. § 362(a)(3).

### B.  Injunctive Relief

#### 1.  <u>Injunctions Pursuant to Section 105(a) of the Bankruptcy Code</u>

The bankruptcy court may "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of" the Bankruptcy Code under section 105(a) of the

Code.  11 U.S.C. § 105(a).  In certain circumstances, section 105(a) can be used to enjoin actions

against non-debtors.  *See Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d

81, 87–93 (2d Cir. 2014).  "Section 105(a) is to be 'construed liberally to enjoin suits that might

20

impede the reorganization process.'" *Lautenberg Found. v. Picard (In re Bernard L. Madoff Inv. Sec.)*, 512 F. App'x 18, 20 (2d Cir. 2013) (quoting *MacArthur Co. v. Johns-Manville Corp.,* 837 F.2d 89, 93 (2d Cir. 1988)).

In considering whether to enjoin suits against non-debtors under section 105(a), courts consider "whether the suits would (i) threaten the debtor's insurance coverage, (ii) increase the debtor's indemnification liability, (iii) result in inconsistent judgments, (iv) expose the debtor to risks of collateral estoppel or *res judicata*, and (v) burden and distract the debtor's management by diverting its manpower from reorganization to defending litigation." *McHale v. Alvarez (In re The 1031 Tax Grp., LLC)*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008).

To the extent that the irreparable harm requirement has not been satisfied in these cases under the traditional analysis for injunctive relief (*see, infra,* Section II.B.2), such cases have held the requirement to be unnecessary. *See Sec. Inv'r Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 436 (Bankr. S.D.N.Y. 2010) ("Because injunctions under section 105(a) are authorized by statute, they need not comply with the traditional requirements of Rule 65."); *1031 Tax Grp.*, 397 B.R. at 684 ("Rather, 'the bankruptcy court may enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it.'") (quoting *Johns-Manville Corp. v. Colo. Ins. Guar. Ass'n (In re Johns-Manville Corp.)*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988)).

### 2. Injunctions Pursuant to Bankruptcy Rule 7065

Bankruptcy courts can also grant injunctions pursuant to Federal Rule of Civil Procedure 65, made applicable to adversary proceedings under Bankruptcy Rule 7065. *See Eastern Air Lines v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990).

21

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "In evaluating these factors, the court takes a flexible approach and no one factor is determinative." *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 (S.D.N.Y. 2007), *aff'g,* 354 B.R. 45 (Bankr. S.D.N.Y. 2006) (quotation omitted).

### C.  Jurisdiction

The federal district courts have original jurisdiction for "all cases under title 11" and "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a) & (b). In turn, 28 U.S.C. § 157(a) provides that district courts may refer all cases or proceedings over which they have jurisdiction under 28 U.S.C. § 1334(a) or (b) to the bankruptcy courts. The Southern District's Amended Order of Reference refers all bankruptcy cases and proceedings to the bankruptcy court in this district. *See, e.g.*, *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 27 (S.D.N.Y. 2011) ("The Southern District of New York has a standing order referring all cases arising under title 11 to the bankruptcy court in this district."); Gen. Order M-431 (S.D.N.Y. Jan. 31. 2012).

The Supreme Court has instructed lower federal courts to construe the jurisdictional grants in Sections 1334 and 157 broadly, recognizing that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

22

Courts have construed section 1334 as creating three potential bases for jurisdiction—(1) those "arising under title 11," (2) those "arising in" a case under title 11, and (3) those "related to" a case under title 11.  11 U.S.C. § 1334.  Proceedings "arise under" title 11 when the cause of action or claims "clearly invoke substantive rights created by bankruptcy law."  *In re Housecraft Indus. USA, Inc*., 310 F.3d 64, 69–70 (2d Cir. 2002).  Proceedings "arise in" a bankruptcy case if they "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy."  *Baker v. Simpson*, 613 F.3d 346, 350–51 (2d Cir. 2010).  "A bankruptcy court has 'related to' jurisdiction over every case where 'the action's outcome might have any conceivable effect on the bankrupt estate.'"  *Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.)*, 619 B.R. 38, 48–49 (S.D.N.Y. 2020) (quoting *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339–40 (2d Cir. 2018)).

"An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  *SPV*, 882 F.3d at 340 (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995)).  "[T]he touchstone for bankruptcy jurisdiction remains 'whether its outcome might have any "conceivable effect" on the bankruptcy estate.'"  *In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir.1992)).

The Second Circuit has also found "related to" jurisdiction based on "strong interconnections between the third party action and the bankruptcy."  *SPV Osus*, 882 F.3d at 342 (2d Cir. 2018) (quotation omitted).  Jurisdiction exists if it is "possible"—even if "improbable"— that a non-debtor could eventually file successful "claims . . . against the debtor for either indemnification or contribution."  *Id*. at 340, 342.  Courts have also considered that

23

litigation against non-debtors may have a conceivable effect on the bankruptcy estate where the litigation entails proving facts that would establish the debtor's own liability and the debtor has a legal or contractual duty to indemnify the non-debtors. *See Purdue Pharm.,* 619 B.R. at 54.

## III.    PRELIMINARY INJUNCTION ANALYSIS

This Court first addresses the Debtor's arguments in favor of a preliminary injunction.[8]

The Debtor provides two bases for why an injunction should be entered to stay the State Court Actions: (A) First, "nearly all" of the relief sought is consistent with the stay already imposed by section 362 of the Code; and (B) Second, and to the extent that any of the relief sought is outside the scope of section 362, an injunction is warranted under section 105(a) of the Code.  The Committee opposes both bases, and the parties' respective arguments on each are addressed in turn in subsections III.A and III.B below.

At the outset, it is important to note that while the Debtor has not changed any of its legal arguments since it filed the PI Motion, it has changed the requested scope of relief multiple times before and through the hearing.  In the PI Motion, the Debtor originally sought a 120-day extension of the injunction until December 8, 2022.  Obviously, intervening events delayed adjudication of the PI Motion and that is no longer the requested relief.  By the time it filed its Reply, the Debtor updated its position to request a 120-day extension of the injunction until August 17, 2023.  (Reply at 25.)  The 120-day period requested appears to have been calculated to run from the first scheduled day of the PI Hearing.

Since then, however, the Debtor has also made two alternative requests for lesser relief. First, in the Reply, the Debtor also requested that even if the Court does not enter the requested

---

[8]      The Court assumes that it has subject matter jurisdiction for purposes of the preliminary injunction analysis, and then addresses the issue briefly in Section IV.

120-day injunction, it should maintain the injunction for a "short period of time" to allow the

Debtor to file, and the District Court to consider, a motion to transfer the State Court Actions to

the federal District Court. (*Id.* at 24–25.) This argument is addressed in detail in Section III.C.

Second, in its closing arguments at the PI Hearing, the Debtor requested that the Court enter a

preliminary injunction that was timed to end 30 days after the conclusion of the ongoing

mediation. (April 20, 2023 Hr'g Tr. 8:8–14.)

Because both requests were made for the first time in the Reply and at the PI Hearing, the

Committee did not have an opportunity to brief the alternative relief. At the PI Hearing, the

Committee opposed the request for a short period of time to file a motion to transfer the State

Court Actions (*see id.* at 79:10–81:16), and the 30-day injunction after mediation. (*See id.* at

85:18–21). The Court notes this at the outset, as the extent of relief requested will be particularly

relevant to certain of the legal requirements for an injunction under section 105(a). Thus, the

Court will have to consider the range of relief requested by the Debtor as opposed to the single

injunction originally requested in the PI Motion.

### A. Applicability of the Automatic Stay

The Debtor contends that its request for an injunction is modest because the automatic

stay under section 362(a) of the Bankruptcy Code already bars continued prosecution of nearly

all the State Court Actions. It provides three arguments in support: (1) the DRVC Related

Parties and the Debtor are co-insureds; (2) the Debtor would be named in the State Court Actions

absent the bankruptcy; and (3) there is an identity of interest between the DRVC Related Parties

and the Debtor. These arguments are addressed in turn in corresponding subsections below.

In sum, as to the Debtor's first argument, the Debtor may be factually correct in arguing

that the State Court Actions could result in later actions to obtain insurance proceeds, but legally,

that does not warrant staying the State Court Actions pursuant to section 362 of the Code at this time.  The Debtor's second and third arguments regarding application of the automatic stay are completely lacking in merit and relief is not warranted on those grounds, either.

    1.  Insurance

The Debtor first argues that allowing the State Court Actions to proceed against DRVC Related Parties would violate the automatic stay under section 362(a)(3) of the Code because the DRVC Related Parties are co-insureds with the Debtor.  Thus, the Debtor contends that actions against the DRVC Related Parties threaten the amount of insurance proceeds available to the Debtor to defend against and satisfy similar claims.  The fundamental authority for this argument stems from *MacArthur Co. v. Johns-Manville Corp*, where the Second Circuit recognized that insurance proceeds can constitute property of the estate, and that the automatic stay bars actions against non-debtors to obtain such proceeds.  *See MacArthur Co. v. Johns-Manville Corp. (Manville I)*, 837 F.2d 89, 92–93 (2d Cir. 1988).

The parties are effectively in agreement as to the terms of the insurance.  The Committee does not seriously dispute that under certain policies at issue, proceeds used by the DRVC Related Parties for defense costs, settlement, or satisfaction of judgments will reduce the amount of insurance proceeds later available to the Debtor due to per-occurrence or aggregate limits on the insurance shared between the Debtor and DRVC Related Parties.  Despite this agreement, there appear to be two sub-issues: (a) whether the Debtor has met the evidentiary burden to show how insurance proceeds could be dissipated as a result of the State Court Actions; and (b) whether the State Court Actions themselves constitute actions to obtain those insurance proceeds.  These are addressed in corresponding subsections below.  Finally, subsection (c)

26

explains the delineation between this Court's findings on the scope of the automatic stay and the parties' relief sought in the form of an injunction.

### a. Evidentiary Argument

The Committee argues that the stay is not applicable here, despite the fact that the Debtor and DRVC Related Parties are co-insureds under policies with limited proceeds, because the Debtor fails to "prove that the prosecution of *each* State Court Action that it seeks to enjoin will have a material adverse impact on the per-occurrence or aggregate limits, if any, of a specific insurance policy." (Opposition ¶ 45 (emphasis added).) In support, the Committee cites to two cases (both diocesan bankruptcies) where courts rejected the applicability of the automatic stay to actions against non-debtor co-insureds because the debtors failed to adequately show that such actions could deplete insurance proceeds belonging to the estate.[9] Despite their contextual similarities, the operation of the insurance policies is much clearer here in comparison to the cases cited by the Committee, and thus they do not support the notion that the Debtor has failed to meet some evidentiary burden with respect to how insurance proceeds are consumed.

First, the Committee cites to *Diocese of Buffalo v. Doe (In re Diocese of Buffalo)*, which recognized the principle that actions against non-debtors are subject to the stay under section 362(a)(3) where they threaten to dissipate insurance proceeds shared with the debtor. 618 B.R. 400, 406–407 (Bankr. W.D.N.Y. 2020). The court in *Diocese of Buffalo* held that there was not adequate support for the applicability of section 362(a)(3), however, noting that the debtor "has supplied only an outline of insurance coverage. While this presentation is helpful, it falls far

---

[9]     The Committee also cites to *Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 337-38 (Bankr. S.D.N.Y. 1996), as supporting its argument. The Court denied applicability of the stay under section 362, and denied an injunction under section 105(a), but that seemed to be based on a legal, as opposed to evidentiary, basis, as discussed in section III.A.1(b) below.

short of proof sufficient to establish that litigation against Affiliated Entities would necessarily affect property of the bankruptcy estate." *Id.* at 406.  Second, the Committee cites to *Diocese of Rochester v. AB 100 Doe (In re Diocese of Rochester)*, which reached the same conclusion as the court in *Diocese of Buffalo*.  *See* 2022 Bankr. LEXIS 1469, *15–16 (Bankr. W.D.N.Y. May 23, 2022).  The court stated that "the Diocese made no effort to provide evidence showing that a specific CVA case would have a materially adverse impact on the per-occurrence limits of a specific policy of insurance." *Id.* at *17.

While the underlying factual circumstances of the diocesan bankruptcies are clearly similar, it is difficult to draw any legal principles from these cases in support of the Committee's evidentiary argument.  Neither opinion recited the actual evidentiary burden the courts held the debtors to in showing that the non-debtor actions would dissipate shared insurance proceeds. The opinions also did not cite any cases applying section 362(a)(3) on this point either.

In any event, it is difficult to say that the Debtor makes the same evidentiary failing here. The Debtors have produced evidence of insurance policies and has submitted the stipulated Coverage Summary showing which insurance policies apply to which actions.  The parties agree on the limitations of every insurance policy.  Part of that agreement is that recovery or defense costs in certain of the identified actions against non-debtors would draw down on insurance that has per-occurrence or aggregate limits.  The Debtor further shows that 224 of the 228 State Court Actions involve related proofs of claim filed against the Debtor.  (*See* Committee Appx. Ex. A.)

The only thing that the Debtor has not proved is the extent to which the insurance will be dissipated in any given case, which is impossible to know.  But in all of the cases at issue there is no doubt that recovery by plaintiffs or defense costs incurred by the DRVC Related Parties, if satisfied by insurance, would draw down on a limited pool of policy proceeds that would

28

otherwise be available to the Debtor.  For these reasons, the Court considers that there are no

shortcomings in the Debtor's proof regarding the operation of the insurance that would preclude

it from making its automatic stay arguments as an evidentiary matter.

### b.   Scope of Section 362(a)(3)

Having determined that the Debtor has adequately shown how State Court Actions *could*

eventually lead to draining shared insurance proceeds, the Court must also address a separate

legal issue—whether the State Court Actions themselves constitute actions to obtain those

insurance proceeds under section 362(a)(3).  *See* 11 U.S.C. § 362(a)(3) (staying "any act to

obtain possession of property of the estate or of property from the estate or to exercise control

over property of the estate").  The Court finds that they do not.  Again, the directly controlling

authority continues to be *Manville I*, where the Second Circuit recognized that insurance

proceeds can be property of the estate, and that the automatic stay bars actions against non-

debtors to obtain such proceeds.  *See* 837 F.2d at 92–93.

While *Manville I* stated the bedrock principle that the debtor's insurance proceeds

constitute property of the estate, that case dealt with enjoining an action directly against the

Debtor's insurer.  *See id.* at 91.  In that case, there was no doubt that the action in question

sought "to obtain possession of" or "to exercise control over" insurance proceeds, within the

scope and meaning of section 362(a)(3).  There is a closer question here, however, because the

State Court Actions are not brought against insurers, and no one has alleged that the state court

plaintiffs have made any demands of entitlement to insurance proceeds.  Rather, the Debtor's

argument here is that because the actions are brought against co-insured parties, they will, as a

practical matter, necessitate the use of insurance proceeds.  To that end, the Debtor cites

persuasive out of circuit cases holding that the automatic stay not only bars actions against

29

insurers, but bars actions against non-debtor co-insureds that could necessitate the non-debtors

drawing from the same insurance proceeds that a debtor is entitled to.  *See A.H. Robins Co. v.*

*Piccinin,* 788 F.2d 994, 1001–02 (4th Cir. 1986) (staying actions "against officers or employees

of the debtor who may be entitled to indemnification under [an insurance] policy or who qualify

as additional insureds under the policy"); *In re Circle K Corp.*, 121 B.R. 257, 259–61 (Bankr. D.

Ariz. 1990) (citing to *A.H. Robins* and staying actions against non-debtor co-insureds).

The Committee attempts to distinguish these cases as "affirm[ing] the uncontroversial

principle that a debtor's insurance policies are property of the estate and proceedings against an

insurer or an officer or employee who may receive indemnification under the policy may be

subject to the automatic stay."  (Opposition ¶ 51.)  But that reasoning fails to articulate why the

same result should not obtain here in a proceeding against a co-insured entitled to policy

proceeds for defense costs or to satisfy a judgment, as opposed to say, an officer who is entitled

to policy proceeds as indemnification.[10]  The focus under the cases cited by the Debtor is that

actions against non-debtors who are entitled to the same insurance proceeds as the Debtor

ostensibly threaten to deplete those proceeds that would otherwise be available to the Debtor;

nothing in the analyses suggests that the identity of the co-insured or how the proceeds are

---

[10]     Certain of the other cases cited by Debtor are inapposite on this issue as they found that shared insurance proceeds militated in favor of granting an injunction under section 105(a), not application of section 362(a)(3).  *See 1031 Tax Grp.,* 397 B.R. at 683.  Others are inapposite as not having addressed insurance whatsoever, either in the context of the automatic stay or section 105(a).  *See Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 287–88 (2d Cir. 2003) (finding that the automatic stay applied to debtor's wholly owned subsidiary because litigation against subsidiary would have an "immediate adverse economic impact" on the debtor).

The Debtor also cites to *In re Boy Scouts of America and Delaware BSA, LLC,* in support of the notion that shared proceeds are property of the estate.  642 B.R. 504, 574–74 (Bankr. D. Del. 2022), *aff'd,* 2023 WL 2662992 (D. Del. Mar. 28, 2023).  As discussed above, this is not a disputed principle.  Beyond that, *Boy Scouts* says nothing about the extent to which section 362(a)(3) shields non-debtor co-insureds from litigation; the only discussion of section 362(a)(3) pertained to whether the provision precluded a buyback of insurance policies pursuant to section 363 of the Bankruptcy Code as part of a proposed plan of reorganization.  *See id.*

labelled is relevant to the analysis. *See A.H. Robins Co,* 788 F.2d at 1001–1002; *Circle K Corp.*, 121 B.R. at 261.

Indeed, many of the cases on this subject, like *Circle K*, involve actions against directors and officers ("D&O") of a debtor that are covered by the debtor's D&O insurance policies, and the Court finds that these cases are quite relevant. And where the ultimate effect of depleting insurance proceeds available to a debtor is the same, there is no meaningful difference between the D&O scenario and the one here, where the non-debtor co-insureds may draw on policy proceeds (either for defense costs or to satisfy judgments) that are subject to per-occurrence or aggregate limits. The Committee does not engage with this issue to articulate why the Debtor's persuasive caselaw should not be followed.

Nevertheless, the Committee does cite to one case from a bankruptcy court in this district that counters the persuasive force of the Debtor's two cases upon closer inspection. *See Granite Partners*, 194 B.R. at 337–38. In *Granite Partners*, the trustee brought a motion to stay litigation by third parties against non-debtor officers of the debtor covered by the debtor's D&O insurance. The Court held that:

> We are not convinced that an action by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights, implicates the automatic stay.
>
> We conclude, therefore, that the automatic stay does not bar these lawsuits on this separate ground involving the debtor's insurance coverage.

*Id*. at 337–338.

While the Committee frames this as resulting from an evidentiary failing on the part of the trustee under its first argument, the Court considers that this holding is actually a result of the court's recognition of the limited scope of the stay under section 362(a)(3). Indeed, as is true

here, there was no doubt in *Granite Partners* that actions against the non-debtors could draw

down on the same limited pool of insurance proceeds that were also available to the debtor.[11]

However, the court's ultimate conclusion was that any threat to insurance proceeds did not

warrant an injunction under section 105(a) of the Code, which is a separate legal issue

considered herein. *Id.* at 337–38. Relevant for purposes of the automatic stay, however, the

court acknowledged that the result in cases like *A.H. Robins*, where courts resort to section

105(a) to impose injunctions, "implies that the *mere threat to the policy does not implicate the*

*automatic stay*, and that the Court should not extend the automatic stay if that is the only 'injury'

that the debtor can show." *Id.* at 337 (emphasis added).

While the court in *Granite Partners* acknowledged that certain insurance proceeds were

property of the estate, it found that actions against parties entitled to those proceeds did not

violate the automatic stay. Put differently, this Court reasons that those actions must not have

constituted acts "to obtain possession of" or "to exercise control over" property of the estate

within the scope and meaning of section 362(a)(3). *Accord In re Aearo Techs. LLC,* 642 B.R.

891, 907 (Bankr. S.D. Ind. 2022) ("Whether § 362(a)(3) stays an action is a two-step inquiry.

First, a court must determine whether property of the estate is at issue; second, a court must

determine whether the action in question constitutes an action to obtain possession of, or exercise

control over, the property in question.").

The Court follows *Granite Partners* and reaches the same conclusion here: the insurance

proceeds constitute property of the estate, but the State Court Actions do not constitute actions to

---

[11]     In *Granite Partners*, the court explained that "under a policy, like the Funds/ACM policy, every dollar paid
to cover the director's liability (or to indemnify them for their litigation expenses) reduces, by one dollar, the
remaining coverage available for indemnification. If the insurance is insufficient to pay all covered claims, such
payments will reduce the amount of coverage available to the debtor." *Id.* at 336.

obtain control over this estate property.  In reaching that conclusion, the Court notes that the

court in *Granite Partners* also considered and distinguished the two persuasive cases cited by

Debtor here in support of its arguments regarding the automatic stay.  *See Granite Partners*, 194

B.R. at 337–38 (discussing *A.H. Robins* and *Circle K*).

Furthermore, this conclusion is consistent with the other D&O cases that the Debtor cited

in this Circuit.  For instance, in *In re First Cent. Fin. Corp.*, the court refused to enjoin actions

against the non-debtor directors and officers simply because they shared potential insurance

proceeds with the debtor.  238 B.R. 9, 16–18 (Bankr. E.D.N.Y. 1999).  While this was due to the

distinguishable fact that there had been no claims made against the debtor that could be satisfied

by the shared insurance proceeds, the conclusion does not support the categorical application of

the stay that the Debtor argues for here.  Further, the Debtor cites to *In re Adelphia Comm. Corp.*

in support of the proposition that the stay should apply to litigation against co-insureds.  285

B.R. 580, 587 (Bankr. S.D.N.Y. 2002), *overruled on other grounds*, 289 B.R. 49 (S.D.N.Y.

2003).  *Adelphia* states no such proposition.  In fact, the issue in *Adelphia* was not whether the

stay applied to actions against the non-debtors, but whether the non-debtors had cause to lift the

stay and access the proceeds of the shared insurance to fund their defense.  *See id.* at 589.

The case is the same here.  Neither party disputes that the Debtor and DRVC Related

Parties may be entitled to the same finite amount of proceeds.  As such, those proceeds are

property of the estate.  Actions to obtain or control those proceeds violate the stay.  But nothing

on the face of the State Court Actions establishes that the relief sought must be satisfied from

insurance proceeds.  To the extent that the DRVC Related Parties contend that *they* will need to

first access the insurance proceeds to defend against these claims, they may bring a lift stay

motion as the co-insureds did in *Adelphia*.  Further, to the extent that a settlement is reached or a

judgment is obtained, the parties in the State Court Actions can similarly move for relief from

the stay if accessing insurance proceeds is a necessary consequence of those events.

                *c.   Delineation Between the Automatic Stay and Requested Injunction*

       The Court makes clear that by delineating the reach of the automatic stay, it is explaining

the scope of a statutory prohibition, and not independently imposing an injunction.

       In the Committee's Opposition, it hedges its total opposition to an injunction by claiming

that it supports allowing the State Court Actions to go forward subject to an order stating that no

judgment can be enforced against, nor any settlement paid from, insurance policies that name the

Debtor as an insured without a further order of this Court.  It notes that this was the same relief

ultimately afforded in *Rochester*.  *See* 2022 Bankr. LEXIS 1469 at *19.  As a practical matter,

this is effectively the relief that is afforded here by the Court's ruling on the scope of the

automatic stay, and the Court considers that it need not enter an order to enforce what is already

barred by statute.  The insurance proceeds are property of the estate and thus an attempt to draw

on the policies by any party will require a lift stay motion and approval of this Court.  This point

is important to note, because in the Reply, the Debtor characterizes the Committee's request as a

"proposed modified preliminary injunction."  (Reply at 4.)  That does not accurately characterize

the Committee's request or the Court's ruling above, which does not impose an injunction.

       The Debtor complains that permitting the State Court Actions to go forward all the way

to an enforceable judgment, but then prohibiting the DRVC Related Parties from accessing the

shared insurance proceeds they paid for would be remarkably unfair to the DRVC Related

Parties.[12]  The Debtor claims that this approach would permit plaintiffs to pursue the DRVC

---

[12]     Following the PI Hearing, the Debtor and Committee submitted a joint stipulation in which the Debtor recognized that non-debtor affiliates were responsible for most of the insurance premium payments for the years covered by both the Royal and London policies.  (*See* ECF Doc. # 199.)  The Court need not resolve now whether

Related Parties' other assets to recover on a judgment but prohibit them from accessing

insurance they have paid for and relied upon.  And the Debtor further argues that this would

effectively preclude the parties from settling insured claims before verdicts, prejudicing both the

parties and the insurers.[13]

The Debtor states that this Court and others have recognized that such an approach

"would pose immediate hardships for the [co-insureds]" who "have a present necessity for the

benefit of their contractual rights notwithstanding the Debtor['s] bankruptcy."  *In re MF Glob.*

*Holdings Ltd.*, 469 B.R. 177, 193–94 (Bankr. S.D.N.Y. 2012); *see also Adelphia Comm. Corp.*,

285 B.R. at 587 ("[B]ankruptcy courts should be wary of impairing the contractual rights of [co-

insureds] even in cases where the policies provide [debtor] coverage.").

This is not so much an argument in favor of the Debtor's own injunction, or against the

Committee's "modified preliminary injunction," as it is against the applicability of the automatic

stay.  The Debtor misses the point entirely as to why the stay applies here.  It cites to *MF Global*

and *Adelphia* for the proposition that imposition of a stay (either automatic or via injunction) to

block a non-debtor co-insured from accessing shared insurance is the incorrect result.  But in

both of those cases, it was already presumed that the automatic stay applied to bar that very

action in the first instance, which is what led to the co-insureds to argue for a lift of the stay in

each case.  *See MF Glob. Holdings Ltd.*, 469 B.R. at 181; *Adelphia Comm. Corp.*, 285 B.R. at

589.  That is precisely what the DRVC Related Parties can do here to the extent they need

---

the automatic stay should be lifted to permit DRVC Related Parties to draw on the policy proceeds.  But it would be ironic, indeed, if the Debtor sought to block the DRVC Related Parties from drawing on insurance that they largely paid for.

[13]    The Committee filed a letter following the Debtor's Reply brief clarifying that it would not oppose an order allowing the DRVC Related Parties to move to seek insurance proceeds, which would avoid these particular effects noted by the Debtor.  (*See* ECF Doc. # 194.)

proceeds for defense costs, settlement, or to satisfy a judgment. This is not an argument against the imposition of the stay in the first instance, at least under *MF Global* or *Adelphia*.

## 2. Debtor "Would Be" Named

Second, the Debtor contends that the automatic stay applies to cases where it is named, stating that there is "a bright-line rule: if the debtor is a named party in a proceeding or action, then the automatic stay imposed by [11 U.S.C. 362(a)(1)] applies to the continuation of such a proceeding or action." *Bayview Loan Servicing LLC v. Fogarty (In re Fogarty)*, 39 F.4th 62, 76 (2d Cir. 2022). The Committee agrees, as it made clear in the Opposition that it does not oppose a stay of state court actions that name the Debtor.[14] (Opposition ¶ 3.)

The Debtor further argues, however, that the State Court Actions in which it was not named should also be stayed under the same principle, because the Debtor is a necessary party in nearly all those actions and would have been named in the complaints in the absence of the bankruptcy case. (PI Motion at 20 (citing *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 511 (3d Cir. 1997) (concluding automatic stay applied to action against non-debtor where debtor would be a necessary party to such action)).) The Debtor observes that there have been proofs of claim filed in the bankruptcy corresponding to 224 of the 228 State Court Actions.

The Committee contends that this argument lacks merit. The Court agrees. First, the Committee notes that joint tortfeasors are not necessary parties because their liability is several and joint.[15] This is not unique to New York law, and bankruptcy and district courts have

---

[14]     The parties do not address whether the state court may bifurcate the state court actions in which the Debtor and the DVRC Related Parties are named defendants, and to allow those actions to proceed against the DRVC Related parties only. Since the Committee agrees that those actions should remain stayed, this Court does not address those issues.

[15]     *See Littanzi v. State*, 388 N.Y.S.2d 686, 688 (3d Dep't 1976); *Siskind v. Levy*, 213 N.Y.S.2d 379, 380-381 (2d Dep't 1961); *see also Peak v. Bartlett, Pontiff, Stewart & Rhodes, P.C.*, 814 N.Y.S.2d 763, 765 (3d Dep't 2006) (joint tortfeasors are not necessary parties and need not be sued together in the same action)).

determined in bankruptcy stay proceedings that joint tortfeasor debtors are not necessary

parties.[16]  The Committee distinguishes the sole case cited by the Debtor, *McCartney*, as not

addressing either the situation presented by the State Court Actions where the co-defendants face

independent liability as joint tortfeasors, or New York law that expressly states joint tortfeasors

are not necessary parties.  Indeed, *McCartney* dealt with a Pennsylvania law requiring a creditor

who purchases its collateral at a foreclosure sale to file a valuation action against both the

borrower and the guarantor to collect any deficiency claim, and whether a state law plaintiff

could have named the guarantor (a debtor in bankruptcy) in its state law petition.  *See* 106 F.3d at

511.  Even Debtor's own authorities offered for its other stay theories discount this precise

scenario as one in which the stay must be applied to non-debtors.  *A.H. Robins Co,* 788 F.2d at

999 (acknowledging that "where the debtor and another are joint tort feasors or where the

nondebtor's liability rests upon his own breach of a duty," the automatic stay "would clearly not

extend to such nondebtor.")

It is unclear that the Debtor even continues to stand by this argument.  *McCartney* was

the only authority it cited for the "necessary party" argument in the PI Motion, and the Debtor

included nothing further on this argument in the Reply and failed to press it at the hearing.  (*See,

e.g.*, April 19, 2023 Hr'g Tr. 32:24–33:7.)   The argument is clearly lacking in merit for these

reasons, and it does not support the application of the automatic stay to the State Court Actions.

---

[16]     *Mardice v. Ebony Media Operations,* 2021 U.S. Dist. LEXIS 8520, at *8–12 (S.D.N.Y. Jan. 15, 2021)
(finding that the automatic stay was not applicable to non-debtor defendants who could be held independently liable
for violations of the Fair Labor and Standards Act); *In re Metal Center, Inc.,* 31 B.R. 458, 462 (Bankr. D. Conn.
1983) (automatic stay does not apply where non-debtor defendant is "independently liable as, for example, where
the debtor and another are joint tortfeasors or where the non-debtor's liability rests upon his own breach of a duty");
*Stanford v. Foamex L.P.,* 2009 U.S. Dist. LEXIS 32405 at *10-17 (E.D. Pa. April 15, 2009) (denying extension of
automatic stay to litigation against non-debtor defendants where plaintiffs alleged non-debtors were independently
liable for breaches of fiduciary duties owed to the plaintiffs under the Employee Retirement Income Security Act).

### 3.  Identity of Interest/Real Party Defendant

Finally, the Debtor contends that the State Court Actions against the DRVC Related

Parties are covered by the traditional debtor protections of the automatic stay, *see* § 362(a)(1),

because they involve "such identity between the debtor and the third-party defendant that the

debtor may be said to be the real party defendant."  *Queenie*, 321 F.3d at 287–88 (quoting *A.H.

Robins*, 788 F.2d at 999).  The Debtor cites several cases for the proposition that courts

recognize that separate, non-debtor legal entities may share an identity of interest with the debtor

when they are co-defendants in actions arising out of a single product or service supplied,

manufactured, or provided by the debtor.  *See, e.g.*, *A.H. Robins*, 788 F.2d at 1014 (finding

identity of interest between debtor and non-debtor with respect to claims arising out of use of

single contraceptive device manufactured by the debtor); *W.R. Grace & Co. v. Chakarian* (*In re

W.R. Grace & Co.*), 386 B.R. 17, 30–32 (Bankr. D. Del. 2008) (noting debtors and non-debtors

shared an identity of interest because debtor's conduct and mining operations were "at the core"

of non-debtor claims, and including non-debtors in scope of preliminary injunction staying

actions against non-debtors); *Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care

Providers of Conn. (In re Dow Corning Corp.)*, 86 F.3d 482, 492–94 (6th Cir. 1996) (noting

identity of interest between debtor and non-debtors in litigation centered around the debtor's role

as manufacturer and/or supplier of silicone gel breast implants).

What is missing from Debtor's argument, and is revealed by its citations, is when an

"identity of interest" justifies application of the stay to a non-debtor under section 362.  Two of

the three cases cited by the Debtor did not analyze identity of interest in the context of the

automatic stay.  *See W.R. Grace*, 386 B.R. at 30–32 (discussing identity of interest between

debtor and non-debtor in determining whether to enjoin actions against non-debtor pursuant to

section 105(a)); *Dow Corning*, 86 F.3d at 488–93 (discussing identity of interest between debtor

and non-debtor in determining whether court had jurisdiction over actions against non-debtor).

Neither of these cases has any bearing on when an identity of interest warrants coverage of a

non-debtor under the automatic stay.

The Debtor's only case that addressed identity of interest in the stay context is the *A.H.*

*Robins* case.  There, the court recited that under section 362(a)(1), the stay generally only applies

to actions against debtors, and only prohibits suits against non-debtors in the "unusual

circumstance . . . when there is such identity between the debtor and the third-party defendant

that the debtor may be said to be the real party defendant *and that a judgment against the third-*

*party defendant will in effect be a judgment or finding against the debtor*."  788 F.2d at 999

(emphasis added).  The court continued to note that "[a]n illustration of such a situation would be

a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any

judgment that might result against them in the case."  *Id.*

The Debtor fails to show that there are such circumstances here.  The Debtor claims that

it shares an identity of interest with the DRVC Related Parties because (1) in the State Court

Actions, "the policies and practices the plaintiffs allege gave rise to their claims are the DRVC's

policies and practices, not distinct policies and practices of the DRVC Related Parties"; (2) "the

testimonial and documentary evidence the plaintiffs in the State Court Actions will rely on at

trial will, in large part, be from the DRVC"; and (3) "the DRVC and the DRVC Related Parties

pursue a common charitable mission."  (PI Motion at 22.)

The arguments offered by the Debtor on this point are largely identical to those offered in

support of the section 105(a) injunction.  The Debtor appears to recognize this in its Reply and

relies primarily on these arguments to justify an injunction under 105, as opposed to the stay

under section 362.[17]  As such, the factual underpinnings of these arguments are discussed in

comprehensive detail in the section 105(a) analysis.  To summarize, these arguments fail for the

same reason that they do in the section 105(a) analysis (*see infra* Section III.B.2(b)–(d)), because

the Debtor has failed to articulate any scenario or theory under which events in the State Court

Actions could effectively lead to "a judgment or finding against the debtor," to the extent that is

even a basis for finding that the stay applies to a non-debtor under cases like *A.H. Robins* and an

identity of interest theory.  788 F.2d at 999.

Specifically, the Debtor fails to explain how a similarity of policies between the Debtor

and DRVC Related Parties would increase the risk of indemnity claims against the debtor, result

in inconsistent judgements, or create *res judicata* or collateral estoppel issues for the debtor if the

State Court Actions are allowed to proceed.  These are exactly the types of issues the Court

would expect the Debtor to also be able to show in arguing that the State Court Actions could

effectively lead to "a judgment or finding against the debtor" warranting application of section

362(a)(1), *see id.*, but the Debtor does not show these circumstances or any others that would be

akin to a judgment against the debtor.  The fact that the Debtor may have some involvement in

producing documents or shares a "charitable mission" with the DRVC Related Parties clearly

does not move the needle on this point, either.

The Debtor fails to offer any other arguments why the consequences of the state court

litigation warrant a stay here under section 362(a)(1).  Having disposed of the Debtor's final

---

[17]     (*See* Reply at 7 n. 8.)  The Debtor also attempts to cite *Boy Scouts* again on this point to bolster its
argument for applicability of section 362(a)(1), but the analysis addressing the "identity of interests" in *Boy Scouts*
was solely in the context of whether the bankruptcy court had jurisdiction to impose an injunction.  *See* 2023 WL
2662992, at *20–22.

argument under section 362, the Court concludes that the Debtor has failed to show that the

automatic stay imposed by the Bankruptcy Code bars the State Court Actions from proceeding.

### B. Preliminary Injunction Under Rule 7065 and Section 105 of the Code

The Debtor argues that even if the State Court Actions do not fall within the scope of the

automatic stay, a preliminary injunction is warranted to enjoin the State Court Actions under

section 105(a) of the Code. *See* 11 U.S.C. § 105(a). The Debtor asserts that in considering

whether to enjoin suits against non-debtors pursuant to section 105(a), courts consider "whether

the suits would (i) threaten the debtor's insurance coverage, (ii) increase the debtor's

indemnification liability, (iii) result in inconsistent judgments, (iv) expose the debtor to risks of

collateral estoppel or *res judicata*, and (v) burden and distract the debtor's management by

diverting its manpower from reorganization to defending litigation." *1031 Tax Grp.*, 397 B.R. at

684. The Debtor further states that "[b]ecause § 105(a) injunctions are authorized by statute,

they do not need to comply with the traditional requirements of Fed. R. Civ. P. 65." *Id.*

The Committee disagrees and contends that the Court must evaluate the appropriateness

of an injunction under Federal Rule of Civil Procedure 65 and the four traditional requirements

for any injunction, in addition to any considerations under section 105(a). *See Winter v. Natural*

*Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary

injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to

suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in

his favor, and [4] that an injunction is in the public interest."). Because the Debtor did not

consider addressing Rule 65 necessary, the PI Motion did not contain analysis of these

requirements, except to the extent that the factors it noted under the section 105 analysis are

relevant to the harm requirement. In the Opposition, the Committee argues that the Debtor fails

41

to show harm through the section 105 factors, and clearly fails to meet the other three

requirements by not addressing them whatsoever.  In its Reply, the Debtor contends that an

injunction is warranted under the traditional four prong test as well, but it does not concede that

anything more than a section 105(a) analysis under the corresponding factors is necessary.

   As an initial matter, the Court must determine whether to evaluate the application for a

stay according to Rule 65, section 105(a), or both authorities.  There does not appear to be any

controlling authority requiring courts to consider the traditional injunction factors when

imposing an injunction pursuant to section 105(a).  *See Calpine Corp.*, 365 B.R. 401, 409

(S.D.N.Y. 2007) (noting that "the Second Circuit has declined to enunciate an explicit test for

when an injunction should issue" under section 105).  Indeed, as the Debtor points out, this Court

and others have resolved motions to stay actions against non-debtors solely by looking to section

105(a) and cases applying that section, without resort to Rule 65 or the traditional injunctive

factors.  *See 1031 Tax Grp.*, 397 B.R. at 684.  Nevertheless, other courts have chosen to apply

the traditional factors in the context of injunctions under section 105.  *See Calpine Corp.*, 365

B.R. at 409.  Whether a Court applies the traditional requirements in a given case depends in

large part on the arguments made by the litigants.

   The parties have asserted the applicability of both authorities here, and the Court will

consider both authorities in determining whether to impose an injunction.  The Court observes

that in any event, there should hardly ever be a situation where an injunction is warranted under

one authority but not the other.  Both lines of authority essentially turn on the same facts; courts

are primarily concerned with whether third-party litigation will have an impact on the

bankruptcy case absent the injunction, and if so, whether that impact threatens to adversely affect

a bankruptcy case that is otherwise on-track.  Whether framed as harm and likelihood of success

in the Rule 65 context, or as part of the general considerations under section 105(a),[18] an

injunction should issue under either authority where circumstances warrant. Furthermore, the

Court finds that considering both authorities is the most analytically sound way to proceed

because it finds that an injunction is not warranted here under either section 105 or Rule 65.

As a result, the analysis below proceeds by addressing the four traditional requirements

under Rule 65, and by addressing the section 105(a) factors in the context of the irreparable harm

requirement for Rule 65, which is how the parties have come to frame their arguments in the

context of the differing standards offered.

### 1. Likelihood of Success

In the bankruptcy context, "likelihood of success" means likelihood of a successful

reorganization. *Calpine Corp.*, 354 B.R. at 50; *Lyondell Chem. Co. v. CenterPoint Energy Gas

Servs. Inc. (In re Lyondell Chem. Co)*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009) (recognizing

that whether a debtor will ultimately be able to reorganize "cannot be determined in the earliest

weeks of a case," and focusing on whether the debtor is meeting challenges in the early phases of

the case and otherwise proceeding "on track"). In sum, the likelihood of success here is

uncertain, and the case does not have the benefit of being in the early stages where uncertainty is

an inherent and accepted part of the case.[19] This factor is neutral at best for the Debtor.

---

[18]    *See 1031 Tax Grp.*, 397 B.R. at 674 ("To enjoin claims against non-debtors under § 105(a), a bankruptcy court must find that the claims 'threaten to thwart or frustrate the debtor's reorganization efforts,' and that the injunction is 'important' for effective reorganization.") (citations omitted).

[19]    This case has been pending for almost three years without any consensual reorganization plan. The State Court Actions against the non-debtors have essentially been frozen in place, depriving sexual abuse survivors of any recoveries for their very serious claims.

### a. Factual Positions

The Committee states that the Debtor's proposed plan of reorganization includes coercive non-debtor releases of the DRVC Related Parties without fair compensation to the Survivors. The Committee argues that it and the Survivor constituency will oppose that plan, rendering confirmation impossible, and reorganization under the Debtor's plan unlikely. Instead, the Committee contends that the Survivor constituency will support its plan, which will compensate Survivors from assets of the Debtor while preserving other avenues of recovery, including claims against the DRVC Related Parties, if those parties are not willing to provide fair compensation for their liability and releases thereof. The Committee observes that a stay of State Court Actions against the DRVC Related Parties would not be necessary to facilitate the Committee Plan because the DRVC Related Parties will not be released unless they make contributions that are acceptable to the Survivors. The Committee contends that mediation is at an impasse and further mediation is not likely to yield a consensual resolution.

The Debtor disagrees with the Committee's characterization. The Debtor contends that the Committee's opposition to the Debtor's plan does not mean that reorganization is unlikely. The Debtor states that it is not attempting to confirm its plan on a non-consensual basis, and it highlights the possibility of an amended plan which reflects a consensual resolution despite whatever issues stakeholders may have with the Debtor's current plan. The Debtor argues that the parties are not at an impasse in mediation as the Committee suggests. Indeed, the Debtor is correct that the parties are again involved in mediation, which began again after the Committee filed its Opposition, and was not reflected in the Committee's arguments as a result.

*b. Legal Support*

The Committee cites to *Calpine* and *Lynodell* for the proposition that likelihood of success refers to the likelihood of successful reorganization in a bankruptcy case, which the Debtor does not dispute. Beyond that, the Committee cites two persuasive cases in which courts have concluded that debtors failed to show that a successful reorganization was likely.

First, the Committee cites to *Mariner Health*, which involved a debtor that was within the first few months of its bankruptcy that sought to stay certain litigation against affiliates for two to three months. *In re Mariner Health Cent., Inc.*, 2023 Bankr. LEXIS 95, *2 (Bankr. N.D. Cal. Jan. 12, 2023). Despite the particularly early phase of the case, the Court identified several challenges facing the debtor in the way of recovery on estate causes of action and funding claims in a reorganization. *Id.* at *30–35. The court concluded that the debtors failed to carry their burden in showing that the case had a likelihood of success. *Id.* While this case does support the Committee's general proposition that inability to confirm a plan weighs against likelihood of success, the Court does not consider *Mariner Health* to carry much persuasive weight here.

First, the court in *Mariner Health* seemed to be imposing a more exacting standard under the Ninth Circuit's decision in *In re Excel Innovations, Inc.*, and required particularized evidence of likelihood of plan confirmation. *See* 502 F.3d 1086, 1097 (9th Cir. 2007). This Court is not bound by *Excel Innovations*. Furthermore, it is unclear that the application of *Excel Innovations* in *Mariner Health* is consistent with principles in this Circuit. Indeed, the very uncertainty that the court found weighed against the injunction in that case—the early posture and lack of ascertainable plan structure—are more commonly (and in the Court's opinion, wisely) cited by courts in this district as reasons for allowing the debtor some degree of flexibility in establishing likelihood of success early in a case. Such courts have explained:

> Here the Debtors have so far been successful in doing everything they've needed to do to date. Whether they will be able to address later issues cannot be determined in the earliest weeks of a case, and it would be silly for a court to impose any standard other than the ["*reasonable* likelihood" standard]. That is especially so where thousands of jobs are on the line, which would otherwise be jeopardized by an arbitrary and restrictive placement of burdens on the debtor to meet standards that require proof of the uncertain. Application of a higher standard would make it essentially impossible to protect the debtors' ability to reorganize in all but the simplest or most predictable chapter 11 cases.

> Here I can say with great comfort, and find, that the Debtors are proceeding on track, and there is no reason to believe or suspect that their reorganization will fail—unless, of course, the acts sought to be enjoined cause it to fail.

*Lyondell Chem. Co.*, 402 B.R. at 590.

Furthermore, unlike in *Mariner Health*, there are two potential plan structures here.[20] And while the Committee considers the Debtor's plan inadequate, the Committee's main gripe is with the initially proposed contributions offered by the Debtor, insurers, and DRVC Related Parties. There do not seem to be strongly held doubts about these parties' abilities to in fact make larger contributions to fund the plan (indeed, that is what the Committee's plan contemplates). And the Debtor, Committee, insurers, and other stakeholders are currently pursuing mediation to that end.

Nevertheless, the Committee also points to the *Rochester* case again as an example of a case where an injunction was denied in extremely similar circumstances, due in part to the fact that the court did not find it reasonably likely that the debtor would reorganize. *See Rochester*, 2022 Bankr. LEXIS 1469 at *18. There the court stated that:

> [T]he Diocese also points to the serious possibility that it may seek to confirm a nonconsensual Chapter 11 plan—a plan that does not have the consent of the Abuse Survivors. While obtaining confirmation of a non-

---

[20]    To the extent that the Committee's plan provides a likelihood of success, the Committee notes that injunctions would not be necessary to achieve that success—indeed, litigation against the non-settling non-debtors is a specifically contemplated aspect of their plan. (*See* Opposition ¶ 76.)

> consensual plan is not impossible, it makes the likelihood of a successful reorganization much more difficult. Given the Diocese's suggestion that it may seek to confirm a Chapter 11 plan without the consent of the Abuse Survivors, *the Court cannot conclude that a successful reorganization is likely*.

*Id.*

The persuasive value of this case is immediately apparent for the Committee's arguments that it is unlikely the Debtor will confirm a plan here. The Debtor's only distinguishing circumstance here would be that the parties continue to pursue mediation. The Debtor does not attempt to distinguish *Rochester*, with caselaw or analogize to any cases where courts found that reorganization was still reasonably likely at a similarly late and contested procedural posture. While the Debtor does cite *Calpine*, in which an injunction was granted approximately fifteen months into the bankruptcy case, the court's finding there suggests that the debtor was still in the process of filing a plan of reorganization and there were no apparent issues raised regarding the debtor's ability to reorganize. *See* 365 B.R. at 409–10 n.31 (basing finding that debtor was likely to succeed in reorganizing on decision of another court reaching the same conclusion for the same debtor three months earlier, where the debtor had not then proposed a plan and had six months remaining of exclusivity) (citing *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc.*, No. 06–5358, 2006 WL 3755175, at *6 (S.D.N.Y. Dec. 20, 2006)).

While the time elapsed is not necessarily a negative indicator of the likelihood of success as shown by cases like *Calpine*, it is also not a positive one under these circumstances with this case being more than thirty months old. Furthermore, the Committee's arguments are not just temporal, as their citation to *Rochester* supports the notion that reliance on an non-consensual plan can also be probative evidence that a successful reorganization is less likely.

In weighing the parties' arguments, it appears that this factor is neutral at best for the Debtor.  On the one hand, the Court is doubtful about the chances of reorganization simply based on how far apart the Debtor and Committee are in their proposed plans.  The Committee has filed a motion to dismiss the Debtor's case because of the lack of progress but the hearing on that motion has been put on hold while the parties have resumed mediation.  *See* Motion to Dismiss, *Diocese of Rockville*, No. 20-12345-MG, ECF Doc. # 1912.  But, the Court believes, whether an injunction should be issued to further stay the State Court Actions, preventing the plaintiffs from proceeding with their efforts to recover compensation from the DRVC Related Parties, raises separate issues from whether the Debtors' chapter 11 case should be dismissed.

The likelihood of a reorganization is, at best, a toss-up at this point.  The more important question is whether the harm in the absence of the requested injunction poses a threat to the possibility of reorganization.  Although filed years ago, the State Court Actions are far from trial ready.  Unless the Debtor's chapter 11 case is dismissed, the Debtor, DRVC Related Parties and the Committee can still put this case back on track and agree to a consensual plan.  That is certainly the Court's hope.  But should the Court further delay the sexual abuse plaintiffs from seeking state court recoveries?   At this juncture, the issue now is the second prong under the traditional requirements for injunctive relief, which focuses on whether the Debtor will suffer irreparable harm in the absence of an injunction.

2. <u>Harm</u>

"A plaintiff seeking a preliminary injunction must establish that . . . he is likely to suffer irreparable harm in the absence of preliminary relief."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).  The Debtor contends that it will suffer irreparable harm absent the injunction because the suits in question will: "(i) threaten the debtor's insurance

48

coverage, (ii) increase the debtor's indemnification liability, (iii) result in inconsistent judgments, (iv) expose the debtor to risks of collateral estoppel or *res judicata*, and (v) burden and distract the debtor's management by diverting its manpower from reorganization to defending litigation." *1031 Tax Grp.*, 397 B.R. at 684.  These are illustrative harms that courts have considered in deciding whether to impose an injunction under section 105(a), and both parties agree these are relevant under the Rule 65 harm requirement.  They are considered in turn below.

### a.   Insurance Proceeds

The Debtor's argument under the first factor depends on the same factual circumstances as the insurance arguments made in the section 362(a)(3) context discussed *supra* in Section III.A.1.  To summarize, the Debtor claims that the State Court Actions seek to reach finite insurance proceeds shared between the Debtor and the DRVC Related Parties that will deplete the amount of proceeds available to the Debtor.  While the Debtor largely conflates the applicability of the automatic stay with the appropriateness of an injunction under section 105 in its briefing, the Court understands the Debtor to argue that an injunction under section 105 may be appropriate to enjoin actions that do not necessarily come within the scope of violating the automatic stay.  That is true.  *See 1031 Tax Grp.*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008) (stating that "[s]ection 105 authorizes a bankruptcy court to exercise power outside the bounds of the automatic stay").  Nevertheless, the Debtor fails to show that depletion of insurance proceeds supports an injunction under section 105(a) here.

The Debtor's main failing is that the harm it complains of will already be protected against by the automatic stay, as discussed *supra*.  In the PI Motion, the Debtor did not appear to contemplate the Court concluding that proceeds are protected by the stay, but that the State Court Actions themselves do not violate the stay.  Instead, the Debtor's theory of harm is that harm

49

would result from the Court finding that insurance proceeds are not protected by the stay or an injunction whatsoever, and allowing State Court Actions to seek those proceeds completely unchecked.  As a result, many of the Debtor's original arguments in the PI Motion miss what is now a narrower question here: what harm will occur to the proceeds in the absence of the injunction when the proceeds are ultimately protected by the automatic stay?  To ask the question is to answer it—none.

Debtor's failure to consider this scenario is reflected in its cited authorities.  In nearly every case cited by the Debtor, the courts found that the actions at issue were stayed pursuant to section 362 in the first instance and granted an injunction on the additional basis of authority conferred by section 105(a).  *See Manville I*, 837 F.2d at 89, 92 (affirming lower court injunction of suits directly against debtor's insurers, and recognizing the court's prior holding that such actions were subject to automatic stay); *A.H. Robins Co.*, 788 F.2d at 1001–1004 (first finding that actions against co-insureds were subject to stay under section 362(a)(3), and then imposing injunction under section 105(a) as an additional ground); *Circle K Corp.*, 121 B.R. at 261 (finding that 362(a)(3) stay applied first to stay actions against director/officer co-insureds, before holding that a stay under 105(a) would be warranted in the alternative, and at the very least, under combination of multiple section 105(a) factors); *Minoco Grp. of Cos. Ltd. v. First State Underwriters Agency of New Eng. Reins. Corp. (In re Minoco Grp. of Cos., Ltd.)*, 799 F.2d 517, 519 (9th Cir. 1986) (finding that 362(a)(3) stay applied to bar insurer's cancellation of debtor's insurance policies).[21]  The Court has already addressed why cases like *A.H. Robins* and

---

[21]    The Debtor also cites cases in support that did not grant an injunction at all.  *See In re First Cent. Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) (finding that automatic stay did not apply and an injunction was not warranted under section 105(a) to enjoin actions against directors and officers of the debtor that were co-insureds because there was no likelihood of debtor being sued that would create a need for recovery from the same proceeds).

*Circle K* lack persuasive force in the context of section 362, and the Debtor fails to explain why these should form an independent basis for an injunction under section 105(a). Indeed, if the Court concluded that the State Court Action plaintiffs were attempting to obtain insurance proceeds in violation of section 362, the Court would be justified in explicitly enjoining such actions pursuant to section 105(a) as the courts did in cases like *A.H. Robins* and *Circle K*. But for reasons discussed *supra*, that is not the position the Court is in.

The only other case cited by Debtor in which a court enjoined litigation against a non-debtor pursuant to section 105(a) to protect insurance proceeds without first finding that such litigation violated the automatic stay was this Court's decision in *1031 Tax Grp. See* 397 B.R. at 684. That case stated a critical point for the Debtor here, which is that "[s]ection 105 authorizes a bankruptcy court to exercise power outside the bounds of the automatic stay." *Id.* This bears repeating given that all of other Debtor's cited precedent involves instances where injunctions were entered to enjoin actions that the courts already considered to be barred by the automatic stay. Nevertheless, *1031 Tax Grp.* is distinguishable for three reasons here.

First, the Court has already ruled that the automatic stay will protect the insurance proceeds at issue. In *1031 Tax Grp.*, however, there was no threshold ruling that the automatic stay applied to actions against the insurance proceeds, as it had not been raised by the parties. While the proponent of the stay in *1031 Tax Grp.* (the chapter 11 trustee) argued that the stay applied to certain actions against non-debtors under section 362(a)(3), the trustee did so on the basis that the causes of action themselves belonged to the estate. *Id.* at 682–84. It does not appear that the trustee attempted to make a separate argument that section 362(a)(3) applied based on the depletion of insurance proceeds.

51

Second, this Court granted the injunction in *1031 Tax Grp.* to aid the trustee along a clearly identified path to plan confirmation.  There, the chapter 11 trustee sought to enjoin litigation that would have upset settlements that the trustee had reached with former employees and insurers of the debtor that were necessary to consummate before a plan of reorganization could be confirmed.  *Id.* at 677–78.  Put differently, the case appeared to have a reasonable likelihood of success.  And more importantly, that success hinged on the injunctive relief requested, which itself only afforded the trustee and non-debtors 90 days to achieve their identified objectives.  As discussed on the first prong, the Debtor and DRVC Related Parties have effectively benefitted from an injunction for years, and they have not identified a clear path toward reorganization.  This case does not resemble *1031 Tax Grp.* whatsoever in this regard.

Third, the threat to insurance proceeds was not the only harm-related factor that weighed in favor of an injunction in *1031 Tax Grp.*  As is further explained below, the Debtor does not make any meritorious showings on the remaining harm factors and cannot make the same holistic showing as the proponents of the injunction in *1031 Tax Grp.*  Debtor does not cite any case where the risk to shared insurance proceeds alone warranted an injunction of an action against a non-debtor, where that action was not already within the scope of the automatic stay.

The Debtor did not address these issues in its Reply.  Instead, the Debtor complains that "permitting the State Court Actions to go forward to an enforceable judgment, but then prohibiting the DRVC Related Parties from accessing the shared insurance proceeds they paid for would be remarkably unfair to the DRVC Related Parties." (Reply at 5.)  Of course, this is not so much an argument in favor of an injunction as it is a preemptive argument to eventually lift the automatic stay, as discussed *supra*.  In sum, the harms to insurance identified by the

52

Debtor will already be prevented by the automatic stay, and the Debtor identifies no additional

harms to insurance that would warrant imposition of a broader injunction under section 105(a).

### b.  Indemnification Liability

The Debtor also argues that allowing the State Court Actions to proceed will increase the

Debtor's indemnification liability, weighing in favor of an injunction under section 105(a).

The Debtor is generally correct that courts consider whether actions against non-debtors

will increase a debtor's indemnification liability in determining whether to impose an injunction

staying such actions under section 105(a).  *See Granite Partners*, 194 B.R. at 337 (recognizing

that an injunction may be proper where suits "threaten the debtor's insurance coverage or

increase the debtor's indemnification liability"); *Ionosphere Clubs*, 111 B.R. at 435 (granting

injunction where litigation against non-debtors would have "direct impact on the estate" because

"if successful . . . [p]laintiffs may undoubtedly claim [the debtor] is liable").

The Debtor claims that if any of the State Court Actions result in a judgment against a

DRVC Related Party, it is likely the DRVC Related Party will pursue indemnification claims

against the DRVC.  The Debtor observes that the Parishes have repeatedly taken the position in

this Court that they believe they have no responsibility for the actions of priests assigned to their

parishes by the DRVC.[22]  The Debtor relied on the direct testimony of Eric P. Stephens at the

hearing, which included two exhibits.  (*See* Stephens Direct.)  Exhibit A is a summary of the

paragraphs in complaints alleging diocesan involvement in the 228 State Court Actions, and

Exhibit B is a summary of the paragraphs in DRVC Related Party answers alleging diocesan

---

[22]    Hundreds of claims were filed by DRVC Related Parties for indemnity and contribution against the Debtor in this case.  While those claims were disallowed consensually, the stipulation and order disallowing the claims provides that they may be reasserted to the extent claims for indemnification actually arise based on underlying suits against the Parishes.  *See* Stipulation and Order, *Diocese of Rockville*, No. 20-12345-MG, ECF Doc. # 2004.

obligations for indemnity, contribution, or setoff, as well as counterclaims against the Debtor

filed in prepetition State Court Actions.

In its Opposition, the Committee points out that the Debtor has not actually established

that there is a real risk of indemnification claims, despite whatever the Debtor argues could be

asserted by the DRVC Related Parties.  First, it observes that the Debtor admits that it has no

contractual obligation to indemnify the DRVC Related Parties for liability from abuse claims.

Thus, the only other available claims for indemnity would be via common law indemnification.

The Committee cites to New York law and observes that to establish common law

indemnification claims against the Debtor, the DRVC Related Parties must establish: (i) the

Debtor had exclusive responsibility for the acts or omissions that resulted in a Survivor's

damages, and (ii) the DRVC Related Parties committed no wrongdoing themselves that

contributed to the Survivors' losses.[23]

The Committee has the better argument on this factor.  The Debtor did not contest these

requirements under New York law in its Reply or at the PI Hearing.  Instead, the Debtor argues

that indemnification may arise because both the complaints and answers by the DRVC Related

Parties assert that the Debtor has some responsibility.  But there is a large gap between general

allegations regarding the Debtor's responsibility and the specific type of scenario giving rise to

indemnification, and the Debtor has not articulated how the former could evolve into the latter.

---

[23]    *See Konsky v. Escada Hair Salon*, 978 N.Y.S.2d 342, 344 (2d Dep't 2014) (stating that "the predicate of
common-law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee") (internal
quotation marks and citations omitted); *XPO Logistics, Inc. v Malcomb*, 2021 N.Y. Misc. LEXIS 479, *13 (Sup. Ct.,
N.Y. Cty. Feb. 5, 2021) ("With respect to the proposed common law indemnity claims, it is well established that
'since the predicate of [such claims] is vicarious liability without actual fault on the part of the proposed indemnitee,
it follows that the party who has itself participated to some degree in the wrongdoing cannot receive the benefit of
the doctrine'") (citing *Trustee of Columbia Univ. v Mitchell/Giurgolas Assoc*, 492 N.Y.S.2d 371, 375 (1st Dep't
1985)).

Specifically, the Debtor has failed to explain—even with a hypothetical—how any one of the State Court Actions could conclude in a way where the DRVC Related Party is found liable on a tort claim, but obtains an indemnification claim by which it would be able to show that it had no responsibility or wrongdoing under the precedents cited by the Committee.[24]

In failing to articulate any scenarios leading to indemnification, the Debtor defends that the court "need only be satisfied that there is a 'substantial risk' of such claims." (Reply at 15–16 (citing *1031 Tax Grp.*, 397 B.R. at 684–85).) The Debtor contends that the Committee is incorrectly holding it to a standard requiring it to "conclusively determine" that there would be indemnity claims if tried to final judgment. (*Id.*)

The Court is not requiring the Debtor to "conclusively determine" that there will be indemnity claims. However, the Court considers that being able to conceive of how indemnity claims *might* arise legally—even with a hypothetical—is a prerequisite to a finding that there is a

---

[24]    At the PI Hearing, the Debtor intimated for the first time that claims for contribution are also relevant under this factor. Of course, the Court recognizes that such claims could arise in an instance where a DRVC Related Party is found jointly and severally liable for damages, but the Debtor ultimately shares some responsibility. However, the Debtor did not cite any caselaw for the proposition that courts should also consider whether litigation against non-debtors increases the risk of contribution claims under section 105(a). The Court finds that the absence of any such authority likely reflects that indemnification and contribution are not synonymous for the purposes of the section 105(a) analysis. The Court observes that this is supported by two points from the caselaw.

First, the cited authorities in many cases seem to be uniquely interested in indemnification, not simply because it creates another potential claim against the debtor, but because resolving issues of indemnification—particularly in the context of contractual indemnification—commonly implicates other factors, like use of shared insurance proceeds for the indemnity obligation, or preclusive effects regarding the debtor's liability to the indemnitee resulting from the underlying suit. *See, e.g., Johns–Manville Corp. v. Asbestos Litig. Group (In re Johns–Manville)*, 26 B.R. 420, 428–29 (Bankr. S.D.N.Y. 1983), *aff'd in part*, 40 B.R. 219 (S.D.N.Y.), *rev'd in part on other grounds*, 41 B.R. 926 (S.D.N.Y. 1984). The Debtor has cited no authorities showing that similar risks arise out of common law or statutory claims for contribution.

Second, enjoining litigation against non-debtors simply based on the risk of contribution claims arising from such actions would seem to be at odds with the principle admitted in Debtor's authorities that status as co-defendants or joint tortfeasors alone does not warrant a stay. *See A.H. Robins Co.*, 788 F.2d at 999 (acknowledging that "where the debtor and another are joint tort feasors or where the nondebtor's liability rests upon his own breach of a duty," the automatic stay "would clearly not extend to such nondebtor.")

.

55

"substantial risk" such claims will arise. Debtor's citation to *1031 Tax Grp.* for this standard

proves the point on what constitutes a sufficient risk. In that case, this Court found that claims

asserted against the Debtor's employees could lead to indemnification or *respondeat superior*

liability for the Debtor, based on the employer-employee relationship between the debtor and

non-debtor. *See 1031 Tax Grp.*, 397 B.R. at 685. Furthermore, the Court reached this

conclusion after addressing the parties' arguments regarding how liability might arise or be

apportioned under state law. *See id.* As prefaced, the Debtor cites to no facts, like an agreement

to indemnify, that would provide the ostensible basis for indemnification, and otherwise fails to

explain how such a claim *could* arise under state law. While this Court was satisfied with the

understanding of how indemnity claims could have arisen in *1031 Tax Grp.*, such that there was

a risk of such claims, the same cannot be said here. Finally, and as discussed above, any citation

to *1031 Tax Grp.* on any isolated factor must be considered in light of the fact that there was an

actual discernable path to reorganization justifying the injunction limited to a 90-day period

(subject to extension), as well as the existence of multiple harm factors under section 105(a).

      For these reasons, this factor does not weigh in favor of an injunction.

### c. *Piecemeal Litigation and Inconsistent Judgments*

      The Debtor claims that the State Court Actions contain common questions of fact and law

that are more effectively resolved in one proceeding. Their two supporting factual arguments are

as follows: (1) "[T]he allegedly unlawful policies and practices giving rise to claims against the

DRVC Related Parties are similar or identical to the alleged policies and practices giving rise to

claims against the DRVC"; and (2) State Court Action plaintiffs that do not name the Debtor will

proceed against the DRVC Related Parties, and State Court Action plaintiffs that do name the

Debtor may try to bifurcate their cases and proceed against the DRVC Related Parties which

56

would "shift all parties' focus away from the reorganization" and "lead to inequitable recoveries based on which plaintiffs are able to advance their cases quickest through the state court system." (PI Motion at 25.)

With respect to the first argument, the Debtor does not actually frame the legal or factual issues that are common to claims against both the Debtor and DRVC Related Parties. While the Court accepts that each entities' policies may be relevant to certain tort claims, there is no support provided for how the policies bear on such claims, why they are similar, or why similarities between the policies will predominate in each case such that it would not be advisable to try them separately. As discussed above, the claims in each State Court Action appear to be for torts committed by the DRVC Related Parties and correspond to proofs of claim alleging independent tort causes of action against the Debtor in the bankruptcy. The Debtor simply relies on the general overlap in factual circumstances that would render both parties co-defendants but for the bankruptcy. The Debtor fails to cite any caselaw showing that this simple connection is sufficient to warrant an injunction of actions against a non-debtor co-defendant.

The Debtor attempts to argue that the State Court Actions should be enjoined under section 105(a) because those actions and the proofs of claim are "inextricably intertwined," citing to the *Boy Scouts* case. (*See* Reply at 17 (citing 2023 WL 2662992, at *20–22 (finding that claims against BSA and local councils were interconnected)).)[25] On review, there are several problems with Debtor's citation to this case for this proposition.

First, *Boy Scouts* was a district court case affirming confirmation of a plan and attendant channeling injunctions; as pointed out for other factors, there is little support for the idea that

---

[25]    The *Boy Scouts* case was cited for the first time in the Debtor's Reply, and thus, the Committee had no opportunity to address the case in briefing.

injunctions are necessary to support a successful reorganization here.  *Boy Scouts*, 2023 WL
2662992, at *19–22.  Second, the decision in *Boy Scouts* affirmed the bankruptcy court's finding
that it had jurisdiction to enter an injunction, not the propriety of the injunction under either the
five section 105(a) factors or four traditional injunction requirements under Rule 65.  *See id.*

Finally, insofar as the arguments on jurisdiction could even be considered as offering
persuasive support on this specific factor under section 105(a), the court in *Boy Scouts* recited the
extensive proof in the record, including examples of allegations and theories from pleadings,
bearing on the overlap in the legal and factual issues between the claims.  Namely, the court
recognized that one of the main theories of liability asserted against the non-debtors depended on
the debtor's liability.  *Id.* at *20.  Further, the Court relied on multiple sources of evidence
showing that the claims were based on participation in the programs that the debtor had
"designed and implemented."  *Id.* at *21.  These are only some of the examples of evidence that
the court relied on regarding the factual issues bearing on both the debtor and non-debtor's
liability.  In any event, the Debtor's factual support offered here pales in comparison to the
evidence the court based its decision on *Boy Scouts*.

More importantly, the upshot of the Debtor's argument is that a stay would help to avoid
inconsistent judgments and piecemeal litigation, but the Debtor simply fails to explain how that
would work.  To illustrate, the Debtor cites cases where courts have recognized that common
issues are better off resolved in one forum, like the bankruptcy court itself.  For example, in
*Drennen v. Certain Underwriters at Lloyds of London (In re Residential Capital, LLC)*, 563 B.R.
756 (Bankr. S.D.N.Y. 2016), the bankruptcy court addressed a post-confirmation insurance
dispute over the extent of coverage under primary and excess policies brought by the post-
confirmation assignees of those policies.  The policies required arbitration in different foreign

58

jurisdictions, and the insurers argued that they would be prejudiced by disparate arbitration rulings on coverage between the excess and the primary carriers and a ruling by the bankruptcy court on the same issue. *Id.* at 761–66. The court granted the insurers' arbitration motions but stayed the arbitration proceedings "until after the issues as to coverage under the primary, excess, and second excess layers of [insurance] coverage are decided." *Id.* at 775–77. Because the issue in *Residential Capital* was the same in all the proceedings—the extent of coverage under certain policies—and there was one forum that could decide those issues, it made sense to have one court proceeding go forward instead of different arbitration proceedings. Further, the court's discussion in that case was also considering issues of *res judicata* and collateral estoppel in parallel, which as discussed below, are also questionable here.[26]

By comparison, the Debtor's only ostensible support for the stay on this point would be that a consensually confirmed plan is the mechanism by which piecemeal litigation and inconsistent judgments are avoided. The Court has already expressed its doubts on the likelihood of this happening, which stands in contrast to the outcome in *Residential Capital*, where the parties to the stayed litigation were provided a forum to actually litigate their disputes.

Finally, the Debtor's second argument that allowing litigation may lead to disparate results for plaintiffs in state court, and therefore have "cascading effects" on the bankruptcy by comparison to *Purdue* lacks merit. *Purdue Pharm.*, 2020 WL 4596869, at *17. *Purdue* did not mention plaintiffs racing against one another to obtain judgments as one of the "cascading effects" relevant in that case. Unsurprisingly, the Debtor does not actually analogize the facts of

---

[26] The Debtor also cites to *1031 Tax Grp.* again on this factor. But there, the Court did not expressly base any of its findings on the risk of inconsistent judgments factor, nor did it consider that there were common issues of fact or law that were necessary to adjudicate in the bankruptcy court (or elsewhere) before the stayed proceedings could proceed. *See 1031 Tax Grp.*, 397 B.R. at 684–86.

this case to *Purdue* and only cites it for the "cascading effects" quote.  Furthermore, in *Purdue*,

the injunction was imposed to protect a settlement structure with non-debtors that were

contributing to a plan with a largely consensual creditor constituency, where litigation against the

non-debtors threatened to frustrate their ability to contribute to the plan.  *Id.* at *16–17.  Like

many of Debtor's other cases, *Purdue* is distinguishable in this respect.  Debtor does not mention

*Purdue* or this argument again in its Reply.

       For these reasons, this factor does not weigh in favor of an injunction.

### d.   Collateral Estoppel and Res Judicata

       Next, the Debtor claims that if the State Court Actions are allowed to proceed, the Debtor

"faces substantial risks of collateral estoppel, record taint, and evidentiary prejudice."  (PI

Motion at 25.)  The Debtor cites to a number of cases for the principle that where litigation

against a non-debtor poses risks of collateral estoppel or *res judicata* (herein referred to as

"preclusive effects") for a debtor, courts are warranted in enjoining such litigation because it

would otherwise require the debtor to participate to defend against those risks.[27]

       Much like the previous factors, the Debtor is correct in its recitation of the principle, but

it provides no explanation how it actually applies here.  The Debtor simply states that the risks of

preclusive effects are high because: (1) "many theories of liability against both the DRVC and

the DRVC Related Parties are similar, resting on theories of negligent failure to supervise the

_____

[27]      *See Lomas Fin. Corp. v. Northern Tr. Co.* (*In re Lomas Fin. Corp.*), 117 B.R. 64, 67 (S.D.N.Y. 1990)
(affirming bankruptcy court finding of irreparable harm where debtor's key personnel would be forced to participate
in litigation to avoid the "threat of collateral estoppel" because "it is not possible for the debtor to be a bystander to a
suit which may have a $20 million issue preclusion effect against it in favor of a pre-petition creditor"); *Calpine*,
365 B.R. 401, 410 (Bankr. S.D.N.Y. 2006) (affirming bankruptcy court decision enjoining state court action against
surety of debtor where the action created the risk of collateral estoppel against the debtor); *LTL Mgmt., LLC v. Those
Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 638 B.R. 291, 317 (Bankr. D.N.J. 2022)
(staying claims against non-debtors arising from the same factual circumstances as claims against the debtor because
"the evidentiary record developed in continued litigation against the [non-debtors] could prejudice [the debtor]").

wrongdoers"; (2) "the relationship between the DRVC and the DRVC Related Parties." (PI

Motion at 26.) Neither of these explains how issues resolved (or not raised) in litigation against

the DRVC Related Parties will bind the Debtor or prevent the Debtor from raising such issues in

resolving the claims against it in the bankruptcy case.

Critically, and as the Committee points out, a party is not subject to collateral estoppel or

*res judicata* in actions where it is not a party, absent a privity-like relationship with a party to the

litigation.[28] The Committee is right. The Debtor has done nothing to controvert these principles

and recognizes that a privity-like relationship is necessary to give rise to such preclusive effects.

The problem for the Debtor is that it does not explain what privity-like relationships with

the DRVC Related Parties exist here. Every case cited by the Debtor in support on this factor

involves circumstances where the non-debtor subject to the litigation was an agent or employee

of the debtor or had agreements by which determinations of liability as to the non-debtor would

necessarily resolve issues of liability as to the debtor (like an indemnity or guaranty

agreement).[29] But the Debtor fails to point to any agreements with the DRVC Related Parties

here, or articulate how the alleged existence of any agency or employment relationships with the

---

[28]    Collateral estoppel only applies to matters "actually litigated and determined" against the party to be precluded. *Singleton Mgmt. v. Compere*, 673 N.Y.S. 2d 381, 384 (1st Dep't 1998). Likewise, *res judicata* or claim preclusion requires an identity of claims between a prior and current action and privity of parties. *See Gramatan Home Investors Corp. v. Lopez*, 414 N.Y.S. 2d 308, 311 (1979) ("[A] person may not be precluded from litigating issues resolved in an action in which that person was not a party."); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 591 F.3d 164, 172 (3d Cir. 2009) (stating that debtor "will not be bound by any judgment against the third party in question"); *Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984) ("Since Manville is not a party . . . , it could not be bound by res judicata or collateral estoppel."). This Court has previously recognized that *res judicata* and collateral estoppel do not generally apply to non-parties. *See 1031 Tax Grp.*, 397 B.R. at 685.

[29]    *See Lomas Fin. Corp.*, 117 B.R. at 66–67 (action for fraud against principals of debtor by debtor's lender); *LTL Mgmt., LLC*, 638 B.R. at 315 (concluding that preliminary injunction factors demonstrated balance of harms in favor of stay of talc claim litigation where the debtor's contractual "indemnification obligations [were] clearly established"), *rev'd*, 2023 U.S. App. LEXIS 2323 (3d Cir. Jan. 30, 2023) (petition dismissed and injunction rendered moot); *Calpine Corp.*, 354 B.R. at 50 (Bankr. S.D.N.Y. 2006) (granting stay of state court action against surety of debtor when such action created the risk of collateral estoppel because the liability of the surety was contingent on the debtor's liability).

DRVC Related Parties would be necessary to litigate, let alone binding in a proceeding that does

not include the Debtor.  Again, the Debtor simply points to Exhibits A and B to the Stephens

Direct, which while organizationally helpful in listing the allegations in the complaints and

answers in the State Court Actions, do not provide anything further to articulate this

connection.[30]  As was true for the indemnity factor, the Court is not requiring the Debtor to show

with certainty that any of these preclusive effects will in fact occur, but rather finds it necessary

to at least understand *how* they could occur before finding that there is a risk they will occur.

> As such, this factor does not weigh in favor of an injunction.

### e.   Distraction

> Finally, the Debtor argues that an injunction is warranted because allowing the State

Court Actions to proceed would require the Debtor to participate in the litigation and would

distract the Debtor from the reorganization process.  In both the PI Motion and Reply, the Debtor

cites several cases for the proposition that courts enjoin third party actions where the continued

litigation will distract the debtor's principals from the reorganization effort.  *Calpine Corp.*, 365

B.R. at 410 (affirming the grant of an injunction where stayed action would burden and distract

key employees from the restructuring effort); *Haw. Structural*, 2006 WL 3755175, at *5

(affirming decision granting injunction against the same debtor on similar grounds); *W.R. Grace*

*& Co.*, 386 B.R. at 34 (finding "litigation burdens" imposed by continued prosecution of 113

cases against debtor's related parties favored an injunction).  The Court refers to this as the

---

[30]     The Debtor's only other argument on this point is to attack the Committee's citation to *Queenie* that the "apprehension" of collateral estoppel is not a basis for enjoining litigation against non-debtors (*see* Opposition at 42–43 (citing *Queenie*, 321 F.3d at 287)), because *Queenie* was a case regarding the scope of the automatic stay. The Debtor is correct there, but this does nothing to fix the issue regarding their failure to establish any type of privity-like relationship that could lead to preclusive effects.

"distraction" argument.  Factually, the Debtor cites a few sources of distraction here that would

allegedly result from the Court refusing to impose a stay:

- The state court plaintiffs' lawyers will be distracted from participating in the reorganization if the stay is ended because there will be a race to litigate claims in state court.  (PI Motion ¶¶ 27–28.)

- The Debtor is a key repository for information, and it will have to assist in fielding document requests.  They note productions to counsel for individual claimants will be much more burdensome than the *en masse* productions that have been made to the Committee to date as a fiduciary of all creditors.  (PI Motion ¶ 27.)

- Specifically, "the same individuals at the Debtor who were involved in overseeing the State Court Actions—in particular, Thomas Renker, William Chapin, and Thomas Doodian—are responsible for the day-to-day process of the chapter 11 case."  (*Id.* (citing Moore Decl. ¶¶ 7–8; Stephens Dir. ¶¶ 40–44).)

- Before the stay, the Debtor was obligated to play a lead role in the State Court Actions "[g]iven the relationship between the DRVC and the DRVC Related Parties . . . and the fact that a majority of the allegations were directed at the Debtor . . . [I]f the 228 State Court Actions are allowed to resume, the Debtor expects it will have to participate in their defense in the same manner, given the related proofs of claim."  (Reply at 19–20.)

With respect to the first point, the Debtor cites no legal support for the notion that

distraction of *plaintiffs* in actions against non-debtors from participating in the reorganization is

relevant to this factor, which according to all precedents, focuses on the distraction to the debtor.

Furthermore, the Court is hesitant to accept Debtor's characterizations of the distractions facing

plaintiffs in the State Court Actions, who can presumably advocate for themselves, either

independently, or via the Committee.

The Court generally credits the Debtor's showing on the second and third points.  The

Debtor's witnesses, namely Mr. Stephens and Mr. Moore, provided testimony showing that the

Debtor will likely become subject to discovery demands based on its handling of certain

documentation for the DRVC Related Parties.  The Court also accepts that the same key

individuals that were involved with the State Court Actions originally may again have to devote time to actions like responding to discovery requests for State Court Actions, should they continue.  And similarly, the Court accepts that these same individuals are responsible for day-to-day processes of the Chapter 11 case.

On the fourth point, the Court partially credits the Debtor's argument that it will also have to exercise some oversight in the State Court Actions, beyond dealing with discrete obligations like responding to discovery requests.  Namely, because the parties in the State Court Actions may be developing factual arguments bearing on the Debtor's responsibility throughout the individual cases, the Court considers that it may be prudent and necessary to monitor such cases to understand the practical implications that they may have for the Debtor on related or similar claims.  Importantly, the Court accepts this as true even under the assumption that such cases will not result in indemnity claims against or preclusive effects for the Debtor.

However, the Court does not consider that the level of involvement will be as substantial as the Debtor suggests.  For instance, the Debtor claims that it will need to take a lead role and participate in the defenses in the State Court Actions "[g]iven the relationship between the DRVC and the DRVC Related Parties."  (Reply at 19–20.)  As explained above, the Debtor has not actually articulated any legal risks that would require an in-depth involvement in the cases as if it were advocating for its own rights and liabilities.  The Debtor otherwise fails to explain why its "relationship" with the DRVC Related Parties would necessitate an in-depth involvement with cases brought solely against the DRVC Related Parties.

Thus, the Court concludes that factually, the Debtor has established that allowing the State Court Actions to proceed may cause some cognizable harms to the Debtor in the abstract.

In turn, the Court now considers whether these harms constitute "irreparable harm" sufficient to warrant an injunction under Rule 65. The Court concludes that they do not for three reasons.

First and foremost, in relying exclusively on the distraction argument, most of the Debtor's cited precedent in favor of an injunction under section 105(a) is of little support. The Debtor has not succeeded in showing harm via any other argument under the section 105(a) factors, and the distraction argument is its final argument under those factors. In the majority of the cases that Debtor cites where injunctions have been imposed, courts have done so only after finding the existence of multiple factors besides the distraction of litigation. *See, e.g.*, *W.R. Grace & Co.*, 386 B.R. at 34 (noting that the non-debtor was named as an insured under the debtor's insurance policies and that allowing litigation to proceed would subject debtor to contractual indemnity claims). The Court considers that such cases are largely distinguishable and provide little support to Debtor.

Second, even in cases where courts have granted injunctions primarily based on the distractions of litigation against non-debtors, the debtors counterbalance their reliance on the distraction factor by making a clear showing that they have a reasonable likelihood of success. *See SVB Fin. Grp. v. UBS Sec. LLC (In re SVB Fin. Grp.)*, 2023 WL 2962212, at *7–8 (Bankr. S.D.N.Y. Apr. 14, 2023) (finding that debtor had a reasonable likelihood of success in the chapter 11 case and that litigation against non-debtors would negatively impact that likelihood by distracting key debtor personnel, and that a 120-day preliminary injunction was appropriate as a result); *Calpine Corp.*, 365 B.R. at 409–10 (citing *Haw. Structural*, 2006 WL 3755175 at *6). As discussed at length *supra*, the Debtor has failed to show a reasonable likelihood of success here. Moreover, the Debtor appears to concede that the chances of success here effectively hinge on the successful completion of the ongoing mediation. Therefore, to the extent that the

Debtor's requested range of relief extends beyond the completion of mediation, they are entirely without support in arguing that such harms threaten the likelihood of success.

Third and finally, even if the Court assumes that there is still some ostensible chance of success during the pendency of the mediation, the Debtor fails to show that the harms complained of will have an imminent and irreparable effect on those chances of success. Under the Rule 65 requirements for an injunction, the harm prong specifically requires the movant to show "imminent irreparable harm to the estate *in the absence of an injunction*." *SVB Fin. Grp.*, 2023 WL 2962212 at *5 (quoting *Purdue Pharm.*, 619 B.R. at 58) (emphasis added).

Without an injunction, it will likely take weeks or months before substantial efforts are required by the Debtor to oversee the State Court Actions or begin fielding discovery requests. Certainly no judgments in favor of the Survivors in those cases are imminent. And if the mediation is successful, which the Court certainly hopes occurs, all of this analysis could easily be mooted. To that end, this Opinion and Order contemplates allowing the parties to extend the stay if they consider that option to be to mutually beneficial for the ongoing mediation.

On the other hand, if the parties conclude mediation without mutually agreeing to any extensions, the Court believes it is time to permit the plaintiffs to move forward with their State Court Actions. In sum, the Court considers that none of the harms complained of will actually materialize while the case still has a conceivable chance of success.

### 3. Balance of the Harms

As illustrated above, the Debtor has offered multiple forms of harm facing it and the DRVC Related Parties. First, the Debtor claims that allowing the State Court Actions to proceed will not advance a "comprehensive, global resolution that compensates all survivors equitably." (Reply at 23.) The existence of this harm is questionable because it is not clear that the stay of

66

the actions has advanced this goal either.  Next, the Debtor also states that there will be harm to

DRVC Related Parties "who will be facing actual, enforceable judgments but who will be

prohibited by an order of this Court from accessing shared insurance proceeds they paid for."

(Reply at 23–24.)  While unequivocally shutting out the DRVC Related Parties from their

insurance proceeds could be quite harmful, this argument overlooks two points.  First, it ignores

the fact that insurance proceeds are protected by the automatic stay irrespective of how the Court

balances harm in deciding whether to impose an injunction.  Second and relatedly, it overlooks

the possibility that the DRVC Related Parties could seek relief in the form of a lift stay motion,

should they need to access the insurance proceeds for defense costs, to satisfy a judgment, or to

possibly reach a settlement.  *See, supra,* n.12.  Finally, the Debtor has not provided adequate

support showing that the risk of harms from adverse legal consequences in the State Court

Actions actually exist.

The only remaining alleged harm is the burden that the Debtor will bear in monitoring the

State Court Actions and participating in discovery.  As discussed above, this can clearly

constitute "harm," although the extent to which that harm warrants an injunction must be

considered alongside the other requirements for injunctive relief.

The Committee's alleged harms all center around the hardships imposed on individual

Survivors in the State Court Actions given the continued delay in their ability to litigate their

cases.  Specifically, they claim that:

- "[T]he Survivors' right to have their cases heard by a jury has been significantly delayed by a stay that has been in place for two and a half years; the injunction will impose further delay."

- "[M]any of the Survivors experienced sexual abuse decades ago and are elderly or ill, or both.  An injunction means some Survivors will never receive compensation or see the perpetrators of their sexual abuse held accountable.  At least six

67

Survivors have passed since the statutory window was expanded and others will
pass before their case is heard."

- "[L]itigation delays create a risk of further memory loss and lack of witnesses,
which increases the burden on Survivors to prove their claims and diminishes the
value of their claims."

- "[T]he Survivors have asserted direct claims against non-debtors, and a broad
injunction will prejudice the Survivors by precluding critical discovery from
solvent non-debtors."

(Opposition ¶ 104.)

The Committee cites persuasive precedent (including another diocesan bankruptcy) in
support of the notion that these are legitimate harms to consider in deciding whether to impose a
stay of litigation against non-debtors. *See Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068,
1076 (3d Cir. 1983) ("[T]he clear damage to the plaintiffs is the hardship of being forced to wait
for an indefinite and, if recent experience is any guide, a lengthy time before their causes are
heard . . . [P]laintiffs and crucial witnesses are dying . . ."); *Rochester*, 2022 Bankr. LEXIS 1469 at
*20–21 (finding that the balance of speculative harms to the Diocese weighed against the harms to
survivor-plaintiffs in connection with a proposed injunction favored survivor-plaintiffs for similar
reasons). Importantly, the Debtor does not contest that these harms do in fact exist.

As a result, the Court is in the position of weighing the inconvenience to Debtor in
participating in the litigation against the DRVC Related Parties versus these time-sensitive
concerns regarding the Survivors' ability to prosecute their cases. The Court finds that the
balance of harms weighs in favor of the Committee.[31]

---

[31]    To the extent Survivors recover against solvent and insured DRVC Related Parties, the Survivors could
recover 100% of their claims while the DRVC Related Parties may have indemnification or contribution claims
against the insolvent Debtor. This would likely mean that, at best, the DRVC Related parties would receive *pro rata*
distributions from the insolvent Debtor's estate. One can certainly ask who should bear the loss—the Survivors or
the DRVC Related Parties? The reality is likely to be more complicated—a Chaper11 plan would likely lead to
substantial payments to Survivors much sooner and with greater certainty.

The Court has already concluded above that the Debtor has failed to show that the litigation will have directly adverse consequences like dissipation of insurance proceeds, increased indemnity claims, inconsistent judgments, collateral estoppel, or *res judicata*. The only harm that the Debtor has shown to exist is the distraction of key personnel from litigation of the State Court Actions. The Court has also concluded, however, that such harm will neither be imminent nor irreparable in the circumstances of this case and the relief sought.

On the other side of the scale is the harm to the Survivors. For every day the injunction lasts, they are not only prevented from pursuing recovery on their claims, but their ability to prove their underlying case is weakened. For many Survivors, allowing time to pass means that they simply may not be able to recover either because the evidence for their case is lost, or because they themselves do not live long enough to press their claims. Importantly, these are claims they would be entitled to bring, if not for the stay in this case. It is clear that these harms to the Survivors become more significant with each passing day in this case, and in the past thirty months have eclipsed what is now a much more incidental—and certainly less consequential— harm for the Debtor, in having a limited role in participating in litigation against non-debtors.

In sum, the Debtor fails to show that the balance of hardships tilt in its favor.

### 4. Public Interest

Both parties essentially rehash their arguments for the other three requirements in arguing why the public interest is favored by the relief they seek. The Court finds that the public interest is not served by allowing the injunction to shield the DRVC Related Parties from litigation.

The Committee argues that the public interest aligns with the Survivors' interests, and it is in the Survivors' interest to litigate these cases given that a consensual resolution has not been reached in the bankruptcy case. The Committee cites to two other diocesan bankruptcy cases in

support of this proposition.  *See Rochester*, 2022 Bankr. LEXIS 1469 at *22; *In re Roman Catholic Bishop of Great Falls*, 584 B.R. 335, 340 n.7 (Bankr. D. Mont. 2018).

The Debtor argues that the Courts have long recognized the "unquestioned public interest in promoting a viable reorganization of the debtor." *A.H. Robins*, 788 F.2d at 1008; *In re Am. Film Techs.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) ("It is 'one of the paramount interests' of this court to assist the Debtor in its reorganization efforts.") (citation omitted).  And "[t]here is a strong public interest in avoiding the dissipation of corporate assets that rightfully should go to creditors or other stakeholders." *In re Soundview Elite Ltd.*, 543 B.R. 78, 118 n.210 (Bankr. S.D.N.Y. 2016); *see also In re Bailey Ridge Partners, LLC*, 571 B.R. 430, 439–40 (Bankr. N.D. Iowa 2017).  As such, the Debtor argues that the public interest favors preserving the status quo to allow mediation to move toward a global resolution for the compensation of all survivors.

The public interest is best served with both of these considerations in mind.  Because the Court has concluded that allowing the State Court Actions to proceed will not necessarily endanger the chances of a successful reorganization, the Court concludes that both of these aims, and thus the public interest, are best served by allowing the State Court Actions to proceed.

### C.  The Debtor's Modified Injunction Request in the Reply

In its Reply, the Debtor also requested that if the Court is not inclined to enter the preliminary injunction for the reasons above, that it enter a time-limited injunction that would allow the Debtor to file, and the District Court to consider, a motion under 28 U.S.C. § 157(b)(5) to transfer the State Court Actions to the District Court.

The Debtor claims that section 157(b)(5) reflects Congress' determination that personal injury claims related to a bankruptcy case are best resolved in a consolidated fashion in the District where the bankruptcy case is pending.  *See In re Pan Am Corp.*, 16 F.3d 513, 516 (2d

Cir. 1994).  The purpose of section 157(b)(5) is "to centralize the administration of the estate and

to eliminate the 'multiplicity of forums for the adjudication of parts of a bankruptcy case.'"  *A.H.*

*Robins Co.*, 788 F.2d at 1011 (quoting 130 Cong. Rec. H.7492, June 29, 1984, *reprinted in* 1984

1984 U.S. Code Cong. & Adm. News at 579).  The Debtor argues that centralizing cases under

section 157(b)(5) "increases the debtor's odds of developing a reasonable plan of reorganization

which will 'work a rehabilitation of the debtor and at the same time assure fair and non-

preferential resolution of the . . . claims.'"  *Dow Corning*, 86 F.3d at 496 (quoting *A. H. Robins*

*Co.*, 788 F.2d at 1011)).

The Debtor states that if the State Court Actions move forward, it would move promptly

to consolidate the State Court Actions in the District Court, where they can be litigated in

coordination with this Court's adjudication of the proofs of claim, to preserve assets for victims,

rationalize the litigation of claims against it, and avoid duplicative litigation over proofs of claim

and CVA cases.  The Debtor argues that if nothing else, a preliminary injunction is at least

warranted to permit the District Court to resolve this motion, to save the parties and state courts

the time and expense litigating cases that may end up being transferred to a federal forum.  The

Court disagrees.  The Committee agrees that the State Court Actions that name the Debtor as a

defendant will remain stayed.  Therefore, the focus then is on those State Court Actions that only

name DRVC Related Parties as defendants.[32]

---

[32]    Removal of cases that are related-to bankruptcy cases is governed by 28 U.S.C. § 1452(a).  While such
cases are removed to the district court, the removed cases are generally referred to the bankruptcy court under 28
U.S.C. § 157(a) and the district court's Order of Reference.  Removed cases may be subject to remand under 28
U.S.C. § 1452(b).  If a bankruptcy court grants a remand motion of related-to actions, the bankruptcy court may
need to issue proposed findings of fact and conclusions of law with any final order for remand entered by the district
court.  *See, e.g., Bayerische Landesbank v. Deutsche Bank AG (In re Residential Capital, LLC)*, 488 B.R. 565
(Bankr. S.D.N.Y. 2013).

The Debtor completely fails to show that an injunction is warranted beyond the completion of mediation.  It similarly fails to show that an injunction is warranted to transfer or remove the State Court Actions simply for the sake of providing the DRVC Related Parties more breathing room.

## IV.    Subject Matter Jurisdiction

The Committee originally argued that the Debtors failed to establish that the Court had subject matter jurisdiction to enter an injunction enjoining litigation of the State Court Actions. The Committee did not press the arguments at the PI Hearing.  (*See* April 20, 2023 Hr'g Tr. 66:16–20.)  The issue is now ultimately moot, having concluded that an injunction is not warranted on the merits under section 105(a).  As a result, the Court need not decide the issue.

The Debtors have made a sufficient showing such that the Court was permitted to consider the merits of the application for an injunction pursuant to section 105(a).  The Debtor correctly states that the Court has jurisdiction over all litigation that "could conceivably have any effect upon the [debtors'] estate being administered*." In re Robert Plan Corp.*, 777 F.3d 594, 597 (2d Cir. 2015) (quoting *In re Turner*, 724 F.2d 338, 341 (2d Cir. 1983) (Friendly, J.))

Specifically, with respect to shared insurance, the Debtor cites to several cases from other circuits that have found "related to" jurisdiction where a non-debtor defendant and a debtor shared joint-insurance policies subject to "possible depletion."[33]  The law in this Circuit is in accord.  *See Quigley*, 676 F.3d at 53–54 (holding that bankruptcy court had subject matter

---

[33]    *See Dow Corning Corp.*, 86 F.3d 482, 495 (6th Cir. 1996); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1001 (4th Cir. 1986) (court had "related to" jurisdiction when suit against non-debtor officer insured by joint insurance policy); *In re Zale Corp.*, 62 F.3d 746, 758–59 (5th Cir. 1995) (concluding that, where disputes regarding an insurance policy can have an effect on a debtor's estate, the bankruptcy court has "related to" jurisdiction over non-debtors' claims against the insurer); *In re Titan Energy, Inc.*, 837 F.2d 325, 329 (8th Cir. 1988) (noting that the scope of a products liability insurance policy affects the size of a debtor's estate for distribution).

jurisdiction to enter injunction over litigation against non-debtor, where non-debtor was a co-insured with the debtor). While this Opinion and Order ultimately concluded that the actions challenged by the Debtor did not warrant an injunction under section 105(a), the Court considers that such actions could still "conceivably have [an] effect" under the lower bar for establishing subject matter jurisdiction. The Court considers that the same is true with respect to Debtor's arguments regarding the distraction of the Debtor's key personnel. *See SVB Fin. Grp.*, 2023 WL 2962212 at *5 (finding that the court had subject matter jurisdiction to enjoin actions based on the distraction to debtor's key personnel that were involved in reorganization efforts).

## V.    CONCLUSION

For the reasons set forth above, the Court **DENIES** the relief requested by the Debtor pursuant to its PI Motion. The existing stay shall remain in effect for fourteen (14) days during which time the parties shall submit an Order consistent with this Opinion. The Court continues to believe that the parties should "keep their powder dry," continuing a consensual stay in place while mediation goes forward, but the Court will await a proposed Order from the parties. If the parties can't agree on the terms of the proposed Order, they may each submit separate drafts and the Court will promptly resolve the matter and enter an Order.

**IT IS SO ORDERED.**

Dated:    June 1, 2023
          New York, New York

                                   *Martin Glenn*
                                   MARTIN GLENN
                        Chief United States Bankruptcy Judge